## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| THE ESTATE OF GENE B. LOKKEN, GLENNETTE KELL, DARLENE BUCKNER, CAROL CLEMENS, FRANK CHESTER PERRY, THE ESTATE OF JACKIE MARTIN, JOHN J. WILLIAMS, AS TRUSTEE OF THE MILES AND CAROLYN WILLIAMS 1993 FAMILY TRUST, and WILLIAM HULL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITEDHEALTH GROUP, INC., UNITEDHEALTHCARE, INC., NAVIHEALTH, INC., and DOES 1-50, inclusive,<br><br>Defendants. | Civil File No. 23-cv-3514 (JRT/DTS)<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

### PLAINTIFFS' CLASS ACTION COMPLAINT

Plaintiffs, the Estate of Gene B. Lokken, Glennette Kell, Darlene Buckner, Carol Clemens, Frank Chester Perry, the Estate of Jackie Martin, John J. Williams, as Trustee of the Miles and Carolyn Williams 1993 Family Trust, and William Hull ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" or "Classes"), by and through their attorneys, bring this class action against Defendants UnitedHealth Group, Inc., UnitedHealthcare, Inc., naviHealth, Inc., and Does 1-50, inclusive (collectively, "Defendants" or "UnitedHealthcare") and allege as follows:

1

## INTRODUCTION

1.      This putative class action arises from Defendants' illegal deployment of artificial intelligence (AI) in place of real medical professionals to wrongfully deny elderly patients care owed to them under Medicare Advantage Plans by overriding their treating physicians' determinations as to medically necessary care based on an AI model that Defendants know has a 90% error rate.

2.      Despite the high error rate, Defendants continue to systemically deny claims using their flawed AI model because they know that only a tiny minority of policyholders (roughly 0.2%)[1] will appeal denied claims, and the vast majority will either pay out-of-pocket costs or forgo the remainder of their prescribed post-acute care. Defendants bank on the patients' impaired conditions, lack of knowledge, and lack of resources to appeal the erroneous AI-powered decisions.

3.      The fraudulent scheme affords Defendants a clear financial windfall in the form of policy premiums and federal funding without having to pay for promised care, while the elderly are prematurely kicked out of care facilities nationwide or forced to deplete family savings to continue receiving necessary medical care, all because an AI model "disagrees" with their real live doctors' determinations.

4.      Defendant UnitedHealth Group, Inc. is the nation's largest insurance company.[2] It had an operating income of $32 billion in 2023. UnitedHealthcare, Inc., the

---

[1] Karen Pollitz, et al., *Claims Denials and Appeals in ACA Marketplace Plans in 2021*, KFF (Feb. 9, 2023) https://www.kff.org/private-insurance/issue-brief/claims-denials-and-appeals-in-aca-marketplace-plans/ (last visited Nov. 13, 2023).

[2]      *UnitedHealth Group*, FORTUNE (Aug. 2, 2023), https://fortune.com/company/unitedhealth-group/global500/ (last visited Nov. 13, 2023).

insurance arm of UnitedHealth Group, Inc., provides health insurance plans for 52.9 million Americans.[3]

5.      Defendants state that their "mission" is "to help people live healthier lives and make the health system work better for everyone."[4] In reality, Defendants systematically deploy an AI algorithm to prematurely and in bad faith discontinue payment for healthcare services for elderly individuals with serious diseases and injuries. These healthcare services are known as post-acute care.

6.      Defendants' AI Model, known as "nH Predict," determines Medicare Advantage patients' coverage criteria in post-acute care settings with rigid and unrealistic predictions for recovery.[5] Relying on the nH Predict AI Model, Defendants purport to predict how much care an elderly patient "should" require, regardless of real doctors' determinations as to the amount of care a patient in fact requires to recover. As such, Defendants make coverage determinations not based on individual patient's needs, as required, but based on the outputs of the nH Predict AI Model, resulting in the inappropriate denial of necessary care prescribed by the patients' doctors. Defendants' implementation of the nH Predict AI Model resulted in a significant increase in the number of post-acute care coverage denials.

---

[3] *Id.*

[4] *About us*, UNITEDHEALTHCARE. https://www.uhc.com/about-us (last visited Nov. 13, 2023).

[5] Casey Ross and Bob Herman, *Denied by AI: How Medicare Advantage plans use algorithms to cut off care for seniors in need*, STAT (Mar. 13, 2023), https://www.statnews.com/2023/03/13/medicare-advantage-plans-denial-artificial-intelligence/ (last visited Nov. 13, 2023).

7.     Defendants intentionally limit their employees' discretion to deviate from the nH Predict AI Model predication by setting up targets to keep stays at skilled nursing facilities within 1% of the days projected by the AI Model.[6] Employees who deviate from the nH Predict AI Model projections are disciplined and terminated, regardless of whether a patient requires more care.[7]

8.     The nH Predict AI Model saves Defendants hundreds of millions of dollars by allowing them to deny claims they are obligated to pay and otherwise would have paid by eliminating or reducing the labor costs associated with paying doctors and other medical professionals for the time needed to conduct an actual and individualized, manual review of each of its insured's claims.

9.     Defendants also utilize the nH Predict AI Model to aggressively deny coverage because they know they will not be held accountable for wrongful denials.

10.     In many instances, Defendants purposefully shift the financial responsibilities of funding post-acute care of their insureds to American taxpayers. In their coverage denial letters, Defendants inform patients who qualify for traditional Medicare that their coverage is being denied solely due to their Medicare eligibility. Defendants direct these patients to enroll in the government-subsidized Medicare program while using

---

[6] Casey Ross and Bob Herman, *UnitedHealth used algorithms to deny care, staff say*, STAT (Nov. 14, 2023), https://www.statnews.com/2023/11/14/unitedhealth-algorithm-medicare-advantage-investigation/#:~:text=The%20nation's%20largest%20health,a%20STAT%20investigation%20has%20found.

[7] *Id.*

4

AI to make meritless coverage determinations that are not based on the patients' medical need.

11.     Plaintiffs and Class members had their post-acute care coverage wrongfully terminated or denied entirely by Defendants using the nH Predict AI Model. Defendants failed to use reasonable standards in evaluating the individual claims of Plaintiffs and Class members and instead allowed their medical needs to be wholly determined by AI.

12.     By engaging in this misconduct, Defendants breached their fiduciary duties, including their duties of good faith and fair dealing, because their conduct serves Defendants' own economic self-interest, violates the company's representations and the law, and elevates Defendants' interests above the interests of the insureds.

13.     By bringing this action, Plaintiffs seek to remedy Defendants' past improper and unlawful conduct by recovering damages to which Plaintiffs and the Class are rightfully entitled and enjoin Defendants from continuing to perpetrate its scheme against its Medicare Advantage insureds.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d)(2). This is a class action in which there is a diversity of citizenship between at least one Plaintiff Class member and one Defendant; the proposed Classes each exceed one hundred members; and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs.

15.     In addition, under 28 U.S.C. §1367, this Court may exercise supplemental jurisdiction over the state law claims because all claims are derived from a common

nucleus of operative facts and are such that Plaintiffs and Defendants would ordinarily expect to try them in one judicial proceeding.

16.     This Court has personal jurisdiction over Defendants because Defendants are headquartered in Minnesota, have sufficient minimum contacts with Minnesota, and otherwise purposefully avail themselves of the benefits and protections of Minnesota law, so as to render the exercise of jurisdiction by this Court proper and consistent with traditional notion of fair play and substantial justice.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391. Defendants regularly conduct business in this District, and a substantial part of the events giving rise to the claims asserted herein occurred in this District. Defendants United Health Group and United Healthcare are residents of this District, being headquartered at 9800 Health Care Ln, Minnetonka, MN.

## THE PARTIES

18.     **Plaintiff the Estate of Gene B. Lokken.** Gene B. Lokken, deceased, was at all times relevant to this action a citizen of Wisconsin, residing in Lincoln County. At all relevant times mentioned herein, Mr. Lokken was covered by a Medicare Advantage Plan policy provided by Defendants.

19.     **Plaintiff Glennette Kell.** Glennette Kell was at all times relevant to this action a citizen of Oregon, residing in Lincoln County. At all relevant times mentioned herein, Mrs. Kell was covered by a Medicare Advantage Plan policy provided by Defendants.

6

20.     **Plaintiff Darlene Buckner**. Darlene Buckner was at all times relevant to this action a citizen of Wisconsin, residing in Dane County. At all relevant times mentioned herein, Mrs. Buckner was covered by a Medicare Advantage Plan policy provided by Defendants.

21.     **Plaintiff Carol Clemens**. Carol Clemens was at all times relevant to this action a citizen of Minnesota, residing in Olmstead County. At all relevant times mentioned herein, Mrs. Clemens was covered by a Medicare Advantage Plan policy provided by Defendants.

22.     **Plaintiff Frank Chester Perry**. Frank Chester Perry was at all times relevant to this action a citizen of California, residing in Los Angeles County. At all relevant times mentioned herein, Mr. Perry was covered by a Medicare Advantage Plan policy provided by Defendants.

23.     **Plaintiff the Estate of Jackie Martin**. Jackie Martin was at all times relevant to this action a citizen of Tennessee, residing in Sullivan County. At all relevant times mentioned herein, Mr. Martin was covered by a Medicare Advantage Plan policy provided by Defendants.

24.     **John J. Williams, as Trustee of the Miles and Carolyn Williams 1993 Family Trust.** John Williams and Carolyn Williams were at all times relevant to this action citizens of California, residing in Sonoma County. At all times mentioned herein, Carolyn Williams was covered by a Medicare Advantage Plan policy provided by Defendants.

25. **Plaintiff William Hull**. William Hull was at all times relevant to this action a citizen of California, residing in Orange County. At all relevant times mentioned herein, Mr. Hull was covered by a Medicare Advantage Plan policy provided by Defendants.

26. **Defendant UnitedHealth Group, Inc. ("UnitedHealth Group").** UnitedHealth Group is a Delaware corporation, headquartered at 9800 Health Care Ln, Minnetonka, MN 55343. UnitedHealth Group conducts insurance operations throughout the country, representing to consumers that UnitedHealth Group and its subsidiaries "help people live healthier lives and help make the health system work better for everyone."[8] UnitedHealth Group has a license to use the federally registered service mark "UNITEDHEALTH GROUP," markets and issues health insurance and insures, issues, administers, and makes coverage and benefit determinations related to the health care policies nationally through its various wholly owned and controlled subsidiaries, controlled agents and undisclosed principals and agents, including Defendants UnitedHealthcare, Inc. and naviHealth, Inc. Defendant UnitedHealth Group is licensed and registered to conduct business in all 50 states, and does conduct business in all 50 states, and is thereby subject to the laws and regulations of all 50 states.

27. **Defendant UnitedHealthcare, Inc. ("UnitedHealthcare").** UnitedHealthcare, incorporated in Delaware, is a wholly owned subsidiary of Defendant UnitedHealth Group, Inc., with its principal place of business at 9800 Health Care Ln, Minnetonka, MN 55343. Defendant UnitedHealthcare markets and issues health insurance

---

[8] *Priorities for advancing a modern health system*, UNITEDHEALTH GROUP, https://www.unitedhealthgroup.com/driven-by-our-mission/what-we-do.html (last visited Nov. 13, 2023).

and insures, issues, administers, and renders coverage and benefit determinations related to the health care policies. Defendant UnitedHealthcare is licensed and registered to conduct business in all 50 states, and does conduct business in all 50 states, and is thereby subject to the laws and regulations of all 50 states.

28.    **Defendant naviHealth, Inc. ("naviHealth").** naviHealth, incorporated in Delaware, is a wholly owned subsidiary of Defendant UnitedHealth Group, with its principal place of business at 210 Westwood Pl #400, Brentwood, TN 37027. naviHealth developed its algorithm nH Predict in response to the enactment of the Affordable Care Act in 2010.[9] The creator of the nH Predict AI Model specifically intended for it to save insurance companies money in the post-acute care setting, which had previously been a highly unprofitable aspect of Medicare services.[10] UnitedHealth Group acquired naviHealth in 2020 for $2.5 billion.[11]

29.    In addition to the Defendants named above, Plaintiffs sue fictitiously named **Defendants Does 1 through 50**, inclusive, pursuant to Section 474 of the California Civil Procedure, because their names, capacities, status, or facts showing them to be liable to Plaintiffs are not presently known. Plaintiffs are informed and believe, and based upon allege, that each of the fictitiously named Defendants are responsible in some manner for the conduct alleged herein. Plaintiffs will amend this complaint to show these Defendants'

---

[9] Casey Ross and Bob Herman, *Denied by AI: How Medicare Advantage plans use algorithms to cut off care for seniors in need*, STAT (Mar. 13, 2023), https://www.statnews.com/2023/03/13/medicare-advantage-plans-denial-artificial-intelligence/ (last visited Nov. 13, 2023).
[10] *Id*.
[11] *Id*.

true names and capacities, together with appropriate charging language, when such information has been ascertained.

## FACTUAL ALLEGATIONS

### A. Background

30.    Defendant UnitedHealthcare offered and sold Medicare Advantage health insurance plans to consumers, including Plaintiffs and Class members.

31.    A Medicare Advantage plan is a type of health plan offered by private companies that contract with Medicare. Medicare Advantage is a taxpayer-funded alternative to traditional Medicare that covers 30.8 million people.[12] Medicare Advantage accounts for more than half (51 percent) of the eligible Medicare population, and $454 billion (or 54 percent) of total federal Medicare spending.[13]

32.    Plaintiffs and Class members enrolled with Defendants to receive Medicare Advantage health insurance coverage. Defendants provided Plaintiffs and members of the Class with written terms explaining the plan coverage UnitedHealthcare offered to them. According to these terms, Defendants are obligated to provide benefits for covered health services and must pay all reasonable and medically necessary expenses incurred by a covered member.

33.    From at least November 14, 2019, to the present (the "Relevant Period"), Plaintiffs and Class members were referred to or received "post-acute care"—medically

---

[12] Nancy Ochieng, et al., *Medicare Advantage in 2023: Enrollment Update and Key Trends*, KFF (Aug. 9, 2023), https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2023-enrollment-update-and-key-trends/ (last visited Nov. 13, 2023).
[13] *Id.*

necessary care for patients recovering from serious illnesses and injuries. Post-acute care is covered by the terms of their insurance agreements provided by Defendants.

34. Post-acute care encompasses skilled care, therapy, and other services provided by home health agencies (HHAs), skilled nursing facilities (SNFs), inpatient rehabilitation facilities (IRFs), and long-term care hospitals (LTCHs), collectively known as post-acute care (PAC) providers because they typically furnish care after an inpatient hospital stay.

35. Medicare Advantage providers use a prospective payment system for each type of PAC provider. Under this system, insurers pay PAC providers an upfront fee that is based on estimates of the national average cost of providing covered care for a specified period of time.

36. Due to the nature of the prospective payment system, insurers' coverage decisions occur before or during a patient's post-acute care. When the insurer decides to end coverage before the doctor's requested discharge date for the patient, the patients are left with an impossible choice: to either forgo their post-acute care despite not being well enough to function without it or to pay out-of-pocket to continue receiving care they were wrongfully denied.

37. Other patients are denied coverage before they receive any post-acute care. When patients are referred to post-acute care facilities by their doctors, Defendants use the nH Predict AI Model to deny prior authorization requests, regardless of the patients' actual conditions or doctors' recommendations.

38.     Defendants have deliberately created a process that systematically fails to have a doctor determine individual coverage for post-acute care in a thorough, fair, and objective manner, instead using the nH Predict AI Model to supplant real doctors' recommendations and patients' medical needs. Defendants' use of the nH Predict AI Model, which directs Defendants' medical review employees to prematurely stop covering care without considering an individual patient's needs, is systematic, illegal, malicious, and oppressive.[14]

39.     The nH Predict AI Model attempts to predict the amount of post-acute care a patient "should" require, pinpointing the precise moment when Defendants will cut off payment for a patient's treatment. If the nH Predict AI Model determines the patient shouldn't require any post-acute care, it recommends denial of prior authorization. The nH Predict AI Model purports to compare a patient's diagnosis, age, living situation, and physical function to similar patients in a database of six million patients it compiled over the years of working with providers to predict patients' medical needs, estimated length of stay, and target discharge date.[15]

---

[14] Casey Ross and Bob Herman, *Denied by AI: How Medicare Advantage plans use algorithms to cut off care for seniors in need*, STAT (Mar. 13, 2023), https://www.statnews.com/2023/03/13/medicare-advantage-plans-denial-artificial-intelligence/ (last visited Nov. 13, 2023).

[15]     https://www.statnews.com/2023/03/13/medicare-advantage-plans-denial-artificial-intelligence/ (last visited Nov. 13, 2023.)

40.     The following is a true and correct representation of a sample nH Predict

Outcome sheet, taken from a naviHealth presentation:[16]



41.     Defendants wrongfully delegate their obligation to evaluate and investigate claims to the nH Predict AI Model in breach of the insurance agreement. The nH Predict AI Model spits out generic recommendations that fail to adjust for a patient's individual circumstances.

42.     Upon information and belief, the nH Predict AI Model applies rigid criteria from which Defendants' employees are instructed not to deviate. The employees who deviate from the nH Predict AI Model prediction are disciplined and terminated, regardless of whether the additional care for a patient is justified.

43.     Due to Defendants' wrongful use of the nH Predict AI Model, patients rarely stay in a nursing home more than 14 days before they start receiving payment denials.[17]

44.     Upon information and belief, the outcome reports generated by nH Predict are rarely, if ever, communicated with patients or their doctors. When patients and doctors request their nH Predict reports, Defendants' employees deny their requests and tell them that the information is proprietary.

45.     Denials issued by Defendants are appealable to Quality Improvement Organizations ("QIOs"), independent third-party organizations established to review claims determinations, per the Medicare Act. These QIOs can overturn denials and reinstate benefits in individual cases. There is, therefore, no way for any individual patient

---

[16] *NaviHealth Guiding the Way – Animated Explainer*, ECG PRODUCTIONS https://www.ecgprod.com/navihealth-guiding-the-way-animated-explainer/ (last visited Nov. 13, 2023).

[17] Casey Ross and Bob Herman, *Denied by AI: How Medicare Advantage plans use algorithms to cut off care for seniors in need*, STAT (Mar. 13, 2023) https://www.statnews.com/2023/03/13/medicare-advantage-plans-denial-artificial-intelligence/ (last visited Nov. 13, 2023).

to understand the actual basis for Defendants' refusal to pay and there is no way for any individual patient to challenge the systematic process that leads to that refusal.

46.     Defendants' scheme relies on most patients not understanding the actual basis for the denial and, therefore, not using the administrative process to appeal denial decisions. The Medicare Act appeals process contains five stages: (1) presenting the claim to the insurer; (2) appeal to a QIO; (3) reconsideration by the same QIO; (4) a hearing before an administrative law judge (ALJ); (5) a hearing before the Medicare Appeals Council.

47.     Upon information and belief, over 90 percent of patient claim denials are reversed through either an internal appeal process or through federal Administrative Law Judge (ALJ) proceedings. Additionally, over 80% of prior authorization request denials are reversed on appeal.[18] This demonstrates the blatant inaccuracy of the nH Predict AI Model and the lack of human review involved in the coverage denial process. This also indicates a systemic problem that cannot be remedied in any individual case.

48.     Defendants also punish successful appeals by immediately requesting updated medical records for patients who won their appeals. This enables Defendants to restart the process—i.e., automatic claim denials that the patient is required to appeal.

49.     Defendants instruct their employees to issue a new denial letter immediately following each successful appeal, forcing the patient to re-start the appeals process from the beginning.  The goal is to force the patient into this cycle until the patient either gives

_____

[18] *Examining Health Care Denials and Delays in Medicare Advantage Before the Permanent Subcommittee on Investigations*, 118th Cong. (2023) (statement of Sen. Richard Blumenthal, Chairman, Permanent Subcommittee on Investigations).

up and decides not to appeal further, fails to submit an appeal in the required time, or an appeal is decided in Defendants' favor.

50.     Plaintiffs' use of this appeals system is generally futile. Under the Medicare Act, the decisionmakers on appeal only have the authority to reinstate benefits—they lack the authority to enjoin Defendants from abusing the nH Predict AI Model to make coverage determinations, which is a part of the relief sought by Plaintiffs. Additionally, even if Plaintiffs succeed on any individual appeal, Defendants' policy of immediately issuing another denial deprives Plaintiffs of the opportunity to receive any meaningful additional care.

51.     If Plaintiffs were required to exhaust their administrative remedies before bringing this action in court, they would suffer irreparable harm. To reach the highest level of appeal before the Medicare Appeals Council often takes years.[19] While waiting for a decision, Plaintiffs would be left with two options: (1) to stay in the facility and risk being responsible for months' or years' worth of medical bills if their appeals are denied; or (2) to forgo care while they wait for a decision to be made on their appeals. Plaintiffs are elderly people who have suffered serious medical traumas. If they opt to forgo care while waiting for a decision on appeal, they risk further serious injury or death. For example, Plaintiff Jackie Martin passed away only three days after returning home following Defendants' denial. Plaintiff Carol Clemens suffered a second stroke six days after

---

[19] Casey Ross and Bob Herman, *Denied by AI: How Medicare Advantage plans use algorithms to cut off care for seniors in need*, STAT (Mar. 13, 2023) https://www.statnews.com/2023/03/13/medicare-advantage-plans-denial-artificial-intelligence/ (quoting Chris Comfort, COO of Calvary Hospital, as stating that the appeals process lasts up to 2.5 years, often leading to appeals that "outlast[] the beneficiary.").

returning home following Defendants' denial. Plaintiffs Lokken and Tetzloff passed away while their appeals were pending.

52.    If Plaintiffs were required to exhaust their appeals before bringing this action in court, Defendants' misconduct would be capable of repetition while evading review. Defendants know that if patients are required to exhaust their remedies, they need only pay the relatively small claims appealed before they reach the highest level of appeal, and their systemic misconduct would never be reviewable in court.

53.    Roughly 0.2% of consumers appeal their health insurance claim denials.[20] Far fewer pursue their appeal to the third level, before an administrative law judge. Upon information and belief, when somebody has an appeal before an ALJ, Defendants intentionally do not contest the appeal—Defendants usually either default or agree to pay the claims. By agreeing to pay the claims of far less than 0.2% of consumers, Defendants ensure that no claims make it to the Medicare Appeals Council, and thus nobody exhausts their administrative remedies. In this way, Defendants ensure that if patients are required to exhaust their administrative remedies, they will be able to fraudulently review and deny well over 99% of claims without their misconduct being reviewable in court.

54.    Defendants fraudulently misled their insureds into believing that their health plans would individually assess their claims.

55.    Had Plaintiffs and Class members known that Defendants would evade the legally required process for reviewing patient claims and instead delegate that process to

---

[20] Karen Pollitz, et al., *Claims Denials and Appeals in ACA Marketplace Plans in 2021*, KFF (Feb. 9, 2023) https://www.kff.org/private-insurance/issue-brief/claims-denials-and-appeals-in-aca-marketplace-plans/ (last visited Nov. 13, 2023).

its nH Predict AI Model to review and deny claims, they would not have enrolled with Defendants and/or would not have paid for their plan the amount they had to pay to be enrolled. Defendants' use of the nH Predict AI Model to deny its insureds' claims undermines the principles of fairness and meaningful claim evaluation, which insureds expect from their insurers.

### B. Plaintiff the Estate of Gene B. Lokken

56.     Plaintiff, the Estate of Gene B. Lokken, represents the interests of Gene B. Lokken, deceased. During the relevant period, Mr. Lokken was enrolled in the Medicare Advantage Plan provided by Defendants.

57.     On or around May 5, 2022, 91-year-old Mr. Lokken fell at home and fractured his leg and ankle. He was admitted to the Aspirus Tomahawk Hospital.

58.     Prior to discharge from the hospital, Mr. Lokken's doctor recommended that Mr. Lokken be admitted to Aspirus hospice care because his health began to deteriorate.

59.     On or around May 11, 2022, Mr. Lokken was admitted to Tomahawk Health Services ("THS") as a hospice resident. Mr. Lokken was very weak, not communicative, and in constant pain from his fractured leg and ankle.

60.     After a month of skilled nursing care with no physical activity, because his fractured leg and ankle were still healing, Mr. Lokken began to show signs of mental and medical improvement.

61.     On or around June 24, 2022, Mr. Lokken's orthopedic doctor assessed his fractured leg, removed a splint, and placed him into a removable ankle boot. The doctor

indicated that physical therapy could start working with Mr. Lokken weight bearing as tolerated for ambulation and transfers as long as the boot was on at all times.

62.     Initial visits to physical therapy began over the next two to three weeks. The physical therapists indicated that Mr. Lokken was slowly building his strength and mobility, but continued intensive physical therapy was medically necessary.

63.     From July 1, 2022, to July 20, 2022, Defendants covered the cost of Mr. Lokken's post-acute care at THS. However, on or around July 20, 2022, Defendants terminated Mr. Lokken's coverage, explaining, "More inpatient days at the skilled nursing facility are not medically necessary. A safe discharge plan has been recommended."

64.     Defendants' denial of coverage dumbfounded Mr. Lokken and his treating physician because Mr. Lokken was still recovering from the fall and had only been receiving physical therapy for two and a half weeks. Mr. Lokken's muscles lacked strength after a month of physical inactivity, and he was learning again to balance while being fully weight-bearing.

65.     Medical records submitted to Defendants for review indicated that Mr. Lokken was not ready to go home. Specifically, the physical therapist's notes stated, "Neuromuscular: Decreased movement/mobility. Musculoskeletal: Paralysis/Weakness." However, Defendants did not review these records when deciding whether Mr. Lokken required additional post-acute care.

66.     Mr. Lokken and his family immediately appealed the Defendants' decision to deny coverage. On or around August 1, 2022, Mr. Lokken received a letter from Defendants stating that his appeal was rejected. In the letter, Defendants explained that

there were no acute medical issues because the patient was self-feeding and required minimal help for hygiene and grooming. This determination went against the physical therapist's recommendation and notes describing Mr. Lokken muscle functions as paralyzed and weak.

67.     Mr. Lokken and his family continued to vigorously appeal Defendants' denial of coverage. But Defendants refused to cover the treatment, repeatedly and wrongfully denying Mr. Lokken's coverage for his medically necessary needs.

68.     Mr. Lokken's family had no choice but to pay out of pocket to continue providing care for Mr. Lokken.

69.     Mr. Lokken's out-of-pocket expenses during his stay at the skilled nursing facility amounted to $12,000-$14,000 per month from July 2022 until July 2023.

70.     Mr. Lokken remained in the skilled nursing facility until he passed away on July 17, 2023.

**C. Plaintiff Glennette Kell**

71.     Plaintiff Glennette Kell is enrolled in a Medicare Advantage plan with Defendants. She pays a monthly premium of $130.00 for that plan.

72.     On or around August 24, 2023, Mrs. Kell was badly injured when she hyperextended her left knee after a fall, requiring emergency surgery. Her left knee had an artificial joint which was damaged by the hyperextension, severely damaging an artery in the back of her leg.

73.    On or around August 26, 2023, Mrs. Kell was admitted to the Legacy Emanuel Medical Center in Portland, Oregon and underwent emergency surgery on her left leg.  A fixator and four pins were installed in Mrs. Kell's leg, immobilizing it.

74.    On or around August 30, 2023, Mrs. Kell was discharged from the hospital, and her doctor referred her to the Regency Gresham Nursing and Rehab Center ("Regency Gresham"), to receive post-acute care for approximately three months.

75.    On August 30, Mrs. Kell was admitted to the Regency Gresham and began to receive care.

76.    On or around September 14, 2023, only two weeks after Mrs. Kell was admitted to the Regency Gresham, Defendants notified her that her coverage was being denied starting September 16, 2023.

77.    Upon receiving her denial, Mrs. Kell appealed the decision to KePRO, a QIO. On September 27, 2023, KePRO granted her appeal, finding that "ending skilled nursing services [was] not appropriate," and reinstating her coverage.

78.    On September 26, 2023, the day before KePRO granted Mrs. Kell's appeal, Mrs. Kell received a second denial letter from Defendants. This time, Defendants were denying Mrs. Kell's coverage for the period after the initial denial that KePRO reversed. The denial letter claimed that skilled nursing services were not medically necessary. Defendants issued the second denial letter before KePRO had issued a written notice reversing Defendants' initial denial of coverage.

79.    On October 5, 2023, Mrs. Kell was again notified that Defendants were denying care. Defendants again claimed the care was not medically necessary.

80.     Mrs. Kell again appealed Defendants' denial of her coverage to KePRO.

81.     On October 10, 2023, KePRO, despite finding that skilled nursing care was medically necessary the day after the second denial letter was issued, denied Mrs. Kell's appeal, finding skilled nursing care no longer necessary.

82.     At the time Defendants denied Mrs. Kell's medical coverage, she could not walk and was not in a physical state to return home safely. Her leg was immobilized by the fixator, requiring another surgery before she could walk. As a result of Defendants' denial, Mrs. Kell had no choice but to pay out-of-pocket to remain in the skilled nursing facility.

83.     Mrs. Kell appealed KePRO's denial to a second-level appeal, and on October 24, 2023, KePRO upheld their decision.

84.     After each denial, Mrs. Kell requested the name of the doctor who determined she no longer required care, but Defendants refused to provide her with that information.

85.     Mrs. Kell was forced to pay approximately $10,000 in out-of-pocket expenses to cover her medical bills.

86.     On or around November 17, 2023, Mrs. Kell underwent another surgery, to remove the fixator and pins from her leg. After the surgery, her doctor once again referred her to a skilled nursing facility. Knowing that Defendants would refuse to pay for her care and issue wrongful denials, Mrs. Kell opted to return home and forgo care.

**D. Plaintiff Darlene Buckner**

87.     Plaintiff Darlene Buckner was enrolled in a Medicare Advantage plan with Defendants until January 1, 2024. She paid a monthly premium of $441.08 for that plan.

88.     On or around October 30, 2023, Mrs. Buckner was hospitalized at East Madison Hospital for a heart attack. The next day on October 31, 2023, she was transferred to UW Health University Hospital.

89.     On or around November 7, 2023, Mrs. Buckner underwent triple bypass open-heart surgery.

90.     After being discharged from the hospital on or around November 16, 2023, Mrs. Buckner's doctor referred her for inpatient rehab or alternatively, to a skilled nursing facility, Capitol Lakes Skilled Nursing & Rehabilitation, to properly recover.

91.     Defendants denied pre-authorization for Mrs. Buckner to receive treatment in an inpatient rehab facility or a skilled nursing facility. As a result, Mrs. Buckner returned to her home, forgoing care.

92.     On or around November 16, 2023, a case worker at the hospital filed an appeal of the pre-authorization denial on Mrs. Buckner's behalf. Mrs. Buckner was notified that the appeal was approved on November 17, 2023, granting coverage for skilled nursing care.

93.     On or around November 21, 2023, Mrs. Buckner was admitted to Capitol Lakes Skilled Nursing & Rehabilitation and began receiving treatment. Because Mrs. Buckner was already discharged from the hospital, she required an additional referral from her primary care physician. This resulted in a delay in her admission to the skilled nursing facility.

94.     Because Mrs. Buckner did not immediately receive the care she needed and was left without treatment while her appeal was considered and she was required to get an additional referral, her medical condition deteriorated and she experienced complications.

95.     On or around November 29, 2023, Mrs. Buckner was transferred from the skilled nursing facility back to the hospital, where she received acute inpatient care.

96.     On or around December 7, 2023, Defendants notified Mrs. Buckner that her stay in the hospital was no longer medically necessary and denied coverage for any treatment beyond that date.

97.     At the time Defendants wrongfully denied Mrs. Buckner's coverage, Mrs. Buckner had an open infected wound near her heart from the open-heart surgery, she was on blood thinners, and was receiving antibiotics through an IV.

98.     Mrs. Buckner's surgeon believed that she was not ready to return home and refused to clear her for discharge.

99.     Mrs. Buckner presently has an outstanding balance of approximately $67,000 due to Defendant's use of fraudulent means to deny her coverage.

**E.  Plaintiff Carol Clemens**

100.    Plaintiff Carol Clemens is enrolled in a Medicare Advantage plan with Defendants.

101.    On December 2, 2023, Mrs. Clemens had a severe medical episode caused by methemoglobinemia, leading to her hospitalization at Mayo Clinic Hospital in Rochester, MN. Mrs. Clemens lost consciousness, collapsed, and displayed life-threateningly low blood oxygen levels, causing her skin to turn blue.

102.    Methemoglobinemia is a potentially life-threatening condition in which diminution of the oxygen-carrying capacity of circulating hemoglobin occurs. As a result, patients like Mrs. Clemens, diagnosed with methemoglobinemia, could experience seizures, a coma, or death.

103.    On or around December 18, 2023, she was transferred to a skill nursing facility, Mayo Clinic Health System.

104.    Mrs. Clemens' doctor prescribed speech, occupational, and physical therapy until approximately January 18, 2024.

105.    On or around December 28, 2023, Defendants notified Mrs. Clemens that her coverage was being denied starting January 2, 2024. She had only been at the skilled nursing facility for approximately ten days at that point.

106.    Mrs. Clemens immediately appealed the wrongful denial of her coverage to Livanta.

107.    On or around December 29, 2023, her appeal was denied, stating that the rehab care was not medically necessary. However, Mrs. Clemens was not ready for discharge. She was unable to eat solid foods, and her doctor recognized her as being at risk of aspiration. Mrs. Clemens had not yet completed her speech therapy and was unable to speak more than a few words. Further, Mrs. Clemens was also unable to walk without assistance.

108.    On or around January 3, 2024, Mrs. Clemens was forced to return home due to Defendants' failure to pay for her treatment.

109.    On or around January 6, 2024, as a result of her premature discharge from the skilled nursing facility, Mrs. Clemens suffered a fall at home.

110.    Three days later, on or around January 9, 2024, Mrs. Clemens suffered a traumatic subarachnoid hemorrhage, and was transported to the emergency room. At the hospital, it was determined that Mrs. Clemens was suffering from a severe brain bleed and acute cystitis without hematuria.

111.    On or around January 26, 2024, Mrs. Clemens was discharged from the hospital and transferred back to the skilled nursing facility, Mayo Clinic Health System. Mrs. Clemens' doctor ordered that she receive rehab care in the skilled nursing facility until February 29, 2024.

112.    Mrs. Clemens was required to pay a $7,500 intake deposit to be admitted to the facility. Defendants refused to cover her care from January 26, 2024, to January 30, 2024, citing an error in the paperwork submitted by the provider. Mrs. Clemens was charged approximately $372 per day for a total of $1863, deducted from her deposit.

113.    Mrs. Clemens' care was covered from January 31, 2024, to February 15, 2024. On February 13, 2024, Mrs. Clemens was issued a denial, stating that Defendants would terminate her coverage effective February 16, 2024. Mrs. Clemens appealed this denial to Livanta, and on February 14, 2024, Livanta denied her appeal. Mrs. Clemens appealed the decision in a second-level appeal, which Livanta again denied.

114.    Because Mrs. Clemens was unable to safely return home, she had no choice but to pay out-of-pocket to continue receiving care at the skilled nursing facility. To the present, Mrs. Clemens remains in the skilled nursing facility.

115.    Mrs. Clemens' current out-of-pocket expenses exceed $16,768.

**F.  <u>Plaintiff Frank Chester Perry</u>**

116.    Plaintiff Frank Chester Perry is enrolled in a Medicare Advantage plan with Defendants. He pays a monthly premium of approximately $200.00 for that plan.

117.    On or around March 27, 2023, Mr. Perry fell at his home, suffering facial fractures and a severe concussion, and was hospitalized at the Ronald Reagan UCLA Medical Center in Los Angeles, California.

118.    Upon discharge from the hospital, Mr. Perry's doctors recommended he receive inpatient post-acute rehab care for three to four weeks.

119.    In late April of 2023, Mr. Perry started receiving such care at the California Rehabilitation Institute in Century City, California, and was making significant progress in his recovery.

120.    About two weeks after his admission, Defendants notified Mr. Perry that coverage of his inpatient rehab care was being denied. Being unable to pay for the higher standard of care he would receive at an inpatient rehab facility, on or around May 1, 2023, Mr. Perry was transferred to a cheaper and less intensive skilled nursing facility, which Defendants agreed to cover, Berkley East Healthcare Center. Mr. Perry continued to progress in the skilled nursing facility, albeit at a slower pace than at the inpatient facility.

121.    Approximately ten days after his admission, Defendants notified Mr. Perry that coverage for his care in a skilled nursing facility was being terminated.

122.    Mr. Perry appealed this denial to Livanta, which was denied. Mr. Perry submitted a second level appeal, which was also denied.

123.    Mr. Perry was not in a financial state to pay for his treatment out-of-pocket. As a result, on or around May 20, 2023, Mr. Perry had no choice but to return home although he was not medically ready for discharge.

124.    The next day, on May 21, 2023, Mr. Perry suffered another fall, fortunately sustaining no serious injuries. Mr. Perry did not go to the hospital.

125.    In or around July 2023, Mr. Perry suffered another fall, sustaining a concussion and resulting in another hospitalization at Ronald Reagan UCLA Medical Center. Mr. Perry was in the hospital for approximately a week and a half. After being discharged from the hospital, Mr. Perry returned home.

126.    Mr. Perry suffered continuous falls throughout the rest of July 2023.

127.    In or around August 18, 2023, Mr. Perry suffered a severe fall causing a subdural hematoma, resulting in a hospitalization at the University of New Mexico Hospital in Albuquerque, New Mexico. He was hospitalized for approximately six weeks. Mr. Perry's doctors recommended he receive inpatient rehab care at Lovelace UNM Neurological Rehab for at least three weeks. However, Defendants denied prior authorization for Mr. Perry's acute rehab care.

128.    Mr. Perry's wife, a physician, called Defendants to discuss and dispute the denial. Eventually, Defendants agreed that Mr. Perry could receive care at an inpatient acute rehab facility, Clear Sky Rehabilitation Hospital in Rio Rancho, New Mexico.

129.    After approximately 10 days, Defendants issued another denial. Mr. Perry again appealed to Livanta, which was denied. Having no other option, Mr. Perry returned home, forgoing care.

130.    A few weeks later, on or around November 19, 2023, Mr. Perry suffered another severe fall, and was again hospitalized, at Sutter Health Center in Davis, California. Upon discharge, Mr. Perry's doctor recommended skilled nursing care for four to six weeks.

131.    Mr. Perry was admitted to the skilled nursing facility, Advanced Health Care of Sacramento, on December 1, 2023.

132.    On or around December 13, 2023, Defendants again issued a notice of non-coverage, refusing to cover Mr. Perry's care.

133.    On or around December 15, 2023, Mr. Perry appealed his denial to Livanta. His appeal was denied. Mr. Perry again returned home, forgoing care. Mr. Perry was unable to climb the stairs leading to his apartment and was forced to stay in a hotel. Mr. Perry had not yet received the rehab care focused on climbing stairs.

134.    When Mr. Perry's wife expressed her concerns on or around December 13, 2023, about Defendants denial of coverage, Defendants' agent told her to apply for Medical. When she said that Mr. Perry would not qualify for Medical, Defendants' agent said Mr. Perry would be better off without her, and suggested they get divorced so he would qualify.

135.    On January 6, 2024, Mr. Perry suffered another fall at home and was again hospitalized at Ronald Reagan UCLA Medical Center. Upon discharge, on January 25, 2024, Mr. Perry's doctors recommended care in a skilled nursing facility for at least three weeks. Mr. Perry was admitted to a skilled nursing facility, Berkley East Healthcare Center, and was receiving care for approximately two weeks before Defendants issued a denial,

refusing to cover any more care. Mr. Perry appealed the denial to Livanta, and her appeal was approved.

136.    On March 1, 2024, Defendants issued another denial, terminating coverage on March 3, 2024. Mr. Perry appealed the denial, and on March 4, 2024, Livanta granted his appeal.

137.    On March 5, 2024, Defendants issued another denial, ending coverage on March 8, 2024. On March 8, 2024, around 6 PM, Mr. Perry's wife spoke with a UnitedHealth advocate in North Carolina, who assured her that the denial was a mistake and that Mr. Perry's treatment would be covered until at least March 24, 2024. The advocate also called Berkley East Healthcare Center and informed them of the decision. However, Defendant naviHealth refused to acknowledge Defendant UnitedHealth's decision, insisting that coverage was terminated.

138.    Mr. Perry remained at Berkley East Healthcare Center, unsure if his treatment was being covered by Defendants, until March 30, 2024, when he was admitted to St. John's Hospital in Santa Monica, California, for a gastrointestinal bleed.

139.    Mr. Perry is being told that he needs to pay a $26,000 outstanding bill at Berkley East Healthcare Center before he can return and receive the rehab care that he needs.

### G. **Plaintiff the Estate of Jackie Martin**

140.    Plaintiff, the Estate of Jackie Martin, represents the interests of Jackie Martin, deceased.

141.    Mr. Martin was enrolled in a Medicare Advantage plan with Defendants. He paid a monthly premium of $28.00 for that plan.

142.    On around April 16, 2023, Mr. Martin suffered a fall at home, fracturing his back. He was hospitalized at Johnson City Medical Center in Johnson City, Tennessee. Upon discharge on April 21, 2023, Mr. Martin was transferred to a skilled nursing facility, NHC HealthCare Kingsport.

143.    On or around May 2, 2023, Defendants issued a notice of non-coverage on May 2, 2023, terminating services on or around May 4, 2023. Mr. Martin appealed this decision to KePRO, who decided on or around May 4, 2023, that Mr. Martin required more care, reversing Defendants' denial.

144.    On or around May 8, 2023, Mr. Martin's son participated in a conference call with naviHealth employees, where he explained his father's condition and need for coverage, in hopes that Defendants would stop trying to prematurely end his care. Defendants informed him that the weekly notices of non-coverage would continue.

145.    Neither Mr. Martin nor his son knew that his father's coverage was being determined by a flawed AI algorithm without any consideration for his current condition.

146.    Defendants issued a second notice of non-coverage on or around May 10, 2023, terminating services on May 12, 2023. Mr. Martin once again appealed this decision to KePRO, who once again reversed the denial, granting Mr. Martin more care.

147.    Defendants issued yet another of non-coverage on May 16, 2023, terminating services on May 18, 2023.

148.     After being faced with his fourth fraudulent discharge, Mr. Martin did not appeal, as it felt inevitable that even if he won his appeal, he would just be sent another denial, despite his obvious need for continued care.

149.     Mr. Martin returned home on May 19, 2023, where he passed away four days later, on May 23, 2023.

150.     Defendants' constant fraudulent denials denied Mr. Martin the chance to fully recover, leading to his death.

**H.  Plaintiff John J. Williams, as Trustee of the Miles and Carolyn Williams 1993 Family Trust**

151.     Plaintiff John J. Williams is the son of Carolyn and Miles Williams.  He represents the interest of his mother, who is now deceased, and he acts as administrator of her estate and trustee of the Miles and Carolyn Williams 1993 Family Trust.

152.     Ms. Williams was enrolled in a Medicare Advantage plan with Defendants. She paid a monthly premium of approximately $95.00 for that plan.

153.     Around the end of February 2023, Carolyn Williams was hospitalized multiple times for a variety of illnesses.  In particular, she had a urinary tract infection ("UTI") that caused acute weakness, confusion, and a reduction of her ability to care for herself on her own.

154.     Upon her discharge, on or about March 20, 2023, Ms. Williams' doctors transferred her to a skilled nursing facility, Spring Lake Village in Santa Rosa, California. The goal was to return Ms. Williams to her assisted living apartment and the expected time was 10-14 days.

155.    During admission, Ms. Williams was advised that UnitedHealthcare was extremely difficult to work with and to expect a denial of coverage.  The admission nurse also advised that after the denial was received, Ms. Williams could appeal but there was very little hope of winning the appeal.

156.    Within days of admission to skilled nursing, Ms. Williams' coverage was denied.  She appealed the decision and won based upon a technicality.  Shortly thereafter, she received another denial of coverage.

157.    Ms. Williams was informed that she would have to begin paying privately to remain in the skilled nursing facility and she left.

158.    Upon discharge, Ms. Williams was provided with in-home occupational and physical therapy.  While rehabilitating on her own, she fell in her apartment in mid-April.  She was also unable to leave her apartment and was fed meals in her room.  Her family had to hire private-pay caregivers (at ~$300 per day for several weeks) to help with daily functions that they would not have had to pay had her coverage not been improperly denied.

159.    On May 7th, 2023, Ms. Williams was again admitted to the hospital with another UTI, as well as an infection in her leg.  She was treated and released again to Spring Lake Village skilled nursing on or about May 12, 2023.  She was warned again by the admission nurse that because she still had UnitedHealthcare, she should expect a denial of coverage.

160.    On May 24,2023 Livanta informed Ms. Williams that her stay at Spring Lake Village would no longer be covered. She was again advised by the facility the family would

be forced to pay privately as a result of the denial of care and they did. She paid out of pocket for the stay from May 26, 2023, until she passed away on May 31, 2023, at a rate of $380 per day.

161. Ms. Williams had out of pocket expenses of at least $5,565 directly attributable to Defendants' improper practices.

### I. Plaintiff William Hull

162. Plaintiff William Hull is enrolled in a Medicare Advantage plan with Defendants. He pays a monthly premium of $39.00 for that plan.

163. On or around June 30, 2023, Mr. Hull experienced a heart attack while on the way to an appointment with his cardiologist. He was transported by ambulance to Saddleback Medical Center in Laguna Hills, California. He remained there for 25 days.

164. Mr. Hull's doctors recommended he be transferred to a skilled nursing facility. On July 19, 2023, a case worker at Saddleback Medical Center reached out to Defendants to obtain prior authorization for his care at Trabuco Hills Post-Acute in Lake Forest, California.

165. On July 24, 2023, Defendants denied prior authorization for Mr. Hull's skilled nursing care. Mr. Hull's case worker sought coverage at other skilled nursing facilities, but each time Defendants refused to cover care. Mr. Hull was not informed of the reasons for the denials.

166. On July 24, 2023, with no other option, Mr. Hull returned home, forgoing medically necessary care. He was unable to walk without assistance.

167.   Four days later, on July 28, 2023, Mr. Hull experienced a major stroke, paralyzing the left side of his body. Mr. Hull later learned that he had exhibited stroke symptoms, but because he was at home and he had no medical qualifications, he did not recognize the symptoms. Had Mr. Hull been in a skilled nursing facility, the stroke symptoms likely would have been recognized and he could have received immediate medical attention.

168.   Mr. Hull was again admitted to Saddleback Medical Center on July 28, 2023, where he received treatment for his stroke. On August 3, 2023, Mr. Hull was discharged from Saddleback and transferred to Providence Mission Hospital in Laguna Beach, California, where he received inpatient rehab care for three weeks. On August 24, 2023, Mr. Hull returned home, where he continued to undergo periodic rehab care.

169.   Mr. Hull is still recovering from his stroke and has not regained full control of the left side of his body.

## CLASS ALLEGATIONS

170.   Plaintiffs bring this action on their own behalf and on behalf of all other persons similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. The Class which Plaintiffs seek to represent comprises:

> "All persons who purchased Medicare Advantage Plan health insurance from Defendants in the United States during the period of four years prior to the filing of the complaint through the present."

Said definition may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

171.    The "Multi-State" Subclass which Plaintiffs seek to represent comprises:

"All persons who purchased Medicare Advantage Plan health insurance from Defendants during the period of four years prior to the filing of the complaint through the present in the following states: Arizona, California, Colorado, Delaware, Hawaii, Iowa, Kentucky, Massachusetts, Nebraska, North Carolina, North Dakota, Ohio, Oklahoma, Rhode Island, South Carolina, South Dakota, Vermont, Washington, West Virginia, Wisconsin, and Wyoming."

Said definition may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

172.    The "Benefits Denial" Subclass which Plaintiffs seek to represent comprises:

"All persons who purchased Medicare Advantage Plan health insurance from Defendants and had benefits denied due to Defendants' use of the nH Predict AI Model during the period of four years prior to the filing of the complaint through the present."

173.    The Oregon Subclass which Plaintiffs seek to represent comprises:

"All persons who purchased Medicare Advantage Plan health insurance from Defendants in the state of Oregon during the period

of four years prior to the filing of the complaint through the

present."

Said definition may be further defined or amended by additional pleadings, evidentiary

hearings, a class certification hearing, and orders of this Court.

174.    The California Subclass which Plaintiffs seek to represent comprises:

"All persons who purchased Medicare Advantage Plan health

insurance from Defendants in the state of California during the

period of four years prior to the filing of the complaint through

present."

Said definition may be further defined or amended by additional pleadings, evidentiary

hearings, a class certification hearing, and orders of this Court.

175.    The Classes are so numerous that their individual joinder herein is

impracticable. On information and belief, members of the Classes number in the hundreds

of thousands or millions throughout the United States and the named states. The precise

number of Class members and their identities are unknown to Plaintiffs at this time but

may be determined through discovery. Class members may be notified of the pendency of

this action by mail and/or publication through the distribution records of Defendants and

third-party retailers and vendors.

176.    Common questions of fact and law predominate over questions that may

affect individual class members, including the following:

a.      Whether Defendants' delegation of coverage determinations to an

automated procedure resulted in a failure to diligently conduct a thorough,

fair, and objective investigation into determinations of claims for medical expenses submitted by insureds and/or healthcare providers;

b.      Whether Defendants' denials of coverage are based on its use of nH Predict AI Model to determine a patients' care needs based on Defendants' internally generated criteria;

c.      Whether Defendants failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies; and

d.      Whether Defendants have a practice of relying on the nH Predict AI Model to make coverage denials instead of engaging in good-faith individual coverage determinations.

177.    Plaintiffs' claims are typical of the claims of the Class and arise from the same common practice and scheme used by Defendants to deny coverage for the members of the Class. In each instance, Defendants used the nH Predict AI Model to review, process, and reduce coverage without adhering to the coverage determination standards set by Medicare. Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained competent and experienced counsel in class action and other complex litigation.

178.    Plaintiffs and the Class have suffered injury, in fact, and have lost money because of Defendants' misconduct. Plaintiffs and the Class had their coverage automatically and illegally diminished by Defendants' nH Predict AI Model without individualized evaluation of their medical records by Defendants' medical directors.

179.    A class action is superior to other available methods for fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for the Class to prosecute their claims individually.

180.    The trial and litigation of Plaintiffs' claims are manageable. Individual litigation of the legal and factual issues raised by Defendants' conduct would increase delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economics of scale, and comprehensive supervision by a single court.

181.    Defendants have acted on grounds generally applicable to the entire Classes, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Classes as a whole. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants.

182.    Absent a class action, Defendants will likely retain the benefits of their wrongdoing. Because of the small size of the individual Class members' claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of herein. Absent a representative action, the Class will continue to suffer losses and Defendants will be allowed to continue these violations of law and to retain the proceeds of its ill-gotten gains.

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT—NATIONWIDE
### AGAINST ALL DEFENDANTS
### *(On Behalf of Plaintiffs and the Benefits Denial Subclass)*

183.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

184.    Defendants formed an agreement and entered into a contract of insurance ("insurance agreement") with Plaintiffs and Class members including offer, acceptance, and consideration.

185.    Pursuant to that insurance agreement, Plaintiffs and the Class paid money to Defendants in exchange for Defendants providing a health insurance policy to Plaintiffs and the Class. Defendants received premiums in exchange for the issuance of a policy of health insurance.

186.    Each insurance agreement included, without limitation, Defendants' duty to exercise its fiduciary duties to policyholders, abide by applicable state laws, and adequately review and inform policyholders prior to a claim denial.

187.    Each insurance agreement includes a provision stating: "Commitment of Coverage Decisions. UnitedHealthcare's Clinical Services Staff and Physicians make decisions on the health care services you receive based on the appropriateness of care and service and existence of coverage."

188.    Plaintiffs and the Class performed their obligations under the contract by paying the amounts due under the contract timely.

189.    Defendants breached each insurance agreement by, without limitation, failing to keep its promise to fulfill its fiduciary duties to policyholders, abide by applicable state laws, provide a thorough, fair, and objective investigation of each submitted claim prior to a claim denial, and provide written statements to Plaintiffs and the Class, accurately listing all bases for Defendants' denial of claims and the factual and legal bases for each reason given for such denial.

190.    Defendants further breached each agreement by making coverage determinations based upon the prediction of the nH Predict AI Model, rather than "the appropriateness of care and service and existence of coverage."

191.    By using the nH Predict AI Model to unreasonably deny Plaintiffs' and Class members' claims without an adequate individualized investigation, Defendants breached the insurance agreement.

192.    As a direct and proximate result of Defendants' breach of contract, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING—NATIONWIDE
### AGAINST ALL DEFENDANTS
**(*On Behalf of Plaintiffs and the Benefits Denial Subclass*)**

193.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

194.    Plaintiffs and Class members entered into written insurance agreements with Defendants and that provided for coverage for medical services administered by healthcare providers.

195.    Pursuant to the contracts, Defendants implied and covenanted that they would act in good faith and follow the law and the contracts with respect to the prompt and fair payment of Plaintiffs' and Class members' claims.

196.    Defendants have breached their duty of good faith and fair dealing by, among other things:

    a.  Improperly delegating their claims review function to the nH Predict system which uses an automated process to improperly deny claims;

    b.  Failing to require its agents to conduct a thorough, fair, and objective investigation of each submitted claim, such as examining patient records, reviewing coverage policies, and using their expertise to decide whether to approve or deny claims to avoid unfair denials.

197.    Defendants' practices as described herein violated their duties to Plaintiffs and Class members under the insurance contracts.

198.    Defendants' practices as described herein constitute an unreasonable denial of Plaintiffs' and Class members' rights to a thorough, fair, individualized, and objective investigation of each of their claims in breach of the implied covenant of good faith and fair dealing arising from Defendants' insurance agreements.

199.    Defendants' practices as described herein further constitute an unreasonable denial to pay benefits due to Plaintiffs and Class members in breach of the implied covenant of good faith and fair dealing arising from the Defendants' insurance agreements.

200.    The Defendants' wrongful denial of Plaintiffs' and Class members' right to a thorough, fair, and objection investigation and a wrongful denial of claims damaged Plaintiffs and Class members.

201.    As a direct and proximate result of Defendants' breaches, Plaintiffs and Class members have suffered and will continue to suffer in the future, economic losses and other general, incidental, and consequential damages, in amounts according to proof at trial. Plaintiffs and Class members are also entitled to recover statutory and prejudgment interest against Defendants.

202.    Defendants' misconduct was committed intentionally, in a malicious, fraudulent, despicable, and oppressive manner, entitling Plaintiffs and Class members to punitive damages against Defendants.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT—NATIONWIDE
### AGAINST ALL DEFENDANTS
### (*On Behalf of Plaintiffs and the Nationwide Class*)

203.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

204.    By delegating the claims review process to the nH Predict system, Defendants knowingly received funds from Plaintiffs, Class members, and government entities for services that Defendants knew they were not going to deliver. Specifically, by systematically delegating claims determinations to the nH Predict system, Defendants failed to deliver services to Plaintiffs and Class members.  This was done in a manner that was unfair, unconscionable, and oppressive.

205.    Defendants knowingly received and retained funds from Plaintiffs and Class members, and government entities. In so doing, Defendants acted with conscious disregard for the rights of Plaintiffs and Class members.

206.    As a result of Defendants' wrongful conduct as alleged herein, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

207.    Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

208.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendants to be permitted to retain the benefits they received, without justification, from arbitrarily denying its insureds medical payments owed to them under Defendants' policies in an unfair, unconscionable, and oppressive manner. Defendants' retention of such funds under such circumstances making it inequitable to retain the funds constitutes unjust enrichment.

209.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and Class members. Defendants should be compelled to return in a common fund for the benefit of Plaintiffs and members of the Class all wrongful or inequitable proceeds received by Defendants.

210.    Plaintiffs and members of the Class have no adequate remedy at law.

## FOURTH CAUSE OF ACTION
### INSURANCE BAD FAITH
### AGAINST ALL DEFENDANTS
*(On Behalf of Plaintiffs and the Multi-State Class)*

211.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

212.    Plaintiffs hereby assert claims under the insurance bad faith laws of the following states: Arizona, California, Colorado, Delaware, Hawaii, Iowa, Kentucky, Massachusetts, Nebraska, North Carolina, North Dakota, Ohio, Oklahoma, Rhode Island, South Carolina, South Dakota, Vermont, Washington, West Virginia, Wisconsin, and Wyoming (the "Bad Faith Claim States").

213.    The Bad Faith Claim States have bad faith insurance common law claims with substantially similar elements and remedies.

214.    The Bad Faith Claim States prohibit using bad faith or unreasonable means to make coverage determinations under an insurance policy.

215.    Plaintiffs and other Multi-State Class members have standing to pursue a cause of action for insurance bad faith in the states listed above because Plaintiffs and Multi-State Class members have suffered an injury in fact, and lost money as a result of Defendants' actions set forth herein.

216.    Plaintiffs and Class members were covered persons under the insurance agreements.

217.    Defendants used and continue to use the nH Predict AI Model to make coverage determinations in bad faith that should be made by licensed physicians who conduct a thorough and holistic review of each patient's medical history and current

45

condition. This bad faith process leads to Defendants unreasonably denying coverage for medically necessary post-acute care. The nH Predict AI Model does not account for individuals' unique circumstances or the statutorily required coverage determination criteria.

218.   Defendants lacked a reasonable basis for using the nH Predict AI Model to make coverage determinations, ultimately denying policyholders' post-acute care. Defendants' use of previous patients' data to determine their insureds' future care without regard for individual circumstances, doctors' recommendations, and patients' actual conditions is unreasonable. A reasonable insurer would not have used the nH Predict AI Model to deny payment of Plaintiffs' and Class members' claims under the facts and circumstances present.

219.   Defendants' denials breach the insurance agreement and are made in bad faith to save money on costly post-acute care coverage. Defendants ignored and continues to ignore patients' medical records, individual circumstances, and physicians' recommendations while strictly adhering to whatever recommendations the nH Predict AI Model issued.

220.   Defendants' bad faith conduct, as alleged herein, was and continues to be malicious and intentionally designed to deprive Plaintiffs and the Class of their rights under the insurance agreement. Defendants knew of the dire consequences of denying elderly patients' medical treatment, yet still used the nH Predict AI Model rather than licensed physicians to review and deny claims without any reasonable or arguable reason for doing so, recklessly and maliciously disregarding the health and lives of Plaintiffs and the Class.

221.   Defendants' denial of Plaintiffs' and Class members' claims was based on the malicious implementation of the nH Predict AI Model intended to enable Defendants to deny as many claims as possible and to pay out as little as possible. Defendants' denial of Plaintiffs' and Class members' claims was not the result of an honest disagreement or an innocent mistake.

222.   Defendants knew or reasonably should have known that the nH Predict AI Model was not a suitable substitute for individual holistic review of Plaintiffs' and the Class members' claims and was an inadequate method for deciding to deny claims. Due to the enormous increase in the number of coverage denial appeals, as well as the 90 percent success rate of those appeals, Defendants have been put on notice that their nH Predict AI Model wrongly denies coverage in the vast majority of cases.

223.   Defendants knew or recklessly disregarded that there was no reasonable basis for denying Plaintiffs' and Class members' claims. Defendants' use of the nH Predict AI Model to make coverage determinations and deny Plaintiffs' and Class members' claims constitutes refusal to pay claims in an arbitrary and capricious manner.

224.   By using nH Predict to predict Plaintiffs' and the Class members' required coverage for post-acute care, Defendants failed to conduct an adequate investigation before denying their claims. Defendants did not consider individual factors that may affect the recovery period or amount of care a patient requires, and routinely ignored the recovery time or treatment prescribed by Plaintiffs' and the Class members' physicians.

225.    The validity of Plaintiffs' and Class members' claims was readily apparent on its face and would not have been fairly debatable if an adequate investigation had been conducted.

226.    Defendants' denials of Plaintiffs' and Class members' claims were based on generalized data from the nH Predict system, not on facts specific to Plaintiffs' and Class members' claims. Consequently, Defendants acted unreasonably in performing its "investigation" of Plaintiffs' and Class members' claims, and the denials were not based upon a reasonable interpretation of the insurance agreement.

227.    As alleged above, Defendants intentionally breached the implied covenant of good faith and fair dealing by denying Plaintiffs and the Class the security and peace of mind that is the object of the insurance relationship.

228.    Defendants' habitual use of nH Predict to deny insurance claims constitutes a general business practice of denying insurance claims without a reasonable basis.

229.    As a direct result of Defendants' insurance bad faith, Plaintiffs and the Class have sustained damages in an amount to be determined at trial.

230.    Defendants have engaged in insurance bad faith and are liable to Plaintiffs and the Class for any and all damages that they sustained as a result of their bad faith conduct.

231.    As a result of Defendants' bad faith conduct, Plaintiffs and Class members suffered severe emotional distress. Plaintiffs and Class members did not know whether they would be able to receive necessary care, whether they would be forced to pay out of pocket for said care, or whether they would be financially able to pay for said care, causing

severe emotional distress. Defendants' bad faith conduct caused Plaintiffs and the Class severe mental suffering.

232.    Plaintiffs' and Class members' emotional distress caused pecuniary loss whereby they had to pay out of pocket for treatment, by disrupting Class members' lives and schedules, by causing Class members to miss work and lose wages, by reducing the value of the Medicare Advantage Plans, and by other means.

233.    Defendants' misconduct was committed intentionally and willfully, in a malicious, fraudulent, wanton, and oppressive manner, entitling Plaintiffs and Class members to punitive damages against Defendants. Defendants acted with an "evil mind" in wantonly denying Plaintiffs and Class Members necessary care, causing severe physical and emotional turmoil, to increase their profits. Defendants' conduct constitutes aggravating and outrageous conduct.

234.    Plaintiffs and the Class are entitled to an award of punitive damages based on Defendants' malicious conduct and their intentional and unreasonable refusal to pay claims.

235.    Defendants' bad faith conduct is the actual and proximate cause of the damages sustained by Plaintiffs and the Class.

236.    By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action. Plaintiffs are therefore entitled to reasonable attorneys' fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

## FIFTH CAUSE OF ACTION
## NEGLIGENCE PER SE—OREGON
## AGAINST ALL DEFENDANTS
### *(On Behalf of Plaintiff Glennette Kell and the Oregon Subclass)*

237.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

238.   Or. Rev. Stat. § 746.230, Oregon's Unfair Claim Settlements Practices Act, provides in relevant part as follows:

1.   An insurer or other person may not commit or perform any of the following unfair settlement practices:

    a.   Misrepresenting facts or policy provisions in settling claims;

    b.   Failing to acknowledge and act promptly upon communications relating to claims;

    c.   Failing to adopt and implement reasonable standards for the prompt investigation of claims;

    d.   Refusing to pay claims without conducting a reasonable investigation based on all available information;

    e.   Failing to affirm or deny coverage of claims within a reasonable time after completed proof of loss statements have been submitted;

    f.   Not attempting, in good faith, to promptly and equitably settle claims in which liability has become reasonably clear;

g.  Compelling claimants to initiate litigation to recover amounts due by offering substantially less than amounts ultimately recovered in actions brought by such claimants;

\*\*\*

m.  Failing to promptly provide the proper explanation of the basis relied on in the insurance policy in relation to the facts or applicable law for the denial of a claim.

239.   By using the nH Predict AI Model to make coverage determinations without sufficient individualized or holistic review, Defendants failed to adopt or implement reasonable standards for the prompt investigation of claims.

240.    By using the nH Predict AI Model to make coverage determinations without sufficient individualized or holistic review, Defendants refused to pay claims without conducting a reasonable investigation based on all available information.

241.   By using the nH Predict AI Model to make coverage determinations without sufficient individualized or holistic review, Defendants did not attempt, in good faith, to promptly and equitably settle claims in which liability has become reasonably clear.

242.   By stating pretextual reasons for denial such as that care was not medically necessary or that Plaintiffs were not progressing quickly enough, Defendants failed to promptly provide the proper explanation of the basis relied on in the insurance policy in relation the facts or applicable law for the denial of each claim.

243.   Oregon law recognized that parties to a contract may be liable to one another in tort.

244.    Or. Rev. Stat. § 746.230 expresses a different standard of care than governs the contract rights and responsibilities between the parties.

245.    In committing these acts, Defendants acted intentionally or recklessly, and in bad faith, with a conscious disregard for Plaintiffs' and the Oregon Class's rights and with the intention of causing, or recklessly disregarding the likelihood of, injury to plaintiff. Thus, Plaintiffs are entitled to punitive damages.

246.    As a foreseeable and direct result of Defendants' violations of Or. Rev. Stat. § 746.230, Plaintiffs and the Oregon Class have sustained damages in an amount to be determined at trial.

247.    Plaintiffs and the Oregon Class are policyholders and are therefore members of the class of persons meant to be protected by Or. Rev. Stat. § 746.230.

248.    The damages Plaintiffs and the Oregon Class seek remedy the type of harm Or. Rev. Stat. § 746.230 was enacted to prevent.

249.    Pursuant to Or. Rev. Stat. § 742.061, Plaintiffs and the Oregon Class are entitled to recover attorneys' fees incurred in pursuit of this action.

250.    Plaintiffs are also entitled to recover prejudgment interest.

## SIXTH CAUSE OF ACTION
### UNFAIR AND DECEPTIVE INSURANCE PRACTICES—MINNESOTA
### AGAINST ALL DEFENDANTS
### *(On Behalf of Plaintiffs and the Nationwide Class)*

251.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

252.    Defendants' denials of Plaintiffs' and Class members' claims were based on the malicious implementation of the nH Predict AI Model intended to enable Defendants to deny as many claims as possible and to pay out as little as possible. The validity of Plaintiffs' and Class members' claims was neither fairly debatable, nor was there a reasonable basis for denying the claim.

253.    A reasonable insurer would not have used the nH Predict AI Model to make coverage determinations or deny Plaintiffs' and Class members' claims under the facts and circumstances alleged herein.

254.    Defendants knew or had reason to know that the nH Predict system was an inadequate method for deciding to deny claims and knew or had reason to know that the nH Predict AI Model was not a reasonable basis to deny claims.

255.    Defendants failed to conduct an adequate independent investigation into Plaintiffs' and Class members' claims before issuing a denial, acting with reckless disregard for whether there was a reasonable basis to deny the claims.

256.    Defendants' general business practice is to use the nH Predict AI Model to make coverage determinations. As a result of this practice, Defendants fail to pay claims without conducting a reasonable investigation, fail to adopt and implement reasonable standards for claim investigation and failing to promptly provide reasonable explanations for denials.

257.    Defendants use of the nH Predict AI violates Minn. Stat. § 72A.02, which is enforceable by plaintiffs through Minn. Stat. § 8.31, subd. 3a.

## SEVENTH CAUSE OF ACTION
## UNFAIR COMPETITION LAW—CALIFORNIA
### Cal. Bus. & Prof. Code Section 17200, *et seq.*
### AGAINST ALL DEFENDANTS
### *(On Behalf of Plaintiff Frank Chester Perry, Plaintiff William Hull, Plaintiff John J. Williams, and the California Subclass)*

258.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

259.    Plaintiffs bring this cause of action pursuant to California Business and Professions Code Section 17200, *et seq.*, on their own behalf and on behalf of all other persons similarly situated.

260.    California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair . . . or fraudulent business act or practice." Cal Bus. & Prof. Code Section 17200, *et seq*.

261.    Under the California Insurance Code, Section 790.03(h), the following are classified as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance when they are knowingly committed or performed with such frequency as to indicate a general practice:

      a.    "Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies."

      b.    "Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear."

262.     Under Cal. Code Regs. tit. 10, Section 2695.7(d), insurers must "diligently pursue a thorough, fair and objective investigation and shall not persist in seeking information not reasonably required for or material to the resolution of a claims dispute."

263.     Cal. Code Regs. tit. 10, Section 2695(e), in relevant parts, provides that "[n]o insurer shall delay or deny settlement of a first party claim on the basis that responsibility for payment should be assumed by others."

## "Unlawful Prong"

264.     Defendants violated the unlawful prong of the UCL when they failed to implement reasonable standards for the thorough, fair, and objective investigation and processing of claims arising under their policies for Plaintiffs and Class members as required by Cal. Code Regs. tit. 10, Section 2695.7(d). Instead, Defendants used the nH Predict AI Model to review and deny claims without any meaningful individualized review.

## "Unfair" Prong

265.     Defendants' actions violated the unfair prong of the UCL because the acts and practices set forth above, including Defendants' use of the nH Predict AI Model to process and deny claims and rejection of claims in batches without a thorough, fair, and objective investigation offend established public policy and cause harm to consumers that greatly outweighs any benefit associated with those practices. Defendants' actions also violate the unfair prong because they constitute a systematic breach of consumer contracts.

## "Fraudulent" Prong

266.     Defendants have violated the fraudulent business practices prong of the UCL because their omissions and misrepresentations regarding the Medicare Advantage policies

and Plaintiffs' and Class Members' rights under their policies, including by using an algorithm to make coverage determinations and denying claims on sham pretenses, were likely to deceive a reasonable consumer, and this information would be material to a reasonable consumer.

267.    In addition, Defendants failed to disclose to Medicare the use of the algorithm to make coverage determinations. Had Defendants' done so, they would not have been able to lawfully sell their Medicare Advantage policies to consumers.

268.    Defendants fraudulently misled Plaintiffs, Class members, and Medicare into believing that their health plans would ensure thorough, fair, and objective investigations by medical professionals into each submitted claim and provide coverage for reasonable and medically necessary procedures by failing to disclose their use of the nH Predict system. Defendants fraudulently misled Plaintiffs, Class members, and Medicare by stating in the Evidence of Coverage that "UnitedHealthcare's Clinical Services Staff and Physicians make decisions on the health care services you receive based on the appropriateness of care and service and existence of coverage."

269.    Plaintiffs and Class members would not have enrolled with Defendants had they known Defendants failed to diligently pursue submitted claims using a thorough, fair, and objective investigation.

270.    Plaintiffs and the Class members would not have enrolled with Defendants had Medicare known Defendants used an algorithm to deny claims, because Medicare would never have allowed Defendants to sell those policies in the first place.

271.   As a direct and proximate result of Defendants' violation of the UCL, Plaintiffs and Class members have been injured in fact and suffered lost money in that Defendants overcharged for the policies themselves given that the policies' value was less than Plaintiffs paid.

272.   To date, Defendants continue to violate the Unfair Competition law by breaching their insurance contracts.

273.   To date, Plaintiffs Kell, Clemens, Perry, and Class members are still insured by Defendants.

274.   Pursuant to Business and Professions Code section 17203, Plaintiffs and Class members seek an order of this Court enjoining Defendants from reviewing claims using the nH Predict AI Model. Without such an order, there is a continuing threat to Plaintiffs and Class members, as well as to members of the general public, that Defendants will continue to systematically use the nH Predict AI Model to make coverage determinations, diminishing the value of the plans and risking serious medical consequences or death for California consumers.

275.   Pursuant to Business and Professions Code section 17203, Plaintiffs and Class members seek an order of this Court awarding Plaintiffs and Class members restitution of the money wrongfully acquired by Defendants by means of responsibility attached to Defendants' failure to disclose the existence and significance of said misrepresentations in an amount to be determined at trial.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request that this Court enter an order granting the following relief against Defendants:

    a.    Awarding actual damages, consequential damages, statutory damages, exemplary/punitive damages, costs and attorneys' fees;

    b.    Awarding damages for emotional distress;

    c.    Awarding disgorgement and/or restitution;

    d.    Awarding pre-judgment interest to the extent permitted by law;

    e.    Appropriate declaratory and injunctive relief enjoining Defendants from continuing its improper and unlawful claim handling practices as set forth herein;

    f.    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs demand a jury trial on all triable issues.

DATED: April 5, 2024                    **LOCKRIDGE GRINDAL NAUEN PLLP**

                                        By: *s/Karen Hanson Riebel*
                                            Karen Hanson Riebel (#0219770)
                                            David W. Asp (#0344850)
                                            Derek C. Waller (#0401120)
                                            100 Washington Avenue South
                                            Suite 2200
                                            Minneapolis, MN 55401
                                            Tel: (612) 339-6900
                                            khriebel@locklaw.com
                                            dwasp@locklaw.com
                                            dcwaller@locklaw.com

                                        **CLARKSON LAW FIRM, P.C.**

                                            Glenn A. Danas, Esq.
                                            Ryan Clarkson, Esq.
                                            Zarrina Ozari, Esq.
                                            *Pro Hac Vice*
                                            CLARKSON LAW FIRM, P.C.
                                            22525 Pacific Coast Highway
                                            Malibu, CA 90265
                                            Tel: (213) 788-4050
                                            gdanas@clarksonlawfirm.com
                                            rclarkson@clarksonlawfirm.com
                                            zozari@clarksonlawfirm.com

                                        **HAUSFELD LLP**

                                            James Pizzirusso, Esq.
                                            *Pro Hac Vice Forthcoming*
                                            HAUSFELD LLP
                                            888 16th St., NW
                                            Ste. 300
                                            Washington, DC 20006
                                            Tel: (202) 540-7200

                                            *Attorneys for Plaintiffs*