## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| THE ESTATE OF GENE B. LOKKEN, GLENNETTE KELL, DARLENE BUCKNER, CAROL CLEMENS, FRANK CHESTER PERRY, THE ESTATE OF JACKIE MARTIN, JOHN J. WILLIAMS, AS TRUSTEE OF THE MILES AND CAROLYN WILLIAMS 1993 FAMILY TRUST, and WILLIAM HULL, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>vs.<br><br>UNITEDHEALTH GROUP, INC., UNITED HEALTHCARE, INC., NAVIHEALTH, INC. and Does 1-50, inclusive,<br><br>       Defendants. | Civil File No. 23-cv-3514-JRT/DTS |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................ 1

II. BACKGROUND ............................................................................ 2

   A. nH Predict Is Unregulated, Undisclosed, and Deployed by Defendants
      Wrongfully to Increase Profits at the Expense of Elderly Americans. .............. 3

   B. Defendants Ensure That Any Appeals Process Purportedly Available to
      Plaintiffs Is Futile. ........................................................................ 6

   C. Patients Will Continue to Be Irreparably Harmed By Defendants' Unlawful
      Conduct. .................................................................................. 9

III. ARGUMENT .............................................................................. 11

   A. Plaintiffs Are Not Required to Exhaust Administrative Remedies. ................ 11

     1. Exhaustion Is Not Required Because Plaintiffs' Claims Do Not Arise Under
        the Medicare Act. ................................................................. 12

     2. Even if it Applied, Plaintiffs Satisfy the Exhaustion Requirement Because
        They Meet the Requirements for Judicial Waiver of the Exhaustion Prong
        and Have Presented Their Claims. ............................................. 14

        a. Plaintiffs Have Satisfied the Presentment Requirement. ................. 15

        b. Plaintiffs Satisfy the Requirements for Judicial Waiver of the
           Exhaustion Prong. ........................................................... 17

           i.   Plaintiffs' Claims are Collateral to Any Claim for Medicare
              Benefits. ............................................................... 19

           ii.  Plaintiffs Would Suffer Irreparable Harm if the Exhaustion Prong
              Was Not Waived. ..................................................... 20

           iii. Pursuit of Further Administrative Proceedings Would be Futile. ..... 22

              1) Defendants' Practice of Routinely Issuing Subsequent Denials
                 Makes the Administrative Review Process Futile. ................. 24

              2) The Secretary Lacks the Authority to Grant the Relief Sought by
                 Plaintiffs. ............................................................. 25

3) Defendants' Conduct is Capable of Repetition While Evading Review. ...................................................................................25

3. Defendants are the Proper Defendants for Plaintiffs' Claims, Not the Secretary. ...........................................................................................26

B. The Medicare Act Does Not Preempt Plaintiffs' State Statutory and Common-Law Claims. .......................................................................................27

1. The Medicare Act Does Not Preempt State Common-Law Claims. ..........27

2. Under The Eighth Circuit Test, The Medicare Act Does Not Preempt Any of Plaintiffs' Claims. ...................................................................30

a. Plaintiffs' State Common-Law Claims Do Not Regulate the Same Subject Matter as the Relevant Medicare Standards. ...........................33

b. Plaintiff's State Statutory Claims Do Not Regulate the Same Subject Matter as the Relevant Medicare Standards. ..........................................35

C. Plaintiffs' Unjust Enrichment Claims Are Not Precluded by The Existence of a Contract. .........................................................................................37

D. Plaintiffs May Enforce Minn. Stat. § 72A.20 Through Minn. Stat. § 8.31 For Systemic Violations. ..........................................................................39

IV.   CONCLUSION ...............................................................................43

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advocate Health Care Network v. Stapleton*,
    581 U.S. 468 (2017) ................................................................................ 28

*Ali v. Fed. Bureau of Prisons*,
    552 U.S. 214 (2008) ................................................................................ 29

*Alston v. United Healthcare Servs., Inc.*,
    291 F. Supp. 3d 1170 (D. Mont. 2018) ..................................................... 32

*Armatas v. Aultman Health Found.*,
    Case No. 19-cv-349, 2020 WL 2482123 (N.D. Ohio Jan. 2, 2020) ............ 19

*Aylward v. SelectHealth, Inc.*,
    35 F.4th 673 (9th Cir. 2022) .................................................................... 33

*Bowen v. City of New York*,
    476 U.S. 467 (1986) ........................................................................ *passim*

*Chem Gro of Houghton, Inc. v. Lewis Cnty. Rural Elec. Coop. Ass'n*,
    No. 11CV93, 2012 WL 1025001 (E.D. Mo. Mar. 26, 2012) ....................... 39

*Clarinda Home Health v. Shalala*,
    100 F.3d 526 (8th Cir. 1996) .................................................................... 13

*Degnan v. Burwell*,
    765 F.3d 805 (8th Cir. 2014) .................................................................... 19

*Do Sung Uhm v. Humana, Inc.*,
    620 F.3d 1134 (9th Cir. 2010) ............................................................ 32, 33

*Elder v. Allstate Ins.*,
    341 F. Supp. 2d 1095 (D. Minn. 2004) ..................................................... 42

*Family Rehab., Inc. v. Azar*,
    886 F.3d 496 (5th Cir. 2018) .................................................................... 21

*Findling v. Grp. Health Plan, Inc.*,
    998 N.W.2d 1 (Minn. 2023) ............................................................ 40, 41, 42

*Genz-Ryan Plumbing & Heating Co. v. Weyerhaeuser NR Co.*,
  352 F. Supp. 3d 901 (D. Minn. 2018) ........................................................ 38

*Gilbert v. TrueAccord Corp.*,
  608 F. Supp. 3d 656 (N.D. Ill. 2022) ........................................................ 40

*Glass Serv. Co. v. State Farm Mut. Ins.*,
  530 N.W.2d 867 (Minn. Ct. App. 1995) ................................................... 42

*Global Rescue Jets, LLC v. Kaiser Found. Health Plan, Inc.*,
  30 F.4th 905 (9th Cir. 2022) ............................................................ 12, 15

*Haaland v. Presbyterian Health Plan*,
  292 F. Supp. 3d 1222 (D.N.M. 2018) ....................................................... 32

*Heckler v. Ringer*,
  466 U.S. 602 (1984) ................................................................... *passim*

*Hepstall v. Humana Health Plan, Inc.*,
  Civil Action No. 18-0163, 2018 WL 6588555 (S.D. Ala. Nov. 26, 2018) ................. 32

*Kaiser v. Blue Cross*,
  347 F.3d 1107 (9th Cir. 2003) ............................................................ 23

*Kovach v. Coventry Health Care, Inc.*,
  No. 10-cv-536, 2011 WL 284174 (W.D. Pa. Jan. 25, 2011) ............................... 19

*Kremer v. Kremer*,
  912 N.W.2d 617 (Minn. 2018) ............................................................ 41

*Ly v. Nystrom*,
  615 N.W.2d 302 (Minn. 2000) ............................................................ 41

*M.M. Silta, Inc. v. Cleveland Cliffs, Inc.*,
  616 F.3d 872 (8th Cir. 2010) ........................................................ 38, 39

*Madsen v. Kaiser Found. Health Plan, Inc.*,
  No. 08cv2236, 2009 WL 1537878 (S.D. Cal. June 2, 2009) ............................... 26

*Martin v. Shalala*,
  63 F.3d 497 (7th Cir. 1995) ............................................................ 20

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ................................................................... *passim*

*Matthews v. Leavitt*,
452 F.3d 145 (2d Cir. 2006) ....................................................................... 25

*Mental Health Ass'n v. Heckler*,
720 F.2d 965 (8th Cir. 1983) ........................................................... 15, 20, 22

*Midland Psychiatric Assocs. v. United States*,
145 F.3d 1000 (8th Cir. 1998) ......................................................... 12, 13, 18

*Morris v. Am. Family Mut. Ins.*,
386 N.W.2d 233 (Minn. 1986) ......................................................... 40, 41, 42

*Motley v. Homecomings Fin., LLC*,
557 F. Supp. 2d 1005 (D. Minn. 2008) .......................................................... 38

*Olmsted Med. Ctr. v. Cont. Cas. Co.*,
65 F.4th 1005 (8th Cir. 2023) ..................................................................... 42

*Payne v. Norfork Sch. Dist.*,
No. 18-CV-3072, 2019 WL 4131084 (W.D. Ark. Aug. 29, 2019) ............................. 40

*Pharm. Care Mgmt. Ass'n v. Mulready*,
78 F.4th 1183 (10th Cir. 2023) ................................................................... 31

*Pharm. Care Mgmt. Ass'n v. Rutledge*,
891 F.3d 1109 (8th Cir. 2018) ................................................................ 31, 32

*Pharm. Care Mgmt. Ass'n v. Wehbi*,
18 F.4th 956 (8th Cir. 2021) ............................................................... *passim*

*Purcell Tire & Rubber Co. v. Padfield, Inc.*,
2022 WL 2785898 (E.D. Mo. July 15, 2022) .................................................... 38

*Quishenberry v. UnitedHealthcare*,
14 Cal. 5th 1057 (2023) ............................................................................ 32

*Rodriguez v. United States*,
480 U.S. 522 (1987) ................................................................................. 29

*Schermer v. State Farm Fire & Cas. Co.*,
702 N.W.2d 898 (Minn. Ct. App. 2005) ......................................................... 42

*Schoolcraft v. Sullivan*,
971 F.2d 81 (8th Cir. 1992) .............................................................. *passim*

*Sipp v. Astrue*,
   641 F.3d 975 (8th Cir. 2011) ................................................................ 15, 17

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ................................................................................ 32

*Snyder v. Prompt Med. Transp., Inc.*,
   131 N.E.3d 640 (Ind. Ct. App. 2019)...................................................... 32

*Sprietsma v. Mercury Marine*,
   537 U.S. 51 (2002) ............................................................................ 28, 29

*Titus v. Sullivan*,
   4 F.3d 590 (8th Cir. 1993)................................................................. 19, 20

*United States v. Seibert*,
   403 F.Supp.2d 904 (S.D. Iowa 2005) ...................................................... 13

*United States v. Tenet Healthcare Corp.*,
   343 F.Supp.2d 922 (C.D. Cal. 2004) ................................................. 12, 13

*Weinberger v. Salfi*,
   422 U.S. 749 (1975) ........................................................................ *passim*

**Statutes**

42 U.S.C. § 405(g) ..................................................................... 11, 14, 26

42 U.S.C. § 405(h) ............................................................................... 11

42 U.S.C. § 1395 ............................................................................ *passim*

Cal. Bus. & Prof. Code § 17200 ....................................................... 27, 36

Cal. Ins. Code § 790.03(h) ................................................................ 36, 37

Minn. Stat. Chapter 72A ................................................................... 40, 41

Minn. Stat. § 8.31 .............................................................. 39, 40, 41, 42

Minn. Stat. § 72A.20 ........................................................ 27, 35, 37, 39

Minn. Stat. § 72A.201 ................................................................. 40, 41, 42

Minn. Stat. § 645.16 ............................................................................. 41

Or. Rev. Stat. § 746.230 ............................................................ 27, 36, 37

**Other Authorities**

42 C.F.R. § 405.1136(a)(1), (d)(1) .................................................. 26

42 C.F.R. § 409.31 ............................................................... 34, 36

42 C.F.R. § 409.61(b) ................................................................ 36

42 C.F.R. § 422.112(a)(6)(ii) ............................................... 34, 35, 36, 37

42 C.F.R. § 424.20 ............................................................... 34, 36

Cal. Code Regs. Tit. 10, §§ 2695.7(d), 2695(e) ................................... 36

17A Am. Jur. 2d Contracts § 577 ................................................... 33

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of
    Legal Texts* 174 (2012) ....................................................... 28

*Dictionary of Modern Legal Usage* 503 (2d ed.1995) ............................. 30

Fed. R. Civ. P. 8(d)(2) ............................................................ 38

H.R. Conf. Rep. No. 108-391 ....................................................... 30

*Medicare Managed Care Manual: Chapter 10 - MA Organization
    Compliance with State Law and Preemption by Federal Law*,
    https://www.cms.gov/regulations-and-guidance/guidance/manuals/
    downloads/mc86c10.pd ......................................................... 32

Restatement of the Law of Liability Insurance § 49 ............................... 34

Restatement (Second) on Contracts § 205 .......................................... 33

Restatement (Third) of Restitution and Unjust Enrichment § 1 ..................... 33

## I.      INTRODUCTION

Plaintiffs bring these claims, individually and on behalf of Class members, against Defendants UnitedHealth Group, Inc., United Healthcare, Inc., naviHealth, Inc., and Does 1-50 (together, "Defendants") for their illegal use of artificial intelligence to wrongfully make coverage determinations for elderly patients' post-acute care coverage without sufficient individualized review. First Am. Compl. ("FAC") ¶ 1. Plaintiffs, on behalf of themselves and the Class, assert claims for breach of contract, breach of implied covenant of good faith and fair dealing, unjust enrichment, insurance bad faith, negligence *per se*, unfair and deceptive insurance practices, and unfair competition.

Defendants provide insurance coverage to Plaintiffs as a Medicare Advantage Plan provider. Thus, Defendants have an obligation to provide an actual, individualized review of the merits of Plaintiffs' claims for benefits. Defendants repeatedly and consistently fail to provide this process, causing irreparable harm to Plaintiffs by endangering Plaintiffs' lives and physical wellbeing in the pursuit of unjust profits. As a direct result of Defendants' failure to abide by their obligations to Plaintiffs and the Class, patients have died and/or have suffered major medical setbacks to their physical health that have permanently impaired their quality of life and life expectancy.

Defendants now seek to evade all liability for breaching their statutory and common law duties to Plaintiffs and Class members by laying the blame for their callous actions at the feet of the Secretary and Plaintiffs for failure to adhere to the Medicare Act's exhaustion requirement. However, exhaustion here is futile as (i) Defendants regularly issue immediate subsequent denials following successful claimant appeals, causing class

1

members to have to re-start the appeal process from square one; (ii) Administrative Law Judges lack the authority to remediate Defendants' illegal conduct; and (iii) Defendants' conduct is capable of repetition while evading review. Nor do Plaintiffs' claims "arise under" the Medicare Act, but rather under state statutory and common law. Further, Plaintiffs' state law claims are not preempted by federal law under binding Eighth Circuit case law, which focuses on whether state law concerns the same subject matter as a Medicare standard, rather than broader out-of-circuit tests on which Defendants rely.

At bottom, Defendants' arguments are nothing more than another effort to sidestep responsibility and shift blame using the same bureaucratic red tape Defendants rely on to endanger the lives and physical safety of Plaintiffs and Class members. Therefore, the Court should deny Defendants' motions to dismiss in its entirety.

## II.   BACKGROUND

UnitedHealthcare covertly uses naviHealth's nH Predict artificial intelligence algorithm in its Medicare Advantage Plans to make coverage determinations for and ultimately deny necessary medical coverage for elderly patients in need of post-acute care. FAC ¶¶ 1, 6. The use of this AI tool to process claims and deny medically necessary care has been a profitable business for UnitedHealthcare, garnering hundreds of millions of dollars in coverage denials UnitedHealthcare would have otherwise had to pay and cost savings from the systematic use of nH Predict in lieu of individualized review. *Id.* ¶¶ 3, 8. Defendants use nH Predict to make coverage determinations and override physicians' medical necessity determinations for post-acute care, despite knowing nH Predict has a 90% error rate in the denials it issues. *Id.* ¶ 1. UnitedHealthcare failed to disclose to its

insureds that, contrary to its written policies, it relied on an algorithm instead of clinical experts to make coverage decisions. *Id.* ¶¶ 10, 268.

UnitedHealthcare implemented nH Predict despite its obligations to timely provide individualized claims review to elderly patients. *Id.* ¶¶ 8-32. Among the most vital care UnitedHealthcare is responsible for covering is "post-acute care," which is care for patients recovering from serious illnesses and injuries—typically after an inpatient hospital stay. *Id.* ¶ 34. Under Medicare Advantage, post-acute care providers are paid prospectively, receiving a lump sum from insurers like UnitedHealthcare based on estimates of the national average cost of providing covered care for a specified period of time. *Id.* ¶ 35. "Due to the nature of the prospective payment system, insurers' coverage decisions must occur before or during a patient's post-acute care." *Id.* ¶ 36. Ensuring that these coverage decisions are made with sufficient scrutiny and within this timeframe is critical to the health and wellbeing of Plaintiffs and others within the class.

### A.   nH Predict Is Unregulated, Undisclosed, and Deployed by Defendants Wrongfully to Increase Profits at the Expense of Elderly Americans.

Defendants use nH Predict to predict the amount of post-acute care a patient "should" require as the primary decision point to cut off payment to Plaintiffs and others for treatment, such as post-acute care ordered by the patients' doctors. *Id.* ¶¶ 6, 39. The delegation of Defendants' coverage determinations to the nH Predict algorithm is contrary to the requirements of state laws the Defendants must abide by as insurers, beyond the reach of the Medicare Appeals Council to remedy, and otherwise unregulated. *Id.* ¶¶ 6, 50. Defendants use the nH Predict algorithm that "purports to compare a patient's diagnosis,

age, living situation, and physical function to similar patients in a database of six million patients . . . to predict patients' medical needs, estimated length of stay, and target discharge date." *Id.* ¶ 39.

Crucially, the algorithm fails to consider a patient's specific circumstances or the observations and recommendations of a patient's clinicians. *Id.* ¶ 6. It bears repeating—Defendants systemically rely on an algorithm with a known error rate of 90% to ignore the recommendations of patients' clinicians and to fail to conduct, as required, a thorough, fair, and objective evaluation of patients' medical claims. *Id.* ¶¶ 1, 38. The purpose of Defendants' choice to use generic predictions from nH Predict is unjust profit—*not* the patients' individualized medical needs or the fulfilment of their obligations to their insureds.

Frequently, these generic predictions result in Defendants denying patients the health care coverage ordered by their doctors: benefits which Defendants are obligated to cover and which would have been covered in the absence of Defendants' adherence to recommendations generated by nH Predict. Instead, Defendants rely on nH Predict—knowing it has an extraordinarily high error rate—to save on review-related costs and to prematurely stop covering patients' care. *Id.* ¶¶ 1, 8, 38. Defendants do so without consideration of Plaintiffs' and other insureds individualized medical needs, contrary to the directives of clinicians closest to these patients, and often over the objection and disagreement of Defendants' own medical review employees, who exist for this very purpose. *Id.* ¶ 38. Indeed, Defendants discipline and terminate employees who conduct individualized assessments that recommend care contrary to the nH Predict model. *Id.* ¶ 7.

UnitedHealthcare specifically instructs its medical review employees not to deviate from the algorithm's predictions by establishing targets to keep patients' stays in post-acute care facilities *within 1% of the days* projected by nH Predict. *Id.* When this training is not enough and an employee disagrees with nH Predict and deviates, Defendants discipline and terminate those employees. *Id.* Defendants also count on nH Predict to reliably deny coverage, understanding that patients are rarely able to start or stay in a post-acute care setting before UnitedHealthcare has approved coverage. *Id.* ¶¶ 5, 36-37.

To systematically avoid such approvals, Defendants almost exclusively rely on nH Predict's determinations to make coverage determinations and issue payment denials to Plaintiffs and others—as demonstrated by the fact that Defendants rarely cover post-acute care for more than fourteen days. *See, e.g., id.* ¶¶ 121, 143, 156. Defendants adhere to this criterion strictly, despite the algorithm's high error rate. *Id.* ¶¶ 1, 42. "[O]ver 90% of patient claim denials are reversed through either an internal appeal process or through" administrative proceedings, and "over 80% of prior authorization request denials are reversed on appeal." *Id.* ¶ 47. Knowing that nH Predict's determinations are largely baseless, Defendants generally keep the outcome reports generated by nH Predict, on which the denials of coverage are predicated, secret from patients and their doctors. *Id.* ¶¶ 44-45. This includes regularly denying patients' and their doctors' requests to receive and review their nH Predict reports to better understand the basis for denial of coverage. *Id.* ¶ 44. Even when Medicare Advantage members or their clinicians *are* privy to Defendants' use of nH Predict and *do* request the output reports generated by the algorithm, Defendants uniformly deny those requests with vague claims that such information is

"proprietary." *Id.* Accordingly, Plaintiffs and others are left with no information to understand the actual basis for Defendants' refusal to pay and no meaningful way to challenge or appeal the denial. *Id.* ¶¶ 44-45.

This is all by Defendants' design. Defendants do not want patients to learn they have entirely delegated their coverage determination responsibilities to an unreliable algorithm, which was designed for the singular purpose of increasing Defendants' profitability. *See id.* ¶¶ 1, 28, 41. Defendant naviHealth explicitly designed nH Predict for the purpose of helping insurance companies, like Defendant UnitedHealthcare, save money in the post-acute care setting, an area which had previously been a highly unprofitable aspect of Medicare services. *Id.* ¶ 28. What the algorithm was *not* designed to do, was ensure fair or individualized coverage decisions for each patient. *Id.* ¶¶ 8, 28, 39.

## B. Defendants Ensure That Any Appeals Process Purportedly Available to Plaintiffs Is Futile.

To be successful, Defendants' scheme cannot and, therefore, does not stop at the point of the initial denial of Plaintiffs' post-acute care coverage determinations. Defendants manipulate the appeals process to render any attempts by patients to exhaust their administrative remedies futile. Defendants' manipulation of the administrative appeals process intended to make such appeals futile is systematically implemented by Defendants.

First, Defendants rely on secrecy and confusion. As discussed above, Defendants work to keep the basis for the nH Predict denials hidden from Plaintiffs and their providers to ensure that Plaintiffs and other patients are unable to understand the basis for Defendants' denials in the first instance should they seek an appeal. *Id.* ¶¶ 44-46. Over the

span of three months, Plaintiff Glennette Kell, who could not walk as a result of her injuries at the time her claim was initially denied by Defendants, was forced to repeatedly appeal wrongful denials of her post-acute care coverage. *Id.* ¶¶ 71-86. Despite repeatedly requesting the name of the doctor who determined she no longer required post-acute care at each of her appeals, Defendants consistently refused to provide even that basic information, let alone information concerning the basis for the denials. *Id.* ¶ 84. Unbeknownst to Mrs. Kell, a doctor never made that determination—nH Predict did, and that determination was merely rubber stamped by Defendants' review team. *Id.* ¶¶ 40-44. Mrs. Kell did not know of the use and existence of nH Predict by Defendants, so did not know to ask for the outcome report generated by the algorithm or to challenge its use on appeal. But even if she had known and asked for the report Defendants, as they had done before, would likely have declined to provide it to her and claimed it was "proprietary." *Id.* ¶¶ 44, 55.

After failing to provide Plaintiffs with information necessary to understand the basis for the coverage denial, Defendants move on to the second method of rendering appeals futile—punishing successful appeals with a litany of additional procedural hurdles intended solely to delay payment. *Id.* ¶¶ 48-49. Here, Defendants systematically wield the Medicare Act appeals process as both a sword and a shield to protect their unjust profits gained via automated review and wrongful denial of coverage. *Id.* ¶¶ 44-53.

At each of the appeal stages outlined by the Act, if Plaintiffs are successful in reversing a denial of coverage issued by Defendants, Defendants restart the coverage determination process and issue another denial, which forces the patient back to square one

of the five step appeals process. *Id.* ¶¶ 48-49. The goal is to render the appeals process entirely futile and to force patients to give up and ultimately accept the denial of coverage without further appeals, or to miss the appeal deadline. *Id.* ¶ 49.

Defendants' actions in creating a cycle of denials have caused some Plaintiffs irreparable, permanent, and dire harm. Such was the case for Plaintiff Jackie Martin, who died just four days after returning home after Defendants denied coverage. *Id.* ¶ 149. Between May 2 and May 18, 2023, Mr. Martin endured three non-coverage determinations issued by UnitedHealthcare based exclusively on Defendants' use of nH Predict. *Id.* ¶¶ 140-50. The first two coverage denials were reversed on appeal, but Defendants continually refused to cover Mr. Martin's care. *Id.* Exactly four days after each of those reversals on appeal, UnitedHealthcare issued Mr. Martin a new notice of non-coverage for future care. *Id.* Recognizing the futility of the appeals process, after the third baseless denial by UnitedHealthcare, Mr. Martin did not appeal because he felt that it was inevitable that, even if he won his appeal, he would just be sent another denial of coverage letter despite his doctor-recommended need for post-acute care. *Id.* ¶ 148. Four days after he returned home because of the AI-based denial, Mr. Martin passed away. *Id.* ¶ 149.

This second way of rendering appeals futile is particularly pernicious because the lengthy time frame of the Medicare Appeals process will eventually obviate the need for Defendants to cover patients' claims entirely. This is because elderly individuals seeking post-acute coverage under Medicare Advantage Plans are among the most vulnerable in the population and at the highest risk of death prior to the often years-long period it takes to fully resolve Medicare appeals. FAC ¶ 51. As discussed above, Mr. Martin passed away

only four days after Defendants issued another non-coverage determination. *Id.* ¶ 149. Plaintiff Gene Lokken also passed away while his appeal was pending. *Id.* ¶ 51. By trapping patients in this vicious deny-appeal-deny cycle, Defendants can undermine the Act's appeals process and run the clock out until the patient no longer needs care. *Id.* ¶¶ 44-53.

Even if an individual had the tenacity to endlessly appeal Defendants' AI-driven denials, the Act's regulations and associated administrative appeals process to prevent the Medicare Appeals Council from substantively addressing Defendants' conduct. *Id.* Decisionmakers on appeal only have the limited authority to reinstate benefits, not to prevent Defendants' systematic reliance on nH Predict to make coverage decisions. *Id.* ¶ 50. Thus, no one in the administrative appeals process has the authority to enjoin Defendants from continuing to unlawfully delegate its coverage determinations process to an algorithm. *Id.*

### C.   Patients Will Continue to Be Irreparably Harmed By Defendants' Unlawful Conduct.

Plaintiffs are and will continue to be irreparably harmed by any requirement to exhaust the administrative appeals process. The administrative appeals process can take up to 3 years. *Id.* ¶ 51 n.19. For Plaintiffs here, even when the process spanned just days or weeks, it was ineffective to provide relief for the irreparable physical harms that befell Plaintiffs over mere hours or days. *See, e.g.*, *id.* ¶¶ 51, 71-86. This is particularly true considering Defendants' abuse of the appeals process—repeatedly restarting the process on each occasion and at each stage that a patient achieves a successful appeal. *Id.* ¶¶ 48-

49. Meanwhile in a matter of days after returning home following a denial, Mr. Martin died; Mr. Hull had a stroke; Mrs. Clemens suffered a traumatic subarachnoid hemorrhage; Mrs. Kell had to pay $10,000 out of pocket to safely transition post-surgery per her doctor's orders; and Mr. Perry suffered a severe fall. *Id.* ¶¶ 51, 85-86, 110, 135, 150, 167. As a result of Defendants' unlawful actions, the administrative appeals process fails to offer Plaintiffs a meaningful avenue to challenge denials of their post-acute care claims. Plaintiffs' lives and well-being depend on real-time access to post-acute care and a decision-making process based on their individualized needs—not on Defendants' profit margins. Defendants have built a system shrouded in secrecy that all but ensures that cannot happen and that profit is the deciding decision point. *Id.* ¶¶ 44-53.

Defendants' use of nH Predict caused irreparable harm for Plaintiffs that cannot be remedied by belated payment of benefits alone—the only remedy the administrative process could provide. *Id.* ¶ 50. For all Plaintiffs, having to choose to forgo potentially life-saving care is no choice at all and, unfortunately for some, like Mr. Martin, they did not have the financial ability to gap fill for Defendants' unlawful failures to provide the required individualized review of their claims.

Plaintiffs and Class members in this action were uniformly and irreparably harmed by UnitedHealthcare's reliance on the nH Predict algorithm to make coverage determinations and issue unlawful, baseless, and repeated denials of post-acute care coverage to Plaintiffs.

## III.     ARGUMENT

### A.     Plaintiffs Are Not Required to Exhaust Administrative Remedies.

Section 405(h) of the Social Security Act precludes judicial review in any action challenging the denial of claimed benefits, except as provided for by Section 405(g). 42 U.S.C. § 405(g)-(h); *Mathews v. Eldridge*, 424 U.S. 319, 327 (1976); *Weinberger v. Salfi*, 422 U.S. 749, 757-58 (1975).

Conversely, actions that do not challenge the denial of benefits (and thus do not "arise under" the Medicare Act) are *not* restricted by Sections 405(h) and 405(g) and may be freely reviewed by this Court. *See Salfi*, 422 U.S. at 760-61 (construing 405(g) only to require exhaustion for claims of entitlement to benefits); *Heckler v. Ringer*, 466 U.S. 602, 605, 614-15 (1984) (applying Section 405(g) only to claims "arising under the Medicare Act").

Defendants argue this Court lacks jurisdiction over Plaintiffs' claims, asserting that Plaintiffs' claims arise under the Medicare Act, which requires them to exhaust administrative remedies. Defs.' Mem. in Supp. of Mot. to Dismiss ("MTD") at 19 (ECF No. 43). Defendants are wrong, and overstate the jurisdictional nature of the exhaustion analysis. Even if this Court finds Plaintiffs' claims arise under the Medicare Act and exhaustion applies, only the presentment requirement is a true jurisdictional inquiry, and Plaintiffs have clearly satisfied that threshold inquiry by alleging sufficient presentment of their claims. *See Eldridge*, 424 U.S. at 328; *Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (describing the second requirement as not "purely 'jurisdictional'").

This Court has jurisdiction over Plaintiffs' claims because (A) Plaintiffs' claims do

not arise under the Medicare Act, and thus are not subject to the exhaustion requirement; and (B) even if Plaintiffs' claims are subject to the exhaustion requirement, Plaintiffs have adequately presented their claims and the circumstances warrant judicial waiver of the exhaustion prong.

> **1.      Exhaustion Is Not Required Because Plaintiffs' Claims Do Not Arise Under the Medicare Act.**

A claim "arises under" the Medicare Act when (1) the "standing and substantive basis for the presentation" of the claims is the Medicare Act, *Salfi*, 422 U.S. at 760-61; or (2) "it is 'inextricably intertwined' with a Medicare benefits determination," *Midland Psychiatric Assocs. v. United States*, 145 F.3d 1000, 1004 (8th Cir. 1998) (quoting *Ringer*, 466 U.S. at 614-16).

Here, the "standing and substantive basis" for Plaintiffs' claims is state statutory and common law, not the Medicare Act. *See* MTD at 21 ("The contractual relationship provides both the 'standing and substantive basis' for the [breach of contract] claim."). In *United States v. Tenet Healthcare Corp.*, 343 F.Supp.2d 922 (C.D. Cal. 2004), the court held that "the common law, not the Medicare Act, provides both standing and the substantive basis" for False Claims Act and common law claims because the claims challenged "the submission of inaccurate and misleading claims," rather than benefits determinations. *Id.* at 928. The *Tenet* court went on to find that the claims did not arise under the Medicare Act, and Section 405(h) did not apply. *Id.*; *accord Global Rescue Jets, LLC v. Kaiser Found. Health Plan, Inc.,* 30 F.4th 905, 917 (9th Cir. 2022) ("California law provide[d] the substantive basis" for the plaintiff's claims, not the Medicare Act, because

the plaintiff's claims were California common law and statutory claims); *United States v. Seibert*, 403 F.Supp.2d 904, 920 (S.D. Iowa 2005) (adopting *Tenet*). Here, like in *Tenet*, Plaintiffs assert only statutory and common law claims.

Similarly, Plaintiffs' claims are not "inextricably intertwined" with a claim for benefits. To determine whether a claim is "inextricably intertwined" with a Medicare benefits determination, courts examine whether the claim is, "at bottom," a claim for benefits. *See Ringer*, 466 U.S. at 614; *Clarinda Home Health v. Shalala,* 100 F.3d 526, 529 (8th Cir. 1996); *Midland*, 145 F.3d at 1004. Defendants argue that the claims here are merely disguised claims for benefits. MTD 20-21. But Plaintiffs do not seek benefits—they only challenge Defendants' *use* of the nH Predict AI Model to make coverage determinations. *See, e.g.*, FAC ¶ 189 (Breach of Contract: "Defendants breached each insurance agreement by, without limitation, failing to . . . provide a thorough, fair, and objective investigation of each submitted claim prior to a claim denial"); *Id.* ¶ 196 (Breach of the Implied Covenant of Good Faith and Fair Dealing: "Defendants have breached their duty of good faith and fair dealing by, among other things: Improperly delegating their claims review function to the nH Predict system which uses an automated process to improperly deny claims"); *see also id.* ¶ 204 (Unjust Enrichment); *Id.* ¶ 217 (Insurance Bad Faith); *Id.* ¶ 239 (Negligence Per Se [Oregon]); *Id.* ¶ 255 (Unfair and Deceptive Insurance Practices [Minnesota]); *Id.* ¶ 264 (Unfair Competition Law [California]).

Defendants mistakenly argue that Plaintiffs' claims are "inextricably intertwined" with a claim for benefits, partly because they mischaracterize Plaintiffs' claims as challenging "the denial of benefits." MTD at 22 (citing a string of out-of-circuit cases, in

which the courts found the plaintiffs challenged the denial of Medicare benefits or sought Medicare benefits as a remedy). Defendants, and the cases they cite, rely chiefly upon *Ringer*. However, *Ringer* is distinguishable from the facts here.

The Supreme Court found the claims at issue in *Ringer* were "inextricably intertwined" with claims for benefits because plaintiffs sought an injunction compelling the Secretary to declare a certain procedure reimbursable under the Medicare Act, such that "only essentially ministerial details will remain before [plaintiffs] would receive reimbursement." 466 U.S. at 615-16. Unlike here, the claims in *Ringer* were claims for benefits merely disguised as a procedural challenge. *See id.* Thus, Plaintiffs' claims are distinguishable from the claims in *Ringer* (and the cases that relied on *Ringer*), because Plaintiffs' claims are not, "at bottom," claims for benefits, but instead are true procedural challenges.

Therefore, Plaintiffs' claims do not arise under the Medicare Act, and they were not required to exhaust administrative remedies before seeking relief in federal court.

> **2.     Even if it Applied, Plaintiffs Satisfy the Exhaustion Requirement Because They Meet the Requirements for Judicial Waiver of the Exhaustion Prong and Have Presented Their Claims.**

Section 405(g) allows for judicial review in actions challenging the denial of claimed benefits when two requirements are met: (1) the plaintiff presents the claim for benefits to the Secretary; and (2) administrative remedies prescribed by the Secretary are exhausted or waived. *See* 42 U.S.C. § 405(g); *Eldridge*, 424 U.S. at 328. To the extent the "presentment" requirement remains a nonwaivable jurisdictional inquiry, Plaintiffs have satisfied it here. *See Ringer*, 466 U.S. at 617; *Eldridge*, 424 U.S. at 328. The second

requirement is waivable and not a bar to jurisdiction. *See Sipp v. Astrue*, 641 F.3d 975, 980 (8th Cir. 2011) (holding that, unlike the presentment requirement, "[t]he administrative exhaustion requirement can however be excused").

### a. Plaintiffs Have Satisfied the Presentment Requirement.

The presentment requirement is satisfied by presenting "an application for benefits; or, in the case of someone who had been receiving benefits and was terminated, it requires notification to the agency that the claimant still asserts disability." *Mental Health Ass'n v. Heckler*, 720 F.2d 965, 969 (8th Cir. 1983) (citing *Eldridge*, 424 U.S. at 329); *Ringer*, 466 U.S. at 617 (finding requirement satisfied when claims were submitted for reimbursement); *Global Rescue Jets*, 30 F.4th at 915 (finding this requirement was satisfied when the claims were submitted to the Medicare Advantage organization ("MAO") in the first instance).

Defendants mistakenly conflate the presentment and exhaustion prongs, arguing that this Court lacks jurisdiction because Plaintiffs did not receive final determinations from the fourth-level appeal before the Medicare Appeals Council. MTD at 23-24. However, presentment never requires complete exhaustion—it is a threshold inquiry that requires only that the claim be presented to the Secretary in the first instance.

Plaintiffs Hull, Buckner, and Perry were issued prior authorization denials for post-acute care. FAC ¶¶ 91, 127, 165. In or around September 2023, Plaintiff Perry presented his prior authorization claim by seeking an initial determination of prior authorization from Defendants, which was denied. *Id.* ¶ 127. On or around November 16, 2023, Plaintiff Buckner presented her prior authorization claim by seeking an initial determination of prior authorization from Defendants, which was denied. *Id.* ¶ 91. On or around July 19, 2023,

Plaintiff Hull presented his claim by seeking an initial determination of prior authorization from Defendants, which was denied. *Id.* ¶¶ 164-65. Thus, Plaintiffs Hull, Buckner, and Perry have satisfied the presentment requirement by seeking an initial determination of their claims.

Plaintiffs Lokken, Kell, Clemens, Perry, Martin, and Williams each had his or her benefits prematurely terminated by Defendants. *Id.* ¶¶ 63, 76-78, 105, 113, 120-21, 129, 132, 135-37, 143, 146-47, 156. Mr. Lokken presented his claims to Defendants by submitting a first-level appeal in late July 2022. *Id.* ¶ 66. Mrs. Kell presented her claims to Defendants by submitting first-level appeals of multiple denials in September and October of 2023. *Id.* ¶¶ 77-83. Mrs. Clemens presented her claims to Defendants by submitting a first-level appeal on or around December 29, 2023. *Id.* ¶¶ 106, 113. Mr. Perry presented his premature-termination claims to Defendants by submitting first-level appeals for multiple denials in May, October, and December of 2023, and March of 2024. *Id.* ¶¶ 122, 129, 133, 135-37. Ms. Williams presented her claims to Defendants by submitting a first-level appeal in or around April 2023. *Id.* ¶ 156. Mr. Martin presented his claims to Defendants by submitting first-level appeals for multiple denials on or around May 2, 2023, and May 10, 2023. *Id.* ¶¶ 143, 146-47. Mr. Martin did not appeal the third and final denial that month, as he felt it was "inevitable that even if he won his appeal, he would just be sent another denial, despite his obvious need for continued care." *Id.* ¶ 148.

Defendants argue that Mr. Martin failed to present his claims because he did not appeal the third and final denial. MTD at 24. However, Defendants ignore the fact that he was presented with three denials *within one month*, without any change in circumstances,

and that he properly notified Defendants that he still asserted a need for care by appealing the first two denials and by participating in a conference call where he notified Defendants that he believed he was entitled to further care. FAC ¶ 144. Mr. Martin died four days after returning home following the final denial. *Id.* ¶ 149.

Thus, Plaintiffs have all satisfied the presentment requirement.

> **b.    Plaintiffs Satisfy the Requirements for Judicial Waiver of the Exhaustion Prong.**

The exhaustion prong may be waived either by the Secretary or by a court. *Sipp*, 641 F.3d at 980 ("The administrative exhaustion requirement can however be excused, either by consent of the commissioner or in exceptional circumstances by the court."). The Supreme Court established judicial waiver in *Eldridge*, noting that "cases may arise where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate." *Eldridge*, 424 U.S. at 330; *Bowen*, 476 U.S. at 483. Particularly where the policy giving rise to the claim is a policy that claimants did not know existed, such as Defendants' use of nH Predict to make claims determinations, exhaustion should not be required because "it would be unfair to penalize these claimants for not exhausting under these circumstances." *Bowen*, 476 U.S. at 483, 485-86 (finding waiver of exhaustion appropriate where defendant implemented an "unlawful, unpublished policy under which countless deserving claimants were denied benefits.").

Defendants' argument that courts lack the authority to waive exhaustion glosses over decades of precedent applying the judicial waiver exception, both from the Supreme

Court and the Eighth Circuit.[1] MTD at 25-26. This omission is particularly glaring because *Ringer*, on which Defendants primarily rely, *explicitly* recognized the judicial waiver exception created by the Court eight years earlier in *Eldridge. See Ringer*, 466 U.S. at 618 ("We have also recognized that in certain special cases, deference to the Secretary's conclusion as to the utility of pursuing the claim through administrative channels is not always appropriate. We held that *Mathews v. Eldridge* was such a case [reciting elements]." (citation omitted)).

Defendants also incorrectly assert that judicial waiver is limited to "Constitutional questions." MTD at 26. Indeed, neither of the primary cases Defendants rely on for this proposition (*Salfi* and *Eldridge*) purport to establish a "Constitutional question" prerequisite. Defendants' argument also ignores *Bowen*, where the Court exercised judicial waiver of the exhaustion requirement as to the plaintiffs' non-constitutional claims, because the defendant had an "unlawful, unpublished policy under which countless deserving claimants were denied benefits." 476 U.S. at 485-86. Plaintiffs are not aware of any case (and Defendants cite none) where the Eighth Circuit has refused to apply judicial waiver solely because a claim is not constitutional in nature.

Additionally, this Court should not limit judicial waiver of exhaustion to constitutional claims, because doing so could categorically exempt MAOs from the judicial waiver doctrine because some courts have held that MAOs are not considered state actors

---

[1] *See, e.g., Eldridge*, 424 U.S. at 330 (establishing the judicial waiver exception); *Ringer*, 466 U.S. at 618 (recognizing and analyzing the *Eldridge* exception); *Bowen*, 476 U.S. at 482 (same); *Midland v. Psychiatric Assocs. v. United States*, 145 F.3d 1000, 1003 (8th Cir. 1998) (recognizing judicial waiver).

subject to constitutional challenges. *See Kovach v. Coventry Health Care, Inc.*, No. 10-cv-536, 2011 WL 284174, at *3-4 (W.D. Pa. Jan. 25, 2011) (dismissing constitutional claims brought against an MAO for lack of state action); *Armatas v. Aultman Health Found.*, Case No. 19-cv-349, 2020 WL 2482123, at *7 (N.D. Ohio Jan. 2, 2020) (recommending dismissal of constitutional claims brought against an MAO for lack of state action). Thus, if this court were to conclude that judicial waiver requires a colorable constitutional claim and that MAOs cannot be liable for constitutional violations, no claim against an MAO could qualify for judicial waiver. This result was surely neither intended nor contemplated by the Supreme Court when it decided *Eldridge* and *Bowen*, before Medicare Advantage and MAOs existed.[2]

This Court does not have to reach that result because the Supreme Court has held judicial waiver is appropriate where: (1) the claim is entirely collateral to claims for benefits; (2) irreparable harm would result from exhaustion; and (3) exhaustion would otherwise be futile. *See Bowen*, 476 U.S. at 483; *Eldridge*, 424 U.S. at 330-31; *Degnan v. Burwell*, 765 F.3d 805 (8th Cir. 2014); *Titus v. Sullivan*, 4 F.3d 590, 592 (8th Cir. 1993). Plaintiffs have clearly satisfied each prong of this test here.

### i. Plaintiffs' Claims are Collateral to Any Claim for Medicare Benefits.

Plaintiffs' claims here are "entirely collateral" to a claim for benefits because they challenge Defendants' coverage determination process. *See Schoolcraft v. Sullivan*, 971

---

[2] Medicare Part C, creating Medicare Advantage, was passed in 1997, effective 1999. *See* 42 U.S.C. § 1395, *et seq.*

F.2d 81, 86 (8th Cir. 1992); *Bowen*, 476 U.S. at 483. In *Schoolcraft*, the Eighth Circuit held that plaintiffs' claims were "sufficiently collateral to justify waiver of exhaustion" when the class "[did] not seek benefits" but instead challenged review procedures. 971 F.2d at 81. Similarly, in *Titus*, the Eighth Circuit held that when the plaintiffs "state[d] that the relief sought is not an award of benefits for any class member, but rather is for declaratory and injunctive relief that would require the Secretary to utilize proper standards and procedures in the disability determination process," that the claims were collateral to a claim for benefits. 4 F.3d at 593. In *Bowen*, the Supreme Court held that plaintiffs' claims were collateral to claims for benefits because plaintiffs had challenged the very procedure by which claims were processed, rather than seeking benefits. 476 U.S. at 483. The Court stated that whether claimants received the "procedure they should have been afforded in the first place" was entirely collateral to the merits of their claims for benefits. *Id.*

The present case falls squarely within *Schoolcraft*, *Titus*, and *Bowen* because Plaintiffs here do not seek benefits, but instead challenge the *procedure* by which their claims were processed. Plaintiffs' claims are therefore "wholly collateral" to their substantive claims of entitlement to benefits.

### ii. Plaintiffs Would Suffer Irreparable Harm if the Exhaustion Prong Was Not Waived.

To demonstrate irreparable harm, Plaintiffs must demonstrate that "deferment of judicial review until exhaustion of administrative remedies would cause them injury that cannot be remedied by later payment of the benefits requested." *Martin v. Shalala*, 63 F.3d 497, 505 (7th Cir. 1995); *see also Mental Health Ass'n*, 720 F.2d at 970. Courts should

"'be especially sensitive' to irreparable injury 'where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the [rights] they should have been afforded in the first place.'" *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 504 (5th Cir. 2018) (quoting *Bowen*, 476 U.S. at 484).

In *Schoolcraft*, the court found irreparable harm when the claimants "clearly demonstrate[d] the harms caused by administrative exhaustion." 971 F.2d at 86-87. The *Schoolcraft* court also recognized that the "overwhelming body of case law" states that retroactive benefits are not an adequate remedy. *Id.*; *see, e.g., Eldridge*, 424 U.S. at 331 ("an erroneous termination [of benefits] would damage [claimant] in a way not recompensable through retroactive payments"). In *Schoolcraft*, the court found that "eventual correction" of the "systemic errors at the initial and reconsideration stages of the administrative process" would not cure the harm the claimants suffered. 971 F.2d at 87.

In *Bowen*, the Court noted that, like in *Eldridge*, the claimants would be irreparably injured if they were required to exhaust administrative remedies, because the "ordeal of having to go through the administrative appeal process" could trigger medical setbacks which could not be remedied by interim benefits or ultimate success on appeal. 476 U.S. at 484. Here, Plaintiffs have suffered many of the same harms. Indeed, Plaintiff Lokken died before he received a final determination from the Medicare Appeals Council. FAC ¶ 70. Mr. Lokken's appeal is still ongoing today, nearly a year after his death. MTD at 24. Mrs. Clemens suffered a life-threatening brain bleed less than a week after returning home following Defendants' denial, long before she would have been able to exhaust administrative remedies. FAC ¶ 110. Mr. Perry suffered a series of falls and

hospitalizations after his multiple denials. FAC ¶¶ 123-35. Mr. Martin passed away four days after returning home following his final denial. FAC ¶ 149. Mrs. Williams passed away five days after her care was denied. FAC ¶ 160. Four days after Mr. Hull was denied prior authorization for post-acute care he suffered a debilitating stroke, leaving him partially paralyzed. FAC ¶ 167. None of the irreparable harms suffered by Plaintiffs can be remedied by interim benefits, exhaustion of administrative process, or "ultimate success if they manage to pursue their appeals." *Bowen*, 476 U.S. at 485.

In addition to the irreparable harm administrative exhaustion poses to elderly Class members dealing with serious, often chronic injuries, the Eighth Circuit has also held that the high reversal rate for their claims denials augers in favor of waiver because of "irreparable harm." In *Mental Health Association*, the Eighth Circuit found that the irreparable harm resulting from exhaustion of administrative remedies was exacerbated by a high reversal rate on appeal of 80%. 720 F.2d at 970. Here, Plaintiffs allege that nH Predict's error rate is 90% and a United States Senate Subcommittee has noted 80% of prior authorization requests denied by Defendants are reversed on appeal—the logic of *Mental Health Association* squarely applies. FAC ¶¶ 47.

Thus, Plaintiffs sufficiently allege irreparable harm triggering waiver, assuming *arguendo*, the exhaustion requirement applies here.

### iii.   Pursuit of Further Administrative Proceedings Would be Futile.

The futility prong addresses whether pursuit of relief through administrative appeals will "serve the purposes of exhaustion, and not be futile in the context of the system."

*Kaiser v. Blue Cross*, 347 F.3d 1107, 1115 (9th Cir. 2003). In *Salfi*, the court explained that the purposes of exhaustion are so "[that] the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review." 422 U.S. at 765. The decision whether to waive exhaustion should be guided by these policies, not "solely by mechanical application of the *Eldridge* factors." *Bowen*, 476 U.S. at 484.

In *Schoolcraft*, the Eighth Circuit held that exhaustion was futile and should be waived when claimants challenged the "procedures and standards" applied by the defendants to certain kinds of medical claims. 971 F.2d at 83. The court found that exhaustion of administrative remedies was futile because, so long as the challenged policy was corrected by later stages of administrative review "the challenged policy could never be judicially reviewed." *Id.* at 87.

In *Bowen*, the Supreme Court held exhaustion was futile and should be waived because the plaintiff's alleged a "systemwide, unrevealed policy that was inconsistent in critically important ways with established regulations." 476 U.S. at 485. Under these circumstances, the Court determined that "there was nothing to be gained from permitting the compilation of a detailed factual record, or from agency expertise," rendering exhaustion futile. *Id.*

Here, exhaustion is futile for three reasons: (1) even if Plaintiffs succeed in any individual administrative appeal, Defendants subject them to immediate renewed denials that do not address the successful appeal with any new information, requiring Plaintiffs to

re-start the appeals process anew; (2) the Secretary lacks the authority to grant the relief necessary to systemically address Defendants' improper denials based on nH Predict; and (3) Defendants abuse the administrative review process such that their conduct is capable of repetition while evading judicial review.

> ### 1) *Defendants' Practice of Routinely Issuing Subsequent Denials Makes the Administrative Review Process Futile.*

In *Salfi*, the Court held that pursuing administrative remedies was futile when there was no chance that the claimant could prevail on appeal, stating that "further exhaustion would not merely be futile for the applicant, but would also be a commitment of administrative resources unsupported by any administrative or judicial interest." 422 U.S. at 765-66.

Here, exhaustion is futile because even if Plaintiffs receive a favorable determination on appeal, Defendants instruct their employees to issue a new denial immediately following a successful appeal, without any change in circumstances to justify the new denial. FAC ¶ 49. By doing so, Defendants lock patients into a perpetual loop of administrative appeals, until the patient gives up and decides not to appeal further, fails to submit an appeal on time, or dies. FAC ¶ 49. Even Plaintiffs who obtain a favorable result in a single appeal are unable to obtain the necessary relief for their physical health and wellbeing because they are only able to receive a few days of additional care before Defendants issue another denial. FAC ¶ 50.

### 2)     The Secretary Lacks the Authority to Grant the Relief Sought by Plaintiffs.

The authority of administrative reviewers is "circumscribed by the appointing agency's enabling statutes and its regulations." *Matthews v. Leavitt*, 452 F.3d 145, 152 (2d Cir. 2006) (holding that an ALJ was "not vested with authority to hear an ordinary breach of contract claim for damages independent of his determination of entitlement to benefits"). Specifically, 42 U.S.C. § 1395w-22(g)(5) sets the bounds of administrative review authority to challenges to payments of benefits. *Id.*

Here, Plaintiffs seek nationwide injunctive relief and damages resulting from Defendants' illegal conduct, not including damages for denied benefits. Thus, the relief Plaintiffs seek is beyond the scope of the administrative remedies available to the Secretary. FAC ¶ 50.

### 3)     Defendants' Conduct is Capable of Repetition While Evading Review.

Lastly, if exhaustion were required, Defendants' conduct would be capable of repetition while evading review. Defendants know that if patients are required to exhaust administrative remedies, they need only pay the extraordinarily small number of claims that reach third-level ALJ appeal, and their systemic misconduct would never be reviewable in court. FAC ¶¶ 52-53. Defendants' scheme relies on the fact that only 0.2% of people appeal Defendants' wrongful denials of their claims, and far fewer pursue their appeal to the third-level appeal before an ALJ. *Id.* ¶ 53. When claimants appeal to an ALJ, Defendants frequently default or agree to pay the claims. *Id.* In this way, Defendants can ensure that virtually nobody is able to exhaust administrative remedies, making their

conduct unreviewable in court unless exhaustion is waived.

Thus, so long as ALJs continue to reverse nH Predict determinations on appeal, Defendants' reliance on nH Predict to make post-acute care determinations will not be reviewable in court, and the wrongful use of nH Predict for this purpose will continue unabated. *See, e.g., Schoolcraft,* 971 F.2d at 87 ("[U]nless exhaustion is waived, if the *ALJ* implements the correct procedures and applies the correct standards and, where appropriate, awards benefits, there will never be judicial review to challenge the actions the DDS takes at the initial and reconsideration stages. Exhaustion would be futile if the challenged policy could never be judicially reviewed.").

Thus, it would be futile for Plaintiffs to exhaust their administrative remedies, and this Court should waive the exhaustion requirement as to Plaintiffs' claims.

### 3.    Defendants are the Proper Defendants for Plaintiffs' Claims, Not the Secretary.

Defendants' contention that the Secretary, not Defendants, is the proper party to answer for Defendants unlawful conduct, MTD at 29-30, is unsupported by any precedent in the Eighth Circuit. With no binding precedential support for their position, Defendants instead rely on a single California district court case, *Madsen v. Kaiser Found. Health Plan, Inc.*, No. 08cv2236, 2009 WL 1537878, (S.D. Cal. June 2, 2009).

The Secretary is the proper defendant only for claims seeking review of *final determinations* from the Medicare Appeals Council, a nuance omitted from Defendants' citation to *Madsen. See* 42 U.S.C. § 405(g); 42 C.F.R. § 405.1136(a)(1), (d)(1); *Madsen*, 2009 WL 1537878, at *4 ("In any civil action seeking judicial review **of a decision of the**

**Medicare Appeals Council**, 'the Secretary of HHS, in his or her official capacity, is the proper defendant.'") (emphasis added).

As Defendants emphasize, have not been issued a final decision by the Medicare Appeals Council. MTD at 24-25. Plaintiffs' claims do not arise under the Medicare Act, or alternatively Plaintiffs' claims are exempt from the exhaustion requirement—either way, Plaintiffs have not received a final determination from the Medicare Appeals Council, and Plaintiffs are not restricted by § 405.1136(d)(1), making Defendants proper parties.

### B.      The Medicare Act Does Not Preempt Plaintiffs' State Statutory and Common-Law Claims.

Plaintiffs bring seven causes of action, none of which are preempted by the Medicare Act: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) unjust enrichment; (4) insurance bad faith; (5) negligence per se; (6) unfair and deceptive practices, pursuant to Minn. Stat. § 72A.20; and (7) unfair competition, pursuant to Cal. Bus. & Prof. Code § 17200, *et seq.* Plaintiffs' first four causes of action involve state common law, which the Act's preemption provision does not reach. Plaintiffs' last three causes of action involve state statutory claims that fall outside the scope of the Act's preemption provision.[3]

#### 1.      The Medicare Act Does Not Preempt State Common-Law Claims.

As a threshold matter, Plaintiffs' state common-law claims do not fall within the scope of the Medicare Act's preemption provision, which states:

---

[3] Although negligence per se is a common-law claim, Plaintiffs allege that Defendants breached their duty of care by violating Oregon's Unfair Claim Settlements Practices Act. FAC ¶ 238; *see* Or. Rev. Stat. § 746.230.

> The standards established under [Part C] shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under [Part C].

42 U.S.C. § 1395w-26(b)(3). The Eighth Circuit has never ruled that the phrase "any State law or regulation" encompasses state common law and the plain language of the statute indicates that it does not.

The Supreme Court's analysis of similar statutory language should guide this Court. In *Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002), the Court explained that the phrase a law or regulation" was "most naturally read as *not* encompassing common-law claims." *Id.* at 63 (emphasis added). The Court explained, under the canon *noscitur a sociis*, "a word is known by the company it keeps." *Id.* Where the terms "'law' and 'regulation' [are] used together in [a] pre-emption clause[,] [it] indicate[s] that Congress pre-empted only positive enactments." *Id.* The Court noted that if it read "law" to include the common law, it would also include "regulations," and so "render the express reference to 'regulation' in the pre-emption clause superfluous." *Id.*

That result runs counter to the surplusage canon, which counsels that "[i]f possible, every word . . . is to be given effect." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012); *see Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017) ("[T]he presumption [is] that each word Congress uses is there for a reason." (citing Scalia & Garner, *Reading Law*). Here, a narrower reading of the term "law" complies with the surplusage canon by giving the term "regulation" meaning. Such a reading also follows *noscitur a sociis* because "[a]ssociated words bear

on one another's meaning." Scalia & Garner, *supra*, at 195. The proximity of "law" to "regulation" indicates the term "law" refers only to positive legislative enactments, just like the term "regulation" refers only to positive administrative rules. *Sprietsma*, 537 U.S. at 63; *see Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225-26 (2008) (explaining that *noscitur a sociis* applies more readily where terms share a "relevant common attribute").

Reading "law" to encompass only positive enactments makes sense in context. Throughout the Part C statute, Congress refers to "State law" without referencing the term "regulation." *See* 42 U.S.C. §§ 1395w-21(h)(7)(A), 1395w-22(b)(2), 1395w-28(f)(8)(D)(i). Congress could have done the same in 42 U.S.C. § 1395w-26(b)(3), but it chose not to. Instead, by saying "any State law or regulation," Congress intended something different. 42 U.S.C. § 1395w-26(b)(3); *see* Scalia & Garner, *supra*, at 170 ("A material variation in terms suggests a variation in meaning."). Specifically, Congress meant to home in on positive legislative enactments—not common law. *See Rodriguez v. United States*, 480 U.S. 522, 525 (1987) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (cleaned up)); *see also Sprietsma*, 537 U.S. at 63. Thus, interpreting "any State law or regulation" narrowly complies with three different canons of statutory construction.

Defendants ignore the statutory text and Supreme Court precedent, and instead cite legislative history in support of their arguments. MTD at 14 (quoting *Medicare Prescription Drug, Improvement, and Modernization Act of 2003*, H.R. Conf. Rep. No. 108-391, at 557 (Nov. 21, 2003), *reprinted in* 2003 U.S.C.A.A.N. 1808). Defendants argue

that this report indicates Congress's intent to limit the applicability of state laws, including state common law. However, the report does not support Defendants' contention. Specifically, the reports states that "State *laws*[] do not and should not apply." H.R. Conf. Rep. No. 108-391, at 557 (emphasis added). The plural "laws" here indicates that Congress was referring to multiple "particular and concrete instance[s] of a legal precept"—positive legislative enactments—not the broader meaning of "the law," which would not take the plural form. *See* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 503 (2d ed.1995) (differentiating between "a law" and "the law").[4] Therefore, Plaintiffs' state statutory and common-law claims are not preempted by the Medicare Act.

> **2.    Under The Eighth Circuit Test, The Medicare Act Does Not Preempt Any of Plaintiffs' Claims.**

The Eighth Circuit takes a limited view of Medicare preemption. It has held that 42 U.S.C. § 1395w-26(b)(3) "does *not* preempt *all* state laws as applied to Medicare Part [C]," just "those that occupy the same 'place'—that is, that regulate the same subject matter as— federal Medicare Part [C] standards." *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 971 (8th Cir. 2021) (emphasis added).[5] A "standard . . . is a [Medicare Part C] statutory

---

[4] Moreover, the language Defendants quote falls under the descriptive section header, "Avoiding duplicative State *regulation*." H.R. Conf. Rep. No. 108-391, at 556 (emphasis added). This header implies that Congress foresaw the Act's preemptive effect as limited to positive statutory enactments and administrative regulations.

[5] Although *Wehbi* dealt with Medicare Part D, not Part C, it still controls this Court's analysis because Medicare Part D's preemption provision is identical to Part C's. *See Wehbi*¸ 18 F.4th at 971 (noting that Congress extended the express preemption provision appliable to Medicare Part C in 42 U.S.C. § 1395w-26(b)(3) to Medicare Part D in 42 U.S.C. § 1395w-112(g)).

provision or a regulation promulgated under [Medicare Part C] and published in the Code of Federal Regulations." *Id.* In the Eighth Circuit, express preemption of a state law occurs when "(1) Congress or [CMS] has established 'standards' in the area regulated by the state law; and (2) the state law acts 'with respect to' those standards." *Pharm. Care Mgmt. Ass'n v. Rutledge*, 891 F.3d 1109, 1113 (8th Cir. 2018), *rev'd on other grounds*, 141 S. Ct. 474 (2020) (quoting 42 U.S.C. § 1395w-26(b)(3)); *see Wehbi*, 18 F.4th at 971. Additionally, the Eighth Circuit has recognized implied preemption where a state law would "otherwise frustrate the purpose of a federal Medicare Part [C] standard." *Wehbi*, 18 F.4th at 972.

The Eighth Circuit dubbed its approach "field preemption," *id.* at 971, but it takes a narrow view of what the relevant "field" is, *see Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183, 1208 (10th Cir. 2023) (noting the Eighth Circuit's "fastidious approach"). In *Wehbi*, the Eighth Circuit drew narrow distinctions between the subject matter of federal Medicare standards and a North Dakota statute. *Wehbi*, 18 F.4th at 972-76. For example, the Eighth Circuit found that a North Dakota statute that addressed pharmacy benefit managers' potential conflicts of interest was not preempted, despite a Part D regulation addressing conflicts of interest, because the state law involved "different kinds of conflicts" than the federal Medicare standard. *Id.* at 976. Additionally, where a Medicare standard used "highly general language," the Eighth Circuit determined that the regulation "indicate[d] an intent to leave to the states the specifics of what plans . . . may or may not" do. *Id.* at 973. In other words, the Eighth Circuit requires a "close match between federal and state standards" before it finds state law preempted. *Mulready*, 78 F.4th at 1208 (describing the Eighth Circuit's approach). Therefore, under Eighth Circuit precedent, the

31

Medicare Act does not preempt generally applicable laws like those Plaintiffs assert here.[6]

Defendants ignore binding Eighth Circuit authority and rely on non-binding Ninth Circuit precedent instead. MTD at 13-15. Defendants argue that, so long as "the conduct underlying [Plaintiffs'] allegations is directly governed by federal statutes," then "the claims are preempted by Medicare." *Id.* at 18 (quoting *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1158 (9th Cir. 2010)). Every case Defendants rely on for this mistaken contention are based on the Ninth Circuit's test—not Eighth Circuit law. *See Haaland v. Presbyterian Health Plan*, 292 F. Supp. 3d 1222, 1231 (D.N.M. 2018) (applying the Ninth Circuit test from *Uhm*); *Alston v. United Healthcare Servs., Inc.*, 291 F. Supp. 3d 1170, 1173-74 (D. Mont. 2018) (same); *Hepstall v. Humana Health Plan, Inc.*, Civil Action No. 18-0163, 2018 WL 6588555, at *6-7 (S.D. Ala. Nov. 26, 2018) (following *Uhm* and *Haaland*); *Snyder v. Prompt Med. Transp., Inc.*, 131 N.E.3d 640, 653 (Ind. Ct. App. 2019) (same); *Quishenberry v. UnitedHealthcare*, 14 Cal. 5th 1057, 1066-67 (2023) (borrowing heavily from *Uhm*).

Defendants offer no explanation attempting to reconcile these out-of-circuit cases with *Wehbi* or *Rutledge*. MTD at 18. Nor can they: the Ninth Circuit's view is incompatible with the Eighth Circuit's test. The Ninth Circuit has interpreted the Medicare preemption

---

[6] The most recent CMS Medicare Manual supports this conclusion. *See Medicare Managed Care Manual: Chapter 10 - MA Organization Compliance with State Law and Preemption by Federal Law*, https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/mc86c10.pdf (stating that "generally applicable standards[] that are not specific to health plans are not preempted" by the Medicare Act); *see Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("[T]he rulings[ and] interpretations . . . of [an agency] . . .constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.").

provision to mean that any state law that imposes *any* duty on a Medicare Advantage plan is preempted. *See Aylward v. SelectHealth, Inc.*, 35 F.4th 673, 681 (9th Cir. 2022). As a result, it focuses on whether a Medicare standard applies to *any part* of a Medicare Advantage plan's conduct to see if preemption is appropriate, *see Uhm*, 620 F.3d at 1158, not whether the state law *concerns the same subject matter* as a Medicare standard, *see Wehbi*, 18 F.4th at 972.

Defendants' reliance on Ninth Circuit law is misplaced, as the Eighth Circuit has clearly spoken on the issue. Although Defendants list several Medicare standards, *see* MTD at 17-18, they never argue that Plaintiffs' claims rely on state statutes or common law that regulate *the same subject matter* as these standards or frustrate their purpose. *See Wehbi*, 18 F.4th at 972 (requiring such analysis before finding a state claim preempted). Under this Circuit's law, the Medicare Act does not preempt any of Plaintiffs' claims.

### a.    Plaintiffs' State Common-Law Claims Do Not Regulate the Same Subject Matter as the Relevant Medicare Standards.

Even assuming *arguendo* the preemption provision applies to state common law, the state common law claims Plaintiffs assert do not regulate the same subject matter as the Medicare standards Defendants cite. Common-law claims like breach of contract or breach of the implied covenant of good faith and fair dealing, for example, regulate the express and implied terms *of a contract*—not the subject matter of the Medicare Act. *See* 17A Am. Jur. 2d Contracts § 577; Restatement (Second) on Contracts § 205. Similarly, a claim for unjust enrichment merely asks whether one party was unjustly enriched at the expense of another; it does not address Medicare standards either. *See* Restatement (Third)

of Restitution and Unjust Enrichment § 1. Indeed, these common-law claims only impose generally applicable duties.

Likewise, the common-law tort of insurance bad faith imposes liability when an insurer "fails to perform under a liability insurance policy: (a) without a reasonable basis for its conduct; and (b) with knowledge of its obligation to perform or in reckless disregard of whether it had an obligation to perform." Restatement of the Law of Liability Insurance § 49. This, too, imposes only a generally applicable duty on insurers to act reasonably and abide by the terms of their insurance policies. To the extent the tort addresses health insurance—albeit in the most general sense—it supplements Medicare standards rather than frustrating them. *See Wehbi*, 18 F.4th at 972 (explaining implied preemption does not reach such claims).

None of Plaintiffs' four common-law claims, in other words, regulate the specific subject-matter of the Medicare standards Defendants invoke. MTD 17-18. They do not address the scope of Medicare benefits for post-hospital extended care services, *see* 42 U.S.C. § 1395d(a)(2)(A); pre-admission and admission requirements for SNF services, *see* 42 C.F.R. § 409.31; conditions for meeting SNF level of care requirements, *see id.*; criteria or need for skilled services, *see id.* § 409.32; examples of or indicia of skilled nursing and rehabilitation services, *see id.* § 409.33; limitations on amount of benefits for post-hospital SNF care, *see id.* § 409.61(b); requirements for post-hospital SNF care, *see id.* § 424.20; requirements regarding who must review organization determinations, *see id.* § 422.566(d); utilization management policies and procedures, *see id.* § 422.112(a)(6)(ii);

or requirements for utilization management committees, *see id.* § 422.137.[7]

Express preemption, then, cannot preclude Plaintiffs from bringing these state common-law claims. *See Wehbi*, 18 F.4th at 972. Implied prevention cannot either: none of these common-law claims frustrate the purpose of any of the Medicare standards listed above. *See id.* They do not "interfere with" the regulations or the rules they set forth, nor do they create additional requirements that have some "bearing" on a Medicare standard. *Id.* at 973-74. Under Eighth Circuit law, Plaintiffs' state common-law claims must proceed.

### b. Plaintiff's State Statutory Claims Do Not Regulate the Same Subject Matter as the Relevant Medicare Standards.

Like the state common-law claims, Plaintiffs' state statutory claims do not regulate the same subject matter as the Medicare standards Defendants cite. Minnesota's Unfair Claims Practices Act ("MUCPA") imposes liability for "[c]ausing or permitting with such frequency to indicate a general business practice any unfair, deceptive, or fraudulent act concerning any claim or complaint of an insured or claimant." Minn. Stat. § 72A.20, subd. 12. The statute lists examples of such practices, including "refusing to pay claims without conducting a reasonable investigation based upon all available information," *id.* § 72A.20, subd. 12(4), and "failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies," *id.* § 72A.20, subd. 12(3).

---

[7] Many of the relevant regulations consist of "highly general language" that "indicates an intent to leave to the states the specifics of what plans" can or cannot do. *Wehbi*, 18 F.4th at 973. For example, 42 C.F.R. § 422.112(a)(6)(ii) requires only that an MA organization establish written "[p]olicies and procedures (coverage rules, practice guidelines, payment policies, and utilization management) that allow for individual medical necessity determinations." It does not instruct on the substance of those policies and procedures.

California's Unfair Competition Law and Insurance Code and Oregon's Unfair Claims Settlements Practices Act set out similar obligations. *See* Cal. Bus. & Prof. Code § 17200, *et seq.* (prohibiting "any unlawful, unfair or fraudulent business act or practice"); Cal. Ins. Code § 790.03(h) (classifying as unfair the practices of "failing to adopt and implement reasonable standards" for investigating and processing insurance claims and "[n]ot attempting in good faith to effectuate" settlement of claims); Cal. Code Regs. Tit. 10, §§ 2695.7(d), 2695(e) (similar); Or. Rev. Stat. § 746.230 (prohibiting unfair settlement practices like "[f]ailing to adopt and implement reasonable" claims-investigation standards or "[r]efusing to pay claims without conducting a reasonable investigation based on all available information"). These state consumer-protection laws do not regulate the same subject matter as Medicare. Instead, they complement federal law by addressing insurers' unfair business practices that the Medicare Act leaves unaddressed. *See Wehbi*, 18 F.4th at 976 (state conflict-of-interest law not preempted because it addressed additional conflicts omitted from the Act).

In contrast, many of the standards Defendants cite in support of their position deal with standards specific to niche areas these state consumer-protection laws do not regulate, like SNF care, *see* 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. §§ 409.31-33, 409.61(b), and 424.20, or utilization management committees, *see id.* § 422.137. *See* MTD at 17. Only two Medicare standards Defendants cite are even arguably relevant here. The first involves the review of organization determinations, *see id.* § 422.566(d); the second involves utilization-management policies and procedures, *see id.* § 422.112(a)(6)(ii). But none of the state consumer-protection laws asserted by Plaintiffs set rules around "[w]ho must

review organization determinations," *see id.* § 422.566(d), nor do they dictate specific utilization-management procedures insurance companies must use, *see id.* § 422.112(a)(6)(ii). They simply require that any standards for investigating claims be "reasonable." *See* Minn. Stat. § 72A.20, subd. 12(3); Cal. Ins. Code § 790.03(h); Or. Rev. Stat. § 746.230.

Under *Wehbi*, this attenuated relationship does not result in express preemption of state-law consumer-protection laws. *See* 18 F.4th at 976 (declining to find state conflict-of-interest provisions preempted just "because some federal regulations also address potential conflicts of interest," especially where the laws "address[ed] different kinds of conflicts"). Implied preemption fails too. Nothing in the consumer-protection statutes or regulations "conflict[s] with . . . or otherwise frustrate the purpose of any federal Medicare Part [C] standard." *See id.* at 974. Indeed, "[n]one of the challenged provisions interferes with" Medicare rules for organization determinations or utilization-management procedures" whatsoever. *Id.* at 973 (rejecting implied-preemption argument) (cleaned up). Accordingly, neither Plaintiffs' state common-law claims nor their statutory claims are preempted here.[8]

### C.  Plaintiffs' Unjust Enrichment Claims Are Not Precluded by The Existence of a Contract.

Defendants' argument that the unjust enrichment claim fails as a matter of law fares

---

[8] Defendants also argue that each of Plaintiffs' claims "is, at bottom, a coverage determination concerning Medicare benefits." MTD at 16. But this argument simply conflates preemption with exhaustion. *See Heckler*, 466 U.S. at 614–15 (using the "at bottom" language in the context of deciding whether a claim "arises under the Medicare Act" for exhaustion purposes only).

no better. Parties may plead "2 or more statements of a claim" in the alternative. Fed. R. Civ. P. 8(d)(2). Courts within the Eighth Circuit routinely allow parties to plead unjust enrichment claims in the alternative to breach of contract claims. *See, e.g., Genz-Ryan Plumbing & Heating Co. v. Weyerhaeuser NR Co.*, 352 F. Supp. 3d 901, 907 (D. Minn. 2018) ("This Court has repeatedly allowed plaintiffs to plead unjust enrichment claims in the alternative to contract claims."); *Motley v. Homecomings Fin., LLC*, 557 F. Supp. 2d 1005, 1014 (D. Minn. 2008) (noting that plaintiffs "may plead [an] unjust-enrichment claim in the alternative to [a] breach-of-contract claim without fear of dismissal"); *Purcell Tire & Rubber Co. v. Padfield, Inc.*, 2022 WL 2785898, at *5 (E.D. Mo. July 15, 2022) ("Although Plaintiff, ultimately, may not recover under both theories, the Court permits Plaintiff to plead alternative claims for breach of contract and unjust enrichment.").

Here, Defendants contend the unjust enrichment claim "fail[s] because 'equitable relief cannot be granted where the rights of the parties are governed by a valid contract.'" MTD at 30 (quoting *M.M. Silta, Inc. v. Cleveland Cliffs, Inc.*, 616 F.3d 872, 880 (8th Cir. 2010)). In making this argument, Defendants overlook the fact that Plaintiffs have not disputed the barriers to eventually recovering under both breach of contract and unjust enrichment theories. Rather, Plaintiffs are invoking their right to plead in the alternative— and the relevant caselaw makes clear that they are entitled to do so in these circumstances.

The singular case that the Defendants rely on to support their proposition is distinguishable from the facts at issue here. In *M.M. Silta*, the contract in question was the subject of prior litigation between the two parties, which ultimately reached the trial stage where a jury found that the defendant was not in breach of the agreement. 616 F.3d at 876.

By contrast here, the central issues have not yet been litigated between the two parties. *See id.* at 880 (noting that "the contract provided both the payment terms and the conditions under which [the defendant] could terminate the agreement," and that "the contract was properly terminated, as determined by the jury in the 2008 trial").

Unlike *M.M. Silta*, the nature of the contractual relationship between the parties in this matter is nuanced, heavily disputed, has not been resolved by a jury at trial, and has not been the subject of prior litigation by the parties. Under these circumstances, the caselaw entitles Plaintiffs to pursue their unjust enrichment claim (Count III) in the alternative to the breach-of-contract claim (Count I). *See Chem Gro of Houghton, Inc. v. Lewis Cnty. Rural Elec. Coop. Ass'n*, No. 11CV93, 2012 WL 1025001, at *3 (E.D. Mo. Mar. 26, 2012) (declining to require "hypertechnicality in pleading" because plaintiff's *intentions* to alternatively plead an unjust enrichment claim were clear).

Plaintiffs' unjust enrichment claim is appropriately pleaded in the alternative to Plaintiffs' breach of contract claim and Defendants' motion to dismiss Count III should be denied.

### D. Plaintiffs May Enforce Minn. Stat. § 72A.20 Through Minn. Stat. § 8.31 For Systemic Violations.

Plaintiffs may enforce the MUCPA, Minn. Stat. § 72A.20,[9] through Minn. Stat.

---

[9] Count six contains a scrivener's error, citing Minn. Stat. § 72A.02, not Minn. Stat. § 72A.20, when referencing the MUCPA. *See* FAC ¶ 257. Plaintiffs invoked § 72A.20, regardless of the error. The cause of action is entitled "Unfair and Deceptive Insurance Practices," and includes language from the correct statute. *Compare* Minn. Stat. § 72A.20, subd. 12 (prohibiting certain "general business practices," including "refusing to pay claims without conducting a reasonable investigation based upon all available

§ 8.31, subd. 3a, because they have alleged systemic violations that affect more than one individual. The MUCPA bars claims under section 8.31 where an "*individual* violation" is alleged, but allows claims of *systemic* violations, which Plaintiffs have alleged here. Minn. Stat. § 72A.201, subd. 1 (emphasis added); *see Findling v. Grp. Health Plan, Inc.*, 998 N.W.2d 1, 13-14 (Minn. 2023) (citing *Morris v. Am. Family Mut. Ins.*, 386 N.W.2d 233, 234 (Minn. 1986); Minn. Stat. § 72A.201).

The Minnesota Supreme Court recently clarified that Minn. Stat. § 8.31 allows a private party to enforce any state law "respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade." *Findling*, 998 N.W.2d at 6-7 (Minn. 2023) (quoting Minn. Stat. § 8.31, subd. 1). The plain language of the private attorney general statute creates a cause of action even for statutes not expressly listed in Minn. Stat. § 8.31, subd. 1. *See id.* at 7-9.

In *Findling*, the Court revisited the language in Minn. Stat. § 72A.201 and clarified its prior holding in *Morris*: "[T]he 1984 amendment [to the MUCPA] prohibited both the Attorney General and individual litigants from bringing claims for a violation of the statute where only one individual was affected—precisely the type of claim that Morris brought."

---

information"), *with* FAC ¶ 256 (discussing Defendants' "general business practice" that amounts to rejecting claims "without conducting a reasonable investigation"). Defendants also referenced Minn. Stat. Chapter 72A. *See* MTD at 31. Accordingly, no amendment is necessary to correct the error. *See Payne v. Norfork Sch. Dist.*, No. 18-CV-3072, 2019 WL 4131084, at *1 n.2 (W.D. Ark. Aug. 29, 2019) (disregarding scrivener's error because it remained clear which provision an amended complaint meant to invoke); *Gilbert v. TrueAccord Corp.*, 608 F. Supp. 3d 656, 666 (N.D. Ill. 2022) (opting not to require plaintiff to amend because complaint "alleged sufficient facts to state a claim" under a specific provision, "whether she cited the section or not").

*Findling*, 998 N.W.2d at 13-14. In *Morris*, the Supreme Court had been concerned "about giving individuals a right to bring a claim under section 8.31 to vindicate the individual rights affected by a single, stand-alone violation of Chapter 72A." *Id.* at 14 (observing that concerns raised in *Morris* were minimized by the Court's decision in *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000)).

That concern does not apply here because Plaintiffs allege a general business practice affecting an entire proposed class. This is consistent with the plain text of Minn. Stat. § 72A.201 and *Findling*, which allow Plaintiffs here to enforce the MUCPA where the violations alleged affect more than one individual. Defendants' contention that *any* violation of the MUCPA does not constitute a practice enforceable under section 8.31, would violate a foundational principle of statutory construction by rendering the particular statutory language "any individual violation" superfluous. *See* Minn. Stat. § 645.16 ("Every law shall be construed, if possible, to give effect to all its provisions."); *Kremer v. Kremer*, 912 N.W.2d 617, 623 (Minn. 2018) (holding that statutes should be read so no word, phrase, or sentence is deemed superfluous).

Defendants fail to cite *Findling* and instead rely on three non-binding cases to argue Plaintiffs cannot enforce the MUCPA through Minn. Stat. § 8.31. MTD at 31 (citing *Schermer v. State Farm Fire & Cas. Co.*, 702 N.W.2d 898, 905 (Minn. Ct. App. 2005); *Glass Serv. Co. v. State Farm Mut. Ins.*, 530 N.W.2d 867, 872 (Minn. Ct. App. 1995); *Elder v. Allstate Ins.*, 341 F. Supp. 2d 1095, 1101 (D. Minn. 2004)). This is a state-law claim, and this Court must apply the law of Minnesota as interpreted by the Minnesota Supreme Court, not the state appellate and federal district court relied on by Defendants

41

here. *Olmsted Med. Ctr. v. Cont. Cas. Co.*, 65 F.4th 1005, 1008 (8th Cir. 2023) (holding a state's supreme court binds federal courts on issues of substantive state law). In *Findling*, the Minnesota Supreme Court made it clear that *Morris* and Minn. Stat. § 72A.201 preclude only *individual* claims under the MUCPA.[10]

Aside from the Minnesota Supreme Court's clear statement on the issue, two of the non-Minnesota Supreme Court cases cited by Defendants dealt with *individual* violations of the MUCPA, so their holdings that plaintiffs lacked a private right of action are entirely consistent with *Findling*, *Morris*, and Minn. Stat. § 72A.201. *See Elder*, 341 F. Supp. 2d at 1097, 1101 (addressing individual claim by decedent's trustee against auto insurer); *Glass Serv. Co.*, 530 N.W.2d at 872 (addressing claim by individual auto-glass dealer). In the lone case cited by Defendants involving a systemic violation, the Minnesota Court of Appeals did not consider the argument that systemic violations are enforceable under the plain text of Minn. Stat. § 72A.201. *Schermer*, 702 N.W.2d at 905, *aff'd* on other grounds, 721 N.W.2d 307 (Minn. 2006). To the extent *Schermer* is inconsistent with *Findling* or the plain text of the statute, the statute itself and *Findling* control.

Here, Plaintiffs have alleged a systemic practice by Defendants to deny medically necessary care using an algorithm for patients enrolled in Medicare Advantage plans. *See, e.g.*, FAC ¶¶ 2, 38-39, 47-48, 256. This practice is not limited to a single individual or the named individuals. Accordingly, the Court should deny Defendants' motion to dismiss

---

[10] Although the issue presented in *Findling* was whether the Minnesota Health Records Act could be enforced through Minn. Stat. § 8.31, the Court engaged in an extensive and well-reasoned discussion of *Morris* and the MUCPA to reach its conclusion. That reasoning is binding here. *See Olmsted Med. Ctr.*, 65 F.4th at 1008.

Plaintiffs' claims for violations of the MUCPA.

**IV.    CONCLUSION**

For the reasons stated above, Plaintiffs request that this Court deny Defendants' motion in its entirety.

Dated: June 24, 2024

Respectfully Submitted,

/s/ Glenn A. Danas
_____

Glenn A. Danas (CA # 270317)
Ryan J. Clarkson (CA # 257074)
Zarrina Ozari (CA # 334443)
*Pro Hac Vice*
**CLARKSON LAW FIRM, P.C.**
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
rclarkson@clarksonlawfirm.com
gdanas@clarksonlawfirm.com
zozari@clarksonlawfirm.com

Karen Hanson Riebel (#0219770)
David W. Asp (#0344850)
Derek C. Waller (#0401120)
Emma Ritter Gordon (#0404000)
**LOCKRIDGE GRINDAL
NAUEN PLLP**
100 Washington Ave. South,
Suite 2200
Minneapolis, MN 55401
Tel: 612-339-6900
khriebel@locklaw.com
dwasp@locklaw.com
dcwaller@locklaw.com

James Pizzirusso (DC #477604)
Nicholas Murphy (DC#90011138)
*Pro Hac Vice Forthcoming*
**HAUSFELD LLP**
888 16th St., NW
Ste. 300
Washington, DC 20006
Tel: (202) 540-7200
jpizzirusso@hausfeld.com
nmurphy@hausfeld.com

*Attorneys for Plaintiffs*