```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT of MINNESOTA
 2
      ------------------------------------------------------------
 3                                  )
      The Estate of Gene B. Lokken, )  File No. 23-cv3514
 4    The Estate of Dale Henry       )          (JRT/SGE)
      Tetzloff, Glennette Kell,      )
 5    Darlene Buckner, Carol         )
      Clemens, Frank Chester Perry,  )  Minneapolis, Minnesota
 6    The Estate of Jackie Martin,   )  August 29, 2024
      John J. Williams as Trustee of )  2:05 p.m.
 7    the Miles and Carolyn Williams )
      1993 Family Trust, and William )
 8    Hull, individually and on      )
      behalf of all others similarly )
 9    situated,                      )
                                     )
10           Plaintiffs,             )
                                     )
11    vs.                            )
                                     )
12    UnitedHealth Group,            )
      Incorporated;                  )
13    UnitedHealthcare, Inc.;        )
      naviHealth, Inc.; and          )
14    Does 1-50,                     )
                                     )
15           Defendants.             )
                                     )
16    ------------------------------------------------------------

17

18             BEFORE THE HONORABLE JOHN R. TUNHEIM
                UNITED STATES DISTRICT COURT JUDGE
19
                         (MOTIONS HEARING)
20

21

22

23

24
          Proceedings reported by certified court reporter;
25    transcript produced with computer.
```

1   **APPEARANCES:**

2      For the Plaintiffs:     Lockridge, Grindal & Nauen, PLLP
                                     DAVID W. ASP, ESQ.

3                                        EMMA RITTER GORDON, ESQ.
                                     DEREK C. WALLER, ESQ.

4                                        100 Washington Avenue South
                                     Suite 2200

5                                        Minneapolis, Minnesota 55401

6                                        Clarkson Law Firm, PC
                                     GLENN A. DANAS, ESQ.

7                                        MICHAEL A. BOELTER, ESQ.
                                     22525 Pacific Coast Highway

8                                        Malibu, California 90265

9      For the Defendants:     Dorsey & Whitney, LLP
                                     SHANNON L. BJORKLUND, ESQ.

10                                        NICOLE A. ENGISCH, ESQ.
                                     MICHELLE S. GRANT, ESQ.

11                                        NICHOLAS PAPPAS, ESQ.
                                     50 South Sixth Street

12                                        Suite 1500
                                     Minneapolis, Minnesota 55402

13

14      Court Reporter:         LORI A. SIMPSON, RMR-CRR
                                     300 South Fourth Street

15                                        1005 U.S. Courthouse
                                     Minneapolis, Minnesota 55415

16

17

18

19

20

21

22

23

24

25

1        **P R O C E E D I N G S**

2              **IN OPEN COURT**

3

4              THE COURT:  Good afternoon.  This is Civil Case

5      Number 23-3514, Estate of Gene Lokken vs. UnitedHealth

6      Group, and there are additional plaintiffs and defendants.

7              Counsel, would you note appearances this

8      afternoon, first for the plaintiffs.

9              MR. ASP:  Good afternoon, Your Honor.  David Asp

10     from Lockridge, Grindal, Nauen for the plaintiffs.

11             MR. DANAS:  Glenn Danas from Clarkson Law Firm in

12     Malibu for plaintiffs.

13             MR. WALLER:  Derek Waller, also Lockridge,

14     Grindal, Nauen, for plaintiffs.

15             MS. BOELTER:  Michael Boelter from Clarkson Law

16     Firm for plaintiffs.

17             MS. GORDON:  Emma Ritter Gordon from Lockridge,

18     Grindal, Nauen for plaintiffs.

19             THE COURT:  All right.  Good afternoon to all of

20     you.

21             For the defense?

22             MR. PAPPAS:  Good afternoon, Your Honor.  Nicholas

23     Pappas of Dorsey & Whitney for the defendants.  I'm joined

24     by Shannon Bjorklund, Nicole Engisch, and Michelle Grant.

25             THE COURT:  All right.  Good afternoon to all of

1    you.

2           All right.  The Court has read the briefs on this

3    motion to dismiss today.  So are you going to proceed,

4    Mr. Pappas?

5           MR. PAPPAS:  Thank you, Your Honor.

6           THE COURT:  Go ahead.

7           MR. PAPPAS:  May it please the Court.

8           There are two key issues in dispute on the motion

9    to dismiss today:  First, whether Medicare Part C preempts

10   plaintiffs' state law causes of action; and, second, whether

11   plaintiffs' admitted failure to exhaust administrative

12   remedies can be excused either because they do not arise

13   under Medicare or because exhaustion can be excused under

14   *Mathews vs. Eldridge*.  The Court can rule on either of these

15   issues; and if it does so in our favor, the case should be

16   dismissed.

17          I'll start with preemption.  Plaintiffs are or

18   were members of Medicare Advantage health insurance plans

19   purchased from the defendant -- from the defendants.

20   Plaintiffs allege seven causes of action.  They allege in

21   their claims that they were entitled to coverage for the

22   cost of staying or staying longer in skilled nursing

23   facilities.

24          They claim defendants conducted insufficient

25   investigation into their individual medical histories by

 1    clinicians in favor of artificial intelligence decisions.

 2    They claim, therefore, they were denied benefits, all in

 3    violation of state common law and statutory duties.

 4          They assert common law claims for breach of

 5    contract, breach of the implied covenant of good faith and

 6    fair dealing, unjust enrichment, and various insurance

 7    bad-faith statutes.

 8          We assume these factual allegations solely for

 9    purposes of this motion, but, Your Honor, it's -- we want to

10    state for the record the defendants strongly deny that

11    artificial intelligence is used in place of individual

12    decisions by clinicians.  That's not for the Court to decide

13    today, but wanted that clear for the record.

14          All of these claims, Your Honor, and the

15    substantive underpinnings of these claims are governed by

16    Medicare standards, including the administration of Medicare

17    Advantage plans by Medicare Advantage organizations and the

18    determination of patients' coverage for insurance benefits.

19          As we discussed in our papers, in deciding the

20    motion to dismiss based on Medicare preemption, the task for

21    this Court will be to apply the Medicare Act's express

22    preemption provision.

23          And most importantly, Your Honor -- the plaintiffs

24    don't get to this until well into their brief, but this is,

25    we think, critical for this Court -- the preemption

1   provision states, quote, standards established under

2   Medicare shall supersede any state law or regulation with

3   respect to MA plans.

4          That is as broad as it sounds, Your Honor, and

5   there's case law that we've cited to the Court regarding

6   what "any state law" means, what "with respect to" means,

7   and what "standards established under Medicare" means.

8          THE COURT:  The Eighth Circuit test appears, at

9   least on its face, to be a little different than what other

10  circuits are developing on preemption.

11         MR. PAPPAS:  Your Honor, Your Honor is focused on

12  the *Wehbi* case.  We respectfully view the *Wehbi* case as

13  being no different than the Ninth Circuit case.  And the

14  *Wehbi* case, Your Honor, cites favorably to all of the cases

15  that we cited in our brief, and those cases -- and even

16  quotes those cases as the underlying conduct rationale and

17  the same subject matter rationale, which is what the Eighth

18  Circuit articulated.

19         The same subject matter and the underlying conduct

20  is exactly the rationale the Ninth Circuit used in *Uhm*.  And

21  in *Do Sung Uhm* the Ninth Circuit likewise, you know, adopted

22  a very broad standard.

23         I think the reason the Eighth Circuit's decision

24  in *Wehbi* came out differently on some of the claims there

25  was because of the context in which the Eighth Circuit was

1    ruling.  And in that case the context was Medicare Part D

2    and the application of whether Medicare Part D standards

3    apply to PBMs, pharmacy benefit administrators.  So it's

4    important to keep that context in mind, Your Honor, because

5    the PBM is one step removed from the actual patient

6    experience.

7            Our case involves that direct patient experience;

8    and the regulations of the Secretary focused precisely on

9    the direct patient experience, the medical necessity of the

10   services, the duration of the stay at the skilled nursing

11   facility, all the things that are the essence of what

12   Medicare is, which is the delivery of healthcare to our

13   seniors.

14           So Your Honor is right, and the plaintiffs have

15   argued, that the *Wehbi* case is different from *Do Sung Uhm*;

16   and we believe that a close reading would suggest otherwise.

17           And if Your Honor wouldn't mind, I would like to

18   focus on *Do Sung Uhm*, because we view that case as being

19   precisely and directly on point.  It's on point because that

20   case involved a member or an enrollee claiming denial of

21   benefits under state law, and the Ninth Circuit exhaustively

22   analyzed a common law cause of action and a statutory cause

23   of action and found both were preempted.  And as I said, the

24   Eighth Circuit cited that case with approval in *Wehbi* and we

25   think, therefore, agreed with it for all practical purposes.

1          So, as I mentioned earlier, the Ninth Circuit

2     starts by saying that the task of the court is to, quote,

3     identify the domain expressly preempted.  We view that

4     language as being similar to the same subject matter

5     standard.  And further the court said the task is to look at

6     the underlying conduct, again, language that the Eighth

7     Circuit cites.  So looking at the subject matter and the

8     underlying conduct, the court found preemption.

9          Importantly, the court also analyzed the "with

10    respect to" language and how the "with respect to" language

11    came about, as well as the other language in the statute.

12    And the Ninth Circuit focused on the amendment to the

13    preemption provision in 2003, which everyone would agree

14    expanded the applicability of preemption.

15         In that context the pre-existing amendment, which

16    is quoted in *Do Sung Uhm*, required specific conflict and

17    required that the underlying state law apply to four

18    specific categories.  Those were eliminated.  So now a

19    conflict isn't even required.  It's so long as any state law

20    applies, even to the same conduct, or outside of the four

21    specific categories would be preempted, and we think that's

22    very important to give the Court a sense of the breadth of

23    Medicare preemption here.

24         Your Honor, I would like to now explain what are

25    the applicable Medicare standards.  We cited those in our

1   papers at page 17 to 18.  They're very dense.  I won't

2   repeat the citations, but it's important for the Court to

3   focus on the breadth of the Medicare standards applicable

4   here and how they relate to plaintiffs' state law claims.

5          So the parties all agree that the plaintiffs here

6   purchased Medicare Advantage plans and that such plans are

7   governed by Medicare Part C.

8          Medicare Part C is a private insurance policy that

9   is intended to provide the same Medicare benefits that

10  traditional Medicare has.  The parties all agree that the

11  Medicare Advantage plans, therefore, are governed by strict

12  procedural rules and rules requiring maximum -- and require

13  coverage.

14         Importantly, Medicare Part A governs medically

15  necessary skilled nursing and rehabilitation care and covers

16  up to 100 days of skilled nursing in rehabilitation care for

17  a benefit period following a qualified inpatient hospital

18  stay of at least three days, subject to certain conditions.

19         So the statute itself gives you the maximum

20  benefit of 100 days in a skilled nursing facility, but under

21  what conditions, Your Honor?  The conditions are -- again,

22  this is in the statute -- are that the patient must require

23  skilled nursing or skilled rehabilitation services daily.

24  The daily skilled services must be services that, as a

25  practical matter, can only be provided in a skilled nursing

1   facility on an inpatient basis.  The services must be

2   provided to address a condition for which the patient

3   received treatment during a qualified hospital stay or that

4   arose while the patient was receiving care in a skilled

5   nursing facility.  That's at 42 U.S. Code 1395f(a)(2)(B).

6   Again, it's in our papers, Your Honor.

7            Congress delegated broad rule-making authority to

8   the Secretary of HHS to further elaborate on these general

9   standards.  How do you determine whether daily care is

10  required?  How do you determine what is the nature of the

11  care?  What is the conditions for which the patient received

12  services in the hospital prior to going to the skilled

13  nursing facility?  And that's at 1395w-26(b).

14           So under that broad rule-making authority, the

15  Secretary adopted regulations governing plan benefit

16  determinations, and that's at 42 C.F.R. 422.566 through

17  422.576.  I won't quote those further, Your Honor, but those

18  regulations deal with things like pre-admission and

19  admission requirements, level of care requirements, criteria

20  and the need for skilled services, examples of skilled

21  nursing at rehabilitation services provided in the regs,

22  limitations on the amount of benefits, and requirement for

23  post-hospital care.

24           The required investigation into medical necessity

25  is also addressed, and this is the most important one,

1    Your Honor, the one that we think directly is covered by the

2    plaintiffs' claims here.  Most -- the regulations clearly

3    provide that an adverse coverage determination must be

4    reviewed by a physician or other appropriate healthcare

5    professional, and that's 42 C.F.R. 422.566(d).

6         So the plaintiffs' claim that AI is used rather

7    than physicians would directly violate a Medicare

8    regulation.  It doesn't happen, Your Honor, as I said

9    earlier, but that's not for the Court to decide today.

10   We're assuming that it does happen.  But it's already

11   covered.  It's already illegal under the Medicare

12   regulations.

13        Similarly, Your Honor, federal regulations require

14   Medicare Advantage plans to have written utilization

15   management policies and procedures that allow for individual

16   medical necessity determinations.

17        The Secretary has, in fact, recently this year

18   published frequently asked questions specifically approving

19   the use of algorithms and AI to assist in making coverage

20   determinations.

21        So while AI may be used to assist, Your Honor, the

22   Secretary has not said that you can simply have AI make the

23   decision.  The physician has to make the decision, but AI

24   can be used.

25        So the point of this, Your Honor, the regulations

1   of the statute already deal with the issue of how AI can or

2   cannot be used in the context of determining lengths of stay

3   and the medical necessity for skilled nursing services.

4          So going back to *Do Sung Uhm*, Your Honor, in

5   addition to dealing with the legislative history and the

6   interpretation of the words "with respect to," the court

7   also focused on the interpretation of "any state law or

8   regulation" and the court said by using "any," the court

9   distinguished the Medicare preemption provision from the

10  Boat Safety Act, which plaintiffs have cited to as being

11  somehow analogous.

12         The Boat Safety Act used "a state law" and

13  interpreted that to only refer to statutory claims rather

14  than common law claims, and the Ninth Circuit said, well,

15  no, the word "any" makes a difference and because Congress

16  used the word "any," it's a broader preemption provision.

17  And I think, interestingly, because the Eighth Circuit cited

18  to the *Uhm* case, we think the Eighth Circuit likewise

19  adopted that broader interpretation.

20         So in opposition to our motion to dismiss, the

21  plaintiffs argued that "any state law" does not include

22  common law claims, and I've addressed that already.

23         They rely on other non-Medicare cases, which we've

24  addressed in our papers, so I won't deal with that today,

25  Your Honor.

1          We've already talked about *Wehbi*, so, Your Honor,

2     unless Your Honor has any further questions on *Wehbi*, I'll

3     skip through all of that.

4          And I think where that leaves me is the exhaustion

5     argument, Your Honor, exhaustion.  So exhaustion is an

6     alternative ground.  It's -- we put it in there.  The

7     plaintiffs basically don't even dispute that none of the

8     plaintiffs here went through all levels of exhaustion, but

9     they nevertheless seek to excuse the plaintiff from

10    exhaustion on two grounds:

11         One, that the plaintiffs' claims don't, quote,

12    arise under the Medicare Act and "arising under," for

13    purposes of Medicare, is somehow similar to the "with

14    respect to" analysis, Your Honor.

15         To the extent that a claim -- let's see.  Yeah,

16    Your Honor, to the extent the plaintiffs' claim is, quote,

17    inextricably intertwined with a benefit determination, even

18    though it's brought under state law nomenclature, the courts

19    have held that that nevertheless is a claim that arises

20    under the Medicare Act.

21         And we believe there's no question but that the

22    plaintiffs' claims deal with benefit determinations and

23    coverage determinations.  In fact, Your Honor, Counts I and

24    II of the Complaint are brought on behalf of a class they've

25    named the benefit denial class.

1           They've cited in their papers their alleged

2      monetary losses being their out-of-pocket expenses for

3      paying for the skilled nursing facilities.  So when the

4      plaintiffs lost coverage under the Medicare Advantage plan,

5      some of the plaintiffs stayed in the skilled nursing

6      facility and paid out of pocket.  So they're seeking

7      reimbursement of those funds.  Well, that is equivalent to

8      the benefit determination.

9           But putting aside their direct claim for benefits,

10     which we think the Complaint suggests they are asserting,

11     all of their claims are predicated and intertwined with the

12     loss of coverage.  All of the alleged failure to

13     investigate, the bad-faith insurance claims are all

14     predicated on you improperly denied me benefits, you denied

15     my stay and caused me to leave because you didn't

16     investigate individually, you used AI.

17          For all those reasons, Your Honor, we think it's

18     quite clear that the plaintiffs' claims arise under because

19     they're inextricably intertwined.

20          THE COURT:  So the evaluation of the Medicare Act

21     for resolution here would involve the regulations that

22     determine how you define benefits?  Is that what your

23     argument is, that the arising under or with respect to the

24     Medicare Act would implicate the regulations and how you're

25     supposed to evaluate claims?  Am I --

1          MR. PAPPAS:  That's correct.

2          THE COURT:  -- accurate about that?

3          MR. PAPPAS:  The regulations in the statute

4    itself, Your Honor, the -- how one evaluates claims is what

5    in the healthcare world is called utilization review.  Is

6    the medical service medically necessary, right?  And that is

7    extensively regulated by the regulations.

8          THE COURT:  Do the terms of the insurance contract

9    matter?

10         MR. PAPPAS:  The terms of the insurance contract

11   matter to the extent that they only bolster the point that

12   the Medicare regulations apply.  We gave the Court excerpts

13   for those.  But that's all they say.

14         It's very clear that everyone knew from the very

15   beginning your Medicare Advantage contract is intended to

16   replicate the benefit that you would get under traditional

17   Medicare and that the regulations apply, and there's other

18   terms and conditions there.  I don't think the Court needs

19   to construe the plan in any way other than that.  It's

20   purely for informational purposes that we gave the Court

21   that information.

22         Now, the plaintiffs say, well, we don't seek

23   benefits here, so therefore there's no inextricable

24   intertwining, right?  This isn't a claim for benefits.  We

25   disclaim benefits, right?

1          Your Honor, the cases have dealt with that.  The

2     cases make clear that that's not dispositive.  Again, we

3     cite the *Uhm* case, but there are other cases, *Kaiser vs.*

4     *Blue Cross of California*, *Shalala vs. Illinois Council on*

5     *Long Term Care*.  We cite those in our papers.

6          The *Heckler vs. Ringer* case from the U.S. Supreme

7     Court likewise makes clear that the court is to look behind

8     the pleadings and look to what is, at bottom, the

9     plaintiffs' claim.

10          In *Heckler vs. Ringer*, it was an injunctive relief

11     case.  There was no claim for benefits and the court

12     described the plaintiffs' claim in that case as a disguised

13     claim for benefits, that the plaintiffs really were

14     complaining about I didn't get my benefit, right?

15          And the plaintiffs here are saying, well, you used

16     AI and that's the problem.  Well, the only relevance of

17     using AI is they claim some denial of benefits.  So in the

18     same way that *Heckler vs. Ringer* was a disguised claim for

19     benefits, so is the plaintiffs' claim here; and it's not

20     even so disguised, as I mentioned earlier, Your Honor.

21          The other ground on which the plaintiffs are

22     seeking to avoid exhaustion here, Your Honor, is that the

23     exhaustion should be excused on the grounds of -- set forth

24     in *Mathews vs. Eldridge*.

25          We've cited the Court to another Supreme Court

1    case, *Califano vs. Sanders*, which we were surprised that

2    plaintiffs didn't even cite to the case in their opposition.

3    But *Califano vs. Sanders* makes clear that *Mathews vs.*

4    *Eldridge* applies only where a claim is brought alleging

5    constitutional violations.

6            And in that case the court said, well, of course

7    if you are alleging denial of constitutional rights, there

8    will be a federal court remedy available to you.  We're not

9    going to require you to go back to the administrative agency

10   and assert a constitutional claim, which is going to be

11   decided by a court anyway.

12           Plaintiffs haven't asserted a constitutional

13   claim, Your Honor.  So based on that, under *Califano vs.*

14   *Sanders*, the plaintiffs cannot use *Mathews vs. Eldridge* to

15   excuse exhaustion.

16           But even under *Mathews vs. Eldridge*, Your Honor,

17   if the Court applies the *Mathews vs. Eldridge* standards,

18   the -- in that case you have to have the claim being

19   collateral to a claim for benefits.  You have to have

20   irreparable harm and futility.  Each of those -- we laid

21   this out in our papers.  Each of those requirements are not

22   met here.

23           Whether post-acute care was medically necessary,

24   whether AI was used and that complies with Medicare

25   regulations or the use of utilization management policies,

1    these are all at the heart of claims for benefits, as I

2    mentioned earlier, Your Honor.  So they don't meet the first

3    standard of a collateral matter.

4         In terms of irreparable harm, courts have

5    routinely held that a delay in the payment of benefits that

6    arises from exhaustion is not irreparable harm, and

7    therefore they don't meet that standard either.

8         And, finally, there's no evidence and they can't

9    show that exhaustion would be futile.  In fact, some of the

10   plaintiffs themselves succeeded in their administrative

11   appeals for denial of benefits and some of them are still

12   pursuing administrative claims.

13        Ms. -- Plaintiff Lokken and I don't remember the

14   other one, but there's another plaintiff whose claims are

15   ongoing.

16        There's a third plaintiff who her claims -- or his

17   claims were ongoing at the time of the Amended Complaint,

18   although the time has expired.  If tolling applies, that

19   plaintiff will also potentially have an administrative

20   remedy.

21        And, likewise, even the plaintiffs that didn't

22   pursue any administrative appeals can seek excusal from the

23   Secretary of statutory deadlines and regulatory deadlines.

24        So all of the plaintiffs could have and certainly

25   some even today can assert administrative claims.  So

1   there's no way the plaintiffs are going to be able to show

2   that exhaustion would be futile.

3           And unless the Court has any questions, that's

4   what I have today.

5           THE COURT:  That's fine.  Thank you, Mr. Pappas.

6           Mr. Asp.

7           MR. ASP:  Thank you, Your Honor.

8           The defendants' position on Medicare preemption

9   would lead you to error because it does not follow the

10  Eighth Circuit's decision in *Wehbi*, which talks about how

11  the Court should apply Medicare's preemption clause to state

12  claims.

13          The defendants have the burden to prove

14  preemption, which means that they have the burden to set

15  forth the test.  And under *Wehbi* what that means is that

16  they need to set forth the specific state law requirements

17  that they say are displaced and then apply the specific

18  federal statute or regulation that displaces them.

19          Instead of doing that here, what they've asked you

20  to do is to say that basically because this is covered by

21  Medicare or governed by Medicare, that the state laws are

22  preempted.  That would be an error.

23          Now, the response today and in the briefing is

24  that defendants believe that the Eighth Circuit in *Wehbi*

25  adopted the standards in the -- that they cited in their

1    opening brief.  *Wehbi* wasn't cited in defendants' opening

2    brief.  They were out-of-circuit cases.

3         And we heard again today the claim that all of the

4    cases that they cited were cited by *Wehbi* or that we argued

5    about were cited by *Wehbi*, and that's not true.  Three of

6    them were.  The rest were not, including the California

7    Supreme case -- Supreme Court case that they rely heavily on

8    in their opening brief.  It's also important to look at how

9    *Wehbi* cited those cases.

10        It's not true to say that *Wehbi* adopted the Ninth

11   Circuit's approach.  The *Uhm* case, which my colleague

12   mentioned, was a cf. cite at the end of a paragraph on page

13   971 of the opinion for the proposition that standards in the

14   preemption clause refers to statutes and regulations.

15   Nowhere does the Eighth Circuit say we followed the Ninth

16   Circuit's approach in this case.  In fact, the Eighth

17   Circuit does say we're creating a framework for considering

18   Medicare preemption.  So the Eighth Circuit is doing

19   something different.

20        If that's not clear from the case itself, which we

21   think it is, you can look at the Tenth Circuit's decision in

22   *Mulready*, which we cited in our response brief and was not

23   in the reply.  In that case the Tenth Circuit acknowledges

24   that the Eighth Circuit is doing something different.  The

25   analysis is more narrow in the Eighth Circuit than it is in

1    the Ninth Circuit, the First Circuit, and the other cases

2    that were cited in the defendants' briefing.

3          So the question is how do you apply *Wehbi*, the

4    Eighth Circuit's framework, here.  I think there's three

5    things you can draw from the standard described by the

6    Eighth Circuit:

7          First, as noted in the opinion, as I just

8    mentioned, the term "standards" means statutes and

9    regulations.

10          So one of the things the defendants have cited to

11    are policy guidance, including a frequently asked question

12    about the use of AI.  That can't preempt state law.  The

13    only things that can preempt it are the statute or the

14    regulation.

15          THE COURT:  Where is the claim that AI was used

16    coming from here?  Is this -- I mean, I understand, I think,

17    what the defense is saying, that it can be and properly used

18    as a part of an evaluation tool, but it's still a doctor

19    making the decision.  Is this -- this isn't farmed out to

20    AI, is it?  Or where is this coming from?

21          MR. ASP:  Our allegation is that it is.  And the

22    allegation is that the doctors, the medical directors are

23    pressured to follow the AI recommendation, which is

24    artificially low.  If they don't follow it, they are

25    punished.  And as a result, almost all of the claims are

1    overturned on appeal because they're not actual medical

2    necessity determinations, they're the algorithm's

3    determinations.

4         THE COURT:  I see.  Okay.

5         MR. ASP:  And that's kind of an important issue

6    because -- and I will kind of jump to this.  When he does --

7    when they do cite to the specific standards, the one that I

8    think he emphasized here today was one that says that a

9    physician has to make a medical necessity determination.

10        And that is in the regulation, but the regulation

11   is broad.  It doesn't say what happens when the physician is

12   pressured to ignore their professional judgment and follow

13   the algorithm, for example, or they have to do it or face

14   punishment.  Those are the things that we've alleged here,

15   and that's the classic kind of bad-faith conduct that states

16   typically regulate.

17        So if you look at what *Wehbi* says at page 971, it

18   talks about again the preemption provision.  It defines the

19   term "supersede" to mean displace.  So the Medicare statute

20   applies to preempt state laws that are displaced by

21   Medicare.

22        And the way that *Wehbi* does that analysis is looks

23   at every particular state law in North Dakota, in that case,

24   and then says how is this actually displaced.  You can't

25   just say it's government Medicare; it has to be displaced.

1            So -- and, notably, the Eighth Circuit also said

2    that when a federal rule uses highly general language, it

3    leaves the specific regulation to the states.  So it doesn't

4    mean the state can't regulate at all in an area.  It means

5    that it's acknowledging the state is regulating that area.

6            And that's a very important point because we cite

7    to the Medicare Managed Care Manual.  This is in footnote 6

8    of our brief.  And the agency says other state health and

9    safety standards or generally applicable standards that are

10   not specific to health plans are not preempted.  So that's

11   the agency telling you that if it's generally applicable, it

12   wouldn't be preempted.

13           It's also important here, I think one of the

14   points this morning -- I don't know if it was in the

15   briefing, but I heard the defense make here -- is that while

16   the *Wehbi* case involved PBM regulation, that's a different

17   type of regulation because it's -- I think the language used

18   was doesn't -- not about the direct patient experience, but

19   about the conduct of PBMs.

20           But, to me, that's more likely to be preempted

21   than the state common law because in North Dakota they're

22   passing a particular law governing the conduct of PBMs as it

23   relates to Medicare and they're saying that's not preempted.

24   They're unsatisfied with the federal regulation doing more.

25           Here we're talking about generally applicable

1    state laws that historically have applied to insurance

2    company conduct when they're looking at -- when they are

3    deciding claims in bad faith.  Those wouldn't be preempted.

4    It would be allowed to proceed.

5         And so just a couple more points on the analysis

6    from *Wehbi* is that if you look at the actual way that it

7    applied -- there, for example, is a North Dakota statute on

8    conflict of interest with PBMs.  There also was a Medicare

9    standard on conflict of interest.

10        So the Eighth Circuit is looking at that and

11   saying, well, that subject matter doesn't mean that the

12   state law -- the fact that it's the same subject matter

13   doesn't mean that it's preempted.  It just means the state

14   and federal laws are doing similar things.  It's not

15   displacing the area; it's just similar.

16        And we'd argue that's the same time thing here.

17   We're using generally applicable state laws to govern

18   insurance company conduct in handling claims, even if those

19   claims are separately regulated by Medicare.

20        We think that when you apply *Wehbi* and look at it

21   as it applies to the claims here, actually as the court

22   would instruct you to do, you will find that they're not

23   preempted.

24        So with -- on the exhaustion issue, I want to be

25   clear about the framework that we're dealing with here.  If

1    you conclude that it doesn't arise under the Medicare

2    statute, that our claims don't arise under Medicare, then

3    the analysis is finished.  You wouldn't go down the line to

4    consider whether there's a waiver on exhaustion of remedies.

5         So I think the way the courts describe it, and I

6    think the *Ringer* case is what defendants have relied on, it

7    talks about:  At bottom, is this really a claim for

8    benefits?  Are you saying with your declaratory judgment or

9    whatever other claim you have, that at the end of the day

10   you want to recover benefits here?

11        And that's not this case.  That's not what we're

12   asking about.  Our objection is to the way that they are

13   using AI to handle claims as they're being considered or as

14   they're determining -- making medical necessity

15   determinations, regardless of whether that results in a

16   claim of approval or not.  It's not a claim for benefits.

17        If we prevail on this case, it's possible that

18   claims could go back through the process and still be denied

19   for a separate reason.  We don't get automatic approvals, as

20   they were talked about in *Ringer*.  This is about the conduct

21   in deciding claims.

22        So we think that makes it distinguishable.  That

23   should lead you to conclude that it doesn't arise under

24   Medicare and, as a result, the exhaustion -- or the

25   exhaustion of administrative remedies requirement wouldn't

1    apply.

2         If you conclude that it does apply, that it does

3    arise under Medicare, then we'd say the exhaustion

4    requirement is waived.  And that analysis has been discussed

5    by the Eighth Circuit several times and none of those cases

6    that we cite by the Eighth Circuit, including cases like

7    *Schoolcraft* or *Mental Health Association of Minnesota*, none

8    of those cases say that waiver of exhaustion is only

9    available to constitutional claims.  That's not the law.

10        Now, they criticized us for not citing the

11   *Califano* case.  I think if you look at that case, you will

12   see that what the Supreme Court is doing is not setting

13   forth a rule that says it only applies to constitutional

14   claims.  It's recognizing that when there are constitutional

15   claims, the exhaustion requirement might not apply, but it

16   is not limiting the cases in that way.  And that's how you

17   read the case so it's consistent with the Eighth Circuit

18   case law.  They're not citing the case that says -- in the

19   Eighth Circuit that has that rule.

20        Just as a sort of -- this didn't come up yet, but

21   one of the issues in the briefing was about the presentment

22   requirement, and that is a nonwaivable subject matter

23   jurisdiction requirement.

24        All of the claims here were presented in that they

25   were initially submitted or, if there was a denial, there

1    was an initial appeal.  So we did satisfy the presentment

2    requirement, which is the only piece that goes to

3    nonwaivable subject matter jurisdiction.  And the best case

4    to look on that in the Eighth Circuit, I think, is *Mental*

5    *Health Association of Minnesota*, which talks about what that

6    requirement means.

7              Another issue before I get to the exhaustion

8    analysis:  The defendants had made this argument, that

9    claims have to be submitted to the Secretary, not a managed

10   care organization, even though all the other functions are

11   delegated to that organization.

12             I think that analysis is incorrect, and the best

13   way to respond to that is to look at the Ninth Circuit's

14   decision in a case called *Global Rescue Jets*.  That's

15   30 F.4th 905.  It talks about why submitting a claim to the

16   MAO is sufficient for -- to present the claim.

17             So with respect to the three factors on whether to

18   waive the exhaustion requirement, I think these claims are

19   collateral because -- and if you look again at *Schoolcraft*,

20   at *Bowen*, the Supreme Court case, those cases have a similar

21   situation, where those cases actually were enforcing federal

22   regulations and saying we -- it doesn't do us any good to

23   appeal these on a claim-by-claim basis.  Because you've

24   enacted some type of policy on a broader scale, as we have

25   here, that means that those -- we can't get relief on an

1    individual basis.  So it's not collateral.  We're arguing

2    about what they've done with the claims process, not a

3    particular claim.

4         It also is absolutely the case that we're looking

5    at both irreparable injury and futility here.  I really

6    don't think there can be an argument any other way.  In the

7    briefing, as I read it, the defendants have essentially

8    tried to rewrite our Complaint so that all we're complaining

9    about is individual claims for benefits and we owe money.

10        But if you look at the allegations in the

11   Complaint and then compare them to these Eighth Circuit

12   cases, you will see these are exactly the types of

13   circumstances where there is irreparable injury and there's

14   futility in continuing to process.  And let me just give you

15   a couple of examples.

16        One of our clients is Frank Perry.  That's at

17   paragraphs 136 and 137.  He had ongoing health issues due to

18   ongoing denials.  The denials would appear two days after

19   the appeal was decided.  So he would appeal, but then get a

20   new denial over and over again.  He suffered longstanding

21   health damage, not just financial damage, but longstanding

22   harm due to the defendants' use of AI.

23        Jackie Martin -- this is 140 to 150 -- received

24   weekly notices of noncompliance, even after his appeal

25   succeeded.  So appeals -- the appeal is totally futile.  You

1   win the appeal.  They continue to tell you they're denying

2   the claim.  That happened through naviHealth, by the way,

3   even after someone at UnitedHealth told him that the claim

4   should be covered.  So he's just continually running into

5   this issue over and over.  It is a fundamental problem with

6   how it was being handled.  Eventually he stopped treatment,

7   left, and died.  So he suffered irreparable injury.

8        The plaintiffs here suffered irreparable injury

9   that's not just money, and it is futile for them to continue

10  to appeal.  They can't address the ultimate issue here.  So

11  if there is an exhaustion requirement that applies, it

12  should be waived here.

13       Thank you.

14       THE COURT:  Thank you, Mr. Asp.

15       Did you have a brief reply, Mr. Pappas?

16       MR. PAPPAS:  Briefly, Your Honor.

17       First, Your Honor, going back to *Wehbi* or web-ee,

18  however you pronounce it, it's important for the Court to

19  recognize that PBMs have historically been regulated by the

20  states.  And I don't think the plaintiff can say,

21  notwithstanding that there are these insurance bad-faith

22  statutes, that these types of claims are in the area of

23  state regulation.

24       These types of claims are claims relating to

25  Medicare Advantage insurance.  It's a creature of federal

1    statutes and a federal benefit.  There's no question that

2    Medicare has -- prior to Part C coming into play, these

3    people were all governed by Medicare.  So going all the way

4    back to the '60s, you had the Medicare statute and Medicare

5    regulations.  So there's no similar historical regulation by

6    the states in these specific types of areas.

7            In terms of -- I heard counsel argue that when --

8    the state laws are doing similar things to the federal laws

9    and therefore can't be preempted under that circumstance.

10           We cite the case *Aylward*, Your Honor.  In the

11   *Aylward* case -- it's a Ninth Circuit case -- the court cites

12   to the ERISA body of law making clear that preemption exists

13   even where the states are purporting to do something similar

14   to the federal statute because they may impose different

15   remedies and therefore undermine the national uniform scheme

16   that Medicare is intended to capture.

17           And the language of the court in the *Aylward* case

18   was that Medicare preempts state law when a state law duty

19   parallels, enforces, or supplements an express federal MA

20   standard on the subject.

21           So to some degree that's what's happening --

22   that's what the plaintiffs are arguing here.  They're

23   saying, well, you know, state law will further the federal

24   interest, but the federal interest doesn't provide the types

25   of remedies that state law would provide and therefore are

1    preempted.

2         Further, Your Honor, in terms of whether

3    exhaustion should be required here, the plaintiffs did in

4    some cases seek to exhaust.  They brought claims for

5    benefits.  I understand one of the plaintiffs even

6    challenged the use of AI.

7         There is a way to bring that claim, the

8    plaintiffs' claim here, to the Secretary.  We argued in our

9    papers that the Secretary is actually the proper defendant

10   here if they wish to make that claim.

11        405(g) of 42 U.S. Code, which is what creates

12   jurisdiction for the Court to look at, review Secretary

13   determinations, requires, as a predicate to the Court having

14   any jurisdiction at all, that there be a final determination

15   by the Secretary.

16        The plaintiffs claim here that AI is used to

17   automatically deny care in the place of a physician.  It's

18   not been brought to the Secretary and therefore the Court

19   has no jurisdiction absent that being exhausted and reviewed

20   in accordance with the statute.  There's no reason that

21   plaintiffs can't do that.

22        *Califano*, Your Honor, I -- with respect to

23   counsel, I think he is completely misreading the *Califano*

24   case.  The *Califano* case did not simply affirm that if

25   there's a constitutional claim, that that is a collateral

1   claim.  The Supreme Court was considering whether or not

2   exhaustion should be excused and said it should not in that

3   case because there was no constitutional claim.

4           That's exactly our case.  There's no

5   constitutional claim; therefore, exhaustion cannot be

6   excused when the claims are covered by or arise under the

7   Medicare statute.

8           In terms of presentment, Your Honor, we looked for

9   it.  There's no case cited in the plaintiffs' papers.  The

10  one case they did cite, saying that you can somehow present

11  to the Medicare Advantage organization rather than to the

12  Secretary, had to do with a completely different context,

13  federal officer jurisdiction.

14          Well, surely in removing a case from state court

15  to federal court you can remove if the Medicare Advantage

16  plan is sued and therefore there could be federal officer

17  jurisdiction.

18          That is a far cry from saying that the Medicare

19  Advantage plan is the Secretary for purposes of 42 U.S. Code

20  405(g).  405(g) is very clear that the Secretary's final

21  determination is what this Court has jurisdiction to review

22  in a claim arising under the Medicare Act.

23          Thank you, Your Honor.

24          THE COURT:  All right.  Thank you, Mr. Pappas.

25          Did you have anything else, Mr. Asp?

1          MR. ASP:  No, Your Honor.

2          THE COURT:  Okay.  Thank you.

3          Thank you, Counsel, for arguments today.  Very

4     helpful.  The Court will take the motion under advisement.

5     We'll issue a written order as quickly as possible.  Thank

6     you.

7          Have a good weekend, everyone.

8        *(Court adjourned at 2:49 p.m.)*

9                         *     *     *

10         I, Lori A. Simpson, certify that the foregoing is a
      correct transcript from the record of proceedings in the
11    above-entitled matter.

12                Certified by:  *s/ Lori A. Simpson*

13                               Lori A. Simpson, RMR-CRR

14

15

16

17

18

19

20

21

22

23

24

25