UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| The Estate of Gene B. Lokken et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UnitedHealth Group, Inc., et al.,<br><br>Defendants. | No. 23-cv-3514 (JRT/SGE) |

**ORDER ON ESI PROTOCOL**

Pursuant to the parties' stipulation (Dkt. 135), the Court enters the following protective order regarding the discovery of electronically stored information ("ESI") and paper documents in this matter:

I. **GENERAL PROVISIONS**

A. **Applicability:** This ESI Protocol will govern the production of Electronically Stored Information ("ESI") and paper documents as a supplement to the Federal Rules of Civil Procedure, this Court's guidelines for discovery of ESI, and any other applicable orders and rules. To the extent that a Party collected and processed documents prior to the entry of this ESI Protocol, and production of such documents cannot be made in accordance with the terms of this ESI Protocol, the Parties shall meet and confer concerning the potential formats of the production of any such documents. The Parties agree to promptly alert all other Parties concerning any technical problems associated with complying with this ESI Protocol. To the extent compliance with this ESI Protocol imposes an undue burden with respect to any protocol, source, or search term, the Parties shall promptly confer in an effort to resolve the issue. If the Parties are unable to resolve the issue by mutual agreement after such conference, the Party seeking relief may move the Court for relief.

B. **Cooperation:** To the extent reasonably possible, the production of documents shall be conducted to maximize efficient and quick access to Documents and minimize related discovery costs. The terms of this ESI Protocol should be construed to ensure

the prompt, efficient, and cost-effective exchange of information consistent with the Federal Rules of Civil Procedure, the Local Rules, and any Orders by this Court.

C. **Limitations & Non-Waiver:** Nothing in this ESI Protocol shall be construed to affect the admissibility of discoverable information. All objections to the admissibility of any documents are preserved and may be asserted at any time. Compliance with this ESI Protocol does not constitute a waiver, by any Party, of any objection to the production of particular ESI for any reason, including as irrelevant, undiscoverable, otherwise inadmissible, unduly burdensome, not reasonably accessible, or privileged. Nor does compliance constitute a waiver of any right to discovery by any Party. For the avoidance of doubt, a Party's compliance with this ESI Protocol will not be interpreted to require disclosure of information potentially protected by the attorney-client privilege, the work product doctrine, the common-interest and joint-defense privileges, or any other applicable privilege. All Parties preserve all such privileges and protections, and all Parties reserve the right to object to any such privileges and protections.

D. **Deadlines:** References to schedules and deadlines in this ESI Protocol shall comply with Fed. R. Civ. P. 6 with respect to computing deadlines.

E. **Definitions:**

   1. Plaintiffs and Defendants, as well as their officers, directors, employees, agents, and legal counsel, are referred to as the "Parties" solely for the purposes of this ESI Protocol. A single Plaintiff or Defendant, as well as, where applicable, its respective officers, directors, employees, agents, and legal counsel, may also be referred to as a "Party" solely for the purposes of this ESI Protocol.

   2. "Plaintiffs" as used herein shall mean Plaintiffs as set forth in the First Amended Class Action Complaint (Dkt. 34) or as amended, including in any subsequent complaint.

   3. "Defendants" as used herein shall mean Defendants named in the First Amended Class Action Complaint (Dkt. 34), or as amended, including in in any subsequent complaint.

   4. "Discovery Material" is defined as all information produced, given, or exchanged by and among all Parties, or received from non-Parties in the Litigation, including all deposition testimony, testimony given at hearings or other proceedings, interrogatory answers, documents, and all other discovery-related materials, whether produced informally or in response to requests for discovery.

    5. "ESI" as used herein means "electronically stored information" and shall have the same meaning as defined under the Federal Rules of Civil Procedure.

    6. "Metadata" means and refers to data providing information about data, and includes without limitation: (i) information embedded in or associated with a native file that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file which describes the characteristics, origins, usage and/or validity of the electronic file and/or (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system.

    7. To avoid misunderstandings about terms, all Parties should consult the most current edition of The Sedona Conference Glossary.

**F. Authenticity and Admissibility:** Nothing in this ESI Protocol shall be construed to affect the authenticity or admissibility of any document or data. All objections to the authenticity or admissibility of any document or data are preserved and may be asserted at any time.

**G. Scope:** This ESI Protocol shall not enlarge, reduce, or otherwise affect the proper scope of discovery in this Litigation, nor imply that discovery produced under the terms of this ESI Protocol is properly discoverable, relevant, or admissible in this or in any other litigation. Additionally, this ESI Protocol does not enlarge, reduce, or otherwise affect the preservation obligations of the Parties.

**H. Confidential Information:** For the avoidance of doubt, nothing herein shall contradict the Parties' rights and obligations with respect to any information designated as confidential under the Protective Order entered in this case.

**I. Preservation:** The Parties agree that they shall continue to take reasonable, good faith and proportional steps to preserve relevant documents and ESI in accordance with their obligations under applicable law. The parties will meet and confer to identify appropriate limits to discovery, including limits on custodians, data sources, scope, time periods for discovery, and other parameters to limit and guide preservation. By preserving or producing information for the purpose of this Litigation, the Parties are not conceding that such material is discoverable or admissible.

**J. Encryption:** To maximize the security of information in transit, any media on which documents are produced may be encrypted by the producing Party. In such cases, the producing Party shall transmit the encryption key or password to the requesting Party, under separate cover, contemporaneously with sending the encrypted media.

## II. GENERAL PRODUCTION FORMAT PROTOCOLS

A. **TIFFs:** Except for structured data, all production images will be provided as a black-and-white, single-page Group IV TIFF of at least 300 DPI resolution with corresponding multi-page text and necessary load files. Each image will have a file name that is the unique Bates number of that image, pursuant to ¶ II(E). Original document orientation should be maintained to the extent reasonably practicable and technologically possible for a producing Party (*i.e.*, portrait to portrait and landscape to landscape). The imaged Data shall retain all attributes of the native or hard-copy file, such as document breaks. To the extent reasonably practicable, produced TIFF images will show all text and images that are visible in the form in which the electronic document was last saved, with the exception of redacted portions. Hidden content, tracked changes or edits, comments, notes, and other similar information, to the extent viewable within a document in its native file format shall also be imaged so that such content is viewable on the image file. Nothing in this subsection requires the modification or alteration of any document or data to make any hidden content, tracked changes or edits, comments, notes, and other similar information viewable if it is not already viewable in the form in which the electronic document was last saved. Documents that are difficult to render in TIFF because of technical issues, or any other documents that are impracticable to render in TIFF format, may be produced in their native format with a placeholder TIFF image stating "Document Produced Natively," or in the alternative, if applicable, "Exception File Unable to Be Imaged." A producing Party retains the option to produce ESI in alternative formats if so agreed by the requesting Party, which may include native format, or a combination of native and TIFF formats. Requests for color copies of a particular document shall be handled on a case-by-case basis. Reasonable requests for color copies—e.g., if a receiving Party believes that a color version of a document is necessary to understand its contents or wishes to use a color version as an exhibit for trial or dispositive motion practice—should be accommodated, provided that the total number of case-by-case requests is also reasonable. If a producing Party converts a document to color image in response to a request from a receiving Party, the Producing Party shall do so in JPEG, TIFF or such other format as agreed with the Requesting Party.

B. **Text Files:** Each ESI item produced under this ESI Protocol shall be accompanied by a text file as set out below. All text files shall be provided as a single document level text file for each item, not one text file per page. Each text file shall be named to use the Bates number of the first page of the corresponding production item.

1. **OCR:** A producing Party may make paper documents available for inspection and copying/scanning in accordance with Fed. R. Civ. P. 34 or, additionally or alternatively, scan and OCR paper documents. Where OCR is used, the Parties will endeavor to generate accurate OCR and will utilize

        OCR processes and technology of sufficient quality to enable the generation of utilizable text files. OCR text files should indicate page breaks where possible. Even if OCR is used by a producing Party, however, the Parties acknowledge that, due to poor quality of the originals, not all documents lend themselves to the generation of accurate OCR.

    2.    **ESI:** Except for redacted documents, emails and other ESI will be accompanied by extracted text taken from the electronic file itself, where available.

    3.    **Redacted documents:** For redacted documents, the producing Party shall provide the full text (minus any redacted content) for the redacted version, including via OCR or an alternative method that creates a text file comparable to OCR.

C.    **Production of Native Items:** The Parties agree that ESI shall be produced as TIFF images consistent with the format described in ¶ II(A) with an accompanying load file, which will contain, among other data points, the ESI data points listed in Appendix 1 hereto (to the extent available). The exception to this rule shall be spreadsheet-application files (*e.g.*, MS Excel), presentation files (*e.g.*, MS PowerPoint), personal databases (*e.g.*, MS Access), and multimedia audio/visual files such as voice and video recordings (*e.g.*, .wav, .mpeg, .mp3, .mp4, and .avi), and any non-standard file types that are not easily rendered to image for which all ESI items shall be produced in native format. In the case of personal database (*e.g.*, MS Access) files containing confidential or privileged information, the Parties shall meet and confer to determine the appropriate form of production. When producing the above file types in native format, the producing Party shall produce a single-page TIFF slip sheet indicating that a native item was produced. The filename must retain the file extension corresponding to the original native format; for example, an Excel 2003 spreadsheet's extension must be .xls. The corresponding load file shall include NativeFileLink information for each native file that is produced. The Parties agree to meet and confer to the extent that there is data in database application files, such as SQL and SAP, to determine a reasonable form of production of usable data. Through the pendency of the Litigation, the producing Party shall exercise reasonable, good faith efforts to maintain all preserved and produced native files in a manner that does not materially alter or modify the file or the metadata.

D.    **Requests for Other Native Files:** Other than as specifically set forth above, a producing Party need not produce documents in native format. If a Party would like a particular document produced in native format and this ESI Protocol does not require the production of that document in its native format, the Party making such a request shall explain the reason for its request that the document be produced in its native format. The requesting Party will provide a specific Bates range for documents it wishes to be produced in native format. The other party shall evaluate

the request in good faith but shall not be required to produce documents in native format other than as specifically stated in ¶ II.C unless a Court order requires such production. Any native files that are produced should be produced with a link in the NativeLink field, along with all extracted text and applicable metadata fields set forth in Appendix 1.

**E.** **Bates Numbering:**

   **1.** All images must be assigned a Bates number that must always: (1) be unique across the entire document production; (2) maintain a constant prefix and length (ten-digits and 0-padded) across the entire production; (3) contain no special characters or embedded spaces; (4) be sequential within a given document; and (5) identify the producing Party. To the extent reasonably practicable, the Bates number must also maintain consistent numbering across a family of documents.

   **2.** If a Bates number or set of Bates numbers is skipped in a production, the producing Party will so note in a cover letter or production log accompanying the production.

   **3.** Producing Parties will use reasonable efforts to brand all TIFF images at a location that does not obliterate or obscure any part of the underlying images.

**F.** **Parent-Child Relationships:** Parent-child relationships (the association between an attachment and its parent document) that have been maintained in the ordinary course of business should be preserved to the extent reasonably practicable. For example, if a Party is producing a hard copy printout of an email with its attachments, the attachments should be processed in order behind the e-mail to the extent reasonably practicable.

**G.** **Entire Document Families:** Subject to ¶¶ II(K) and IVIV.E) below, entire Document families must be produced, even if only the parent email or an attachment to an email is responsive, excepting (1) junk files and non-user-created content routinely excluded during processing (provided such routine processing-generated exclusions are agreed to among the parties), and (2) documents that are withheld on the basis of privilege and in compliance with the parties' stipulation or the Court's order on such assertions of privilege. Where a document is fully withheld from an otherwise produced family on the basis of privilege, the producing Party may produce a single-page TIFF slip sheet indicating that the document was withheld. The corresponding load file record for such a document only needs to provide information for the following fields: BegBates, EndBates, BegAttach, EndAttach, Withheld Placeholder, and Privilege Asserted.

H. **Load Files:** All production items will be provided with a delimited data file or "load file," which will include both an image cross-reference load file (such as an Opticon file), as well as a metadata (.dat) file with the document-level metadata fields identified in Appendix 1 below (to the extent available). The load file must reference each TIFF in the corresponding production. The total number of documents referenced in a production's data load file should match the total number of designated document breaks in the image load files in the production.

I. **Foreign Language Documents:** To the extent that documents or ESI are produced that contain languages other than English, in whole or in part, the Producing Party shall produce all foreign language documents and ESI in the original language. The Producing Party has no obligation to provide a translation of the documents or ESI or any portion thereof.

J. **Confidentiality Designations:** If a particular paper document or ESI item qualifies for confidential treatment pursuant to any applicable federal, state, or common law (*e.g.*, Personally Identifiable Information or Protected Health Information), or to the terms of the Protective Order entered by the Court in the Litigation or a confidentiality stipulation agreed to by the Parties, the designation shall be branded on the document's image. The Producing Party shall use reasonable efforts to ensure that the branding does not obliterate or obscure any part of the underlying images. This designation also should be included in the appropriate data field in the load file. For documents produced in native format with image placeholders, the placeholder image for the native file should be branded with the appropriate confidentiality designation to the extent possible. Requesting Parties shall ensure that the confidentiality claim follows the document regardless of whether the designation imprints on the file when viewed in printed form. Failure to comply with the procedures set forth in this ESI Protocol, any protective order or confidential order, or any confidential stipulation shall not waive any protection or confidential treatment.

K. **Redactions**

   1. **Personal Data Redactions:** A producing Party may redact personal information to the extent that the information falls within one of the following categories: social security numbers, financial-account numbers or bank account information, taxpayer-identification numbers, driver's license numbers, birthdates, driver's license numbers, passport numbers, names of minor children, credit card information, or personal passcodes. The parties understand that additional categories of personal information and/or PHI meriting redaction may be identified during the litigation, and they agree to meet-and-confer regarding the same prior to a producing party making additional redactions. Such redactions should be identified as "Redacted – Personal Data" on the face of the document.

2. **No "relevancy" redactions:** Absent a Court order or an agreement between the parties to the contrary, a party may not make redactions based on an assertion the data is not relevant. Absent a Court order or an agreement between the parties to the contrary, the only redactions permitted are on the basis of privilege or personal data redactions listed above.

L. **Production Media & Protocol:** A producing Party may produce documents via external hard drive (with standard PC compatible interface) ("Production Media"), or via file-sharing service, including any network-based secure file transfer mechanism or SFTP. Any requesting Party that is unable to resolve any technical issues with the electronic production method used for a particular production may request that a producing Party provide a copy of that production using alternative Production Media.

Each production should include a transmittal letter that includes (1) the production date, (2) the Bates range of the materials included in the production, and (3) a brief description identifying the content of the production. Any replacement Production Media will cross-reference the original Production Media and clearly identify that it is a replacement and cross-reference the Bates number range that is being replaced. The Parties shall designate the appropriate physical address for productions that are produced on Production Media.

M. **Resolution of Production Issues:** Documents that cannot be read because of imaging or formatting problems shall be identified by the Receiving Party to the Producing Party promptly after the Receiving Party's discovery of the issue. The Producing Party and the Receiving Party shall meet and confer to attempt to resolve problem(s), to the extent the problem(s) are within the Parties' control.

However produced, a producing Party shall provide clear instructions for accessing the production, including any necessary passwords or encryption keys.

### III. PAPER DOCUMENT PRODUCTION PROTOCOLS

A. **Scanning:** A producing Party shall scan and OCR any paper documents. Where OCR is used, the Parties agree that the following ¶¶ III(B)-(C) shall apply.

B. **Coding Fields:** The following information shall be produced in the load file accompanying production of paper documents: (a) BegBates, (b) EndBates, (c) BegAttach, (d) EndAttach, (e) Custodian, (f) Confidentiality, (g) Pages, and (h) Redacted (Y/N) or otherwise indicating that a redaction is present.

C. **Unitization of Paper Documents:** Paper documents should be logically unitized for production to the extent reasonably practicable. Generally, when scanning paper documents for production, distinct documents shall not be merged into a single

record and single documents shall not be split into multiple records. The Parties will make reasonable efforts to unitize documents correctly.

1. **Relationship:** The relationship among the documents in a folder or other grouping should be reflected in proper coding of the beginning and ending document and attachment fields to the extent reasonably practicable.

2. **Identification:** Where a document, or a document group – such as folder, clipped bundle, or binder – has an identification spine or other label, the information on the label shall be scanned and produced as the first page of the document or grouping.

3. **Fixed Notes:** Paper Documents that contain fixed notes shall be scanned with the notes affixed, if it can be done so in a manner so as not to obstruct other content on the document. If the content of the Document is obscured by the affixed notes, the Document and note shall be scanned separately, and produced in a way that makes clear which page the note was affixed to.

## IV. ESI METADATA FORMAT AND PROCESSING ISSUES

A. **System Files:** ESI productions may be de-NISTed using the industry standard list of such files maintained in the National Software Reference Library by the National Institute of Standards & Technology as it exists at the time of de-NISTing. Other file types may be added to the list of excluded files if they clearly do not have user-created content and by agreement of the Parties.

B. **Metadata Fields and Processing:**

1. **Date and Time:** To the extent reasonably practicable, no party shall modify the date or time as contained in any original ESI.

2. **Time Zone:** To the extent reasonably practicable, each party shall process ESI items using a single time zone, identified as a fielded value in the production database load file. For the avoidance of doubt, ESI items that have already been previously processed in a different time zone need not be reprocessed, though the time zone previously used shall be reflected in the metadata.

3. **Auto Date/Time Stamps:** To the extent reasonably practicable, ESI items shall be processed so as to preserve the date/time shown in the document as it was last saved, not the date of collection or processing.

4. **Metadata Fields:** Except as otherwise set forth in this ESI Protocol, ESI files shall be produced with the data fields set forth in Appendix 1 that are available and can reasonably be extracted from a document.

        The Parties are not obligated to manually populate any of the fields in Appendix 1 if such fields cannot reasonably be extracted from the document using an automated process, with the exception of the following fields: (a) BegBates, (b) EndBates, (c) BegAttach, (d) EndAttach, (e) Custodian/Custodians All/Other, (f) Confidentiality, (g) Redacted (Y/N), and (h) NativeLink fields, which should be delivered regardless of whether the fields can be populated pursuant to an automated process.

**C.     Redaction:**

1.  The Parties agree that, where ESI items need to be produced according to Appendix 1 and also must be redacted, they shall be produced solely in TIFF format with each redaction clearly indicated, except in the case of personal database files (*e.g.*, MS Access), which shall be governed by ¶ II(C), *supra*. The producing Party must also produce a text file of such documents. Any metadata fields reasonably available and unnecessary to protect the privilege protected by the redaction, including but not limited to the metadata fields listed in the Appendix, shall be provided. The Parties understand that for certain MS Excel documents or other file types or files, TIFF redactions may be impracticable. These documents may be redacted in native format.

2.  Native Excel or other spreadsheet files that are redacted may be produced in Native or near Native Format by overwriting the data contained in a particular cell, row, column or tab with the word "Redacted," using industry-standard tools, and shall make clear the reason for the redaction (e.g., "Redacted - Privilege"), provided that such overwriting does not impact any other, nonredacted cells or information in the spreadsheet (e.g., if a cell redacted for privilege contains a numerical value that is used in a formula by other, non-redacted cells in the spreadsheet). If a redaction does impact non-redacted cells/information, the Parties shall promptly meet and confer to resolve the issue. PowerPoint files that are redacted may be produced as TIFF images or JPEG files. The Parties acknowledge that redacting Excel/spreadsheet files and/or PowerPoint files may alter the metadata of the produced file; however, the metadata produced pursuant to Appendix 1 will be the metadata extracted from the original native file, other than metadata containing redacted information.

3.  If the items redacted and partially withheld from production are audio/visual files, the producing Party shall, to the extent reasonably practicable, provide the unredacted portions of the content. If the content is a voice recording, the Parties shall meet and confer to discuss the appropriate manner for the producing Party to produce the unredacted portion of the content.

D. **Email Collection and Processing:**

1. **Email Threading:** In order to reduce the volume of entirely duplicative content within email threads, the Parties may utilize "email thread suppression." As used in this ESI Protocol, email thread suppression means reducing duplicative production of email threads by producing the most recent email containing the thread of emails, as well as all attachments within the thread, and excluding emails constituting exact duplicates of emails within the produced string. For purposes of this paragraph, only email messages in which the parent document, senders and recipients, and all attachments are exactly the same will be considered duplicates. Duplicative emails suppressed under this paragraph need not be reflected on the Party's privilege log. Under no circumstances will email thread suppression eliminate (a) the ability of a requesting Party to identify every custodian who had a copy of a produced document or email within their accessible ESI data at the time of processing, or (b) remove from a production any unique responsive branches and/or attachments contained within an email thread.

2. **Email Domains:** Producing Parties may utilize an ESI search process to identify categories of documents that will be culled from a potential production (prior to the production to the other party), such as emails from domains typically associated with junk email, such as fantasy football-related emails, retailer advertising, and newsletters or alerts from non-industry sources. To the extent a Party opts to exclude uniquely identifiable email domain names as part of its initial filter of potentially responsive documents, the Parties agree to disclose domain names excluded under this paragraph.

E. **De-duplication:** A producing Party may de-duplicate any file globally (i.e., across Document Custodians) at the "family" level (i.e., families should not be broken due to de-duplication). The producing Party will make a reasonable effort to identify all custodians who were in possession of any de-duplicated documents through an appropriate load file field such as DuplicateCustodian or CustodianAll/Other (as noted in the Appendix). In the event of rolling productions of documents or ESI items, the producing Party will, as needed, supplement the load files with updated duplicate custodian information to the extent such metadata exists. Duplicate custodian information may be provided by a metadata "overlay" and will be provided by a producing Party no later than 14 days after that Party has substantially completed its production of ESI.

1. Duplicate electronic documents shall be identified by utilizing the industry-standard process of comparison of auto-generated hash values (e.g., MD5 or SHA-1). All electronic documents bearing an identical value will be considered duplicative. The producing Party is not obligated to extract, review, or produce entirely duplicate ESI documents. Any other

11

    methodology for identification of duplicates, including email field selection for hash value creation, shall be discussed with the requesting Party and approved in writing before implementation. The requesting Party will not unreasonably withhold approval.

  2. Duplicate emails shall be identified by utilizing the industry-standard process of comparison of auto-generated hash values (*e.g.*, MD5 hash values) for the email family, which shall include the parent email and all attachments. Duplicate identification will be identified at a family level, including message and all attachments. Email families bearing an identical value are considered a duplicate group.

F. **Zero-byte Files:** The Parties may filter out stand-alone files identified as zero-bytes in size that do not contain responsive file links or file names. If the requesting Party in good faith believes that a zero-byte file was withheld from production and contains information responsive to a request for production, the requesting Party may request that the producing Party produce the zero-byte file. The requesting Party may provide a Bates number to the producing Party of any document that suggests a zero-byte file was withheld from production and contains information responsive to a request for production. While a request does not automatically trigger an obligation to produce a zero-byte file, the producing Party shall evaluate the request in good faith and shall not unreasonably withhold requested zero-byte files.

G. **Microsoft "Auto" Feature:** To the extent reasonably practicable and technologically possible for a producing Party's vendor, Microsoft Excel (.xls) and Microsoft PowerPoint (.ppt) documents should be analyzed for the "auto" features, where documents have an automatically updated date and time in the document, file names, file paths, or similar information that when processed would be inaccurate for how the document was used in the ordinary course of business. If "auto date," "auto file name," "auto file path," or similar features are identified, the produced document shall be identified in a load file, metadata field, or otherwise as having these features (*e.g.*, branded with the words "Auto Date," "Auto File Name," or "Auto File Path").

H. **Hidden Text:** ESI items shall be processed, to the extent practicable, in a manner that preserves hidden columns or rows, hidden text, worksheets, speaker notes, tracked changes, and comments.

I. **Embedded Objects:** Microsoft Excel spreadsheets (.xls) embedded in Microsoft Word documents will be extracted as separate documents and treated as attachments to the document. The Parties agree that other embedded objects, including, but not limited to, logos, icons, emoticons, and footers, may be culled from a document set and need not be produced as separate documents by a producing Party (*e.g.*, such

embedded objects will be produced within the document itself, rather than as separate attachments). Notwithstanding the foregoing, documents that have already been previously processed need not be reprocessed to comply with this paragraph.

J. **Hyperlinked Files:** The Parties shall disclose whether they regularly use point-in-time or other documents that are transmitted as links in documents and emails, including products such as Google's G Suite (*e.g.*, links to Google Documents, Google Drive) or Microsoft 365 (*e.g.*, links from OneDrive, SharePoint, Teams), etc. When identified, the Parties will meet and confer about the production of any point in time documents that are links in documents or emails following the production of the underlying documents (i.e., the document or email that links to a point in time document). ESI referenced in ESI only by a hyperlink or other pointer shall not be construed to be in the same document family solely by virtue of the hyperlink reference. The Parties reserve all rights with respect to the production of such point in time documents, except that the producing Party shall not object to producing point in time documents on the grounds that the underlying documents were previously collected and produced.

K. **Compressed Files:** Compression file types (*i.e.*, .CAB, .GZ, .TAR, .Z, and .ZIP) shall be decompressed and extracted in a reiterative manner to ensure that a zip within a zip is decompressed into the lowest possible compression resulting in individual folders and/or files.

L. **Password-Protected, Encrypted, or Proprietary-Software Files:** With respect to any ESI items that are password-protected or encrypted within the scope of review, the producing Party will take reasonable steps to obtain identified passwords and remove such protection so that the documents can be reviewed and produced if appropriate. ESI that is likely to contain responsive information that cannot be reviewed because proprietary software is necessary to view the ESI will be disclosed to a requesting Party, and the Parties shall meet and confer regarding the next steps, if any, with respect to such ESI.

V. **DOCUMENT SOURCE SCOPE AND DISCLOSURE PARAMETERS**

A. **Time Period:** The Parties agree that ultimately, they will be able to limit the processing of discoverable information to that which was created, modified, sent, or received during a particular time period for unstructured data (email, loose ESI, etc.). The parties will also agree on a time period for production of structured data.

13

However, if the parties cannot agree on what those time periods will be, they will consequently raise that issue with the Court.

B.   **Document Source Negotiations**

   1.   **Initial Document Custodians and Sources**: Each party will provide a list of proposed document custodians and non-custodial document sources (*e.g.*, centralized document sources other than an individual document custodian's files) reflecting those employees or sources with information and/or documents responsive to an agreed-upon or Court-ordered scope of Rule 34 Requests. The Parties shall be prepared to meet and confer regarding how discoverable information is stored and how it may be collected.

   2.   **Additional Document Custodians or Sources:** If, after the Parties identify initial document custodians, a requesting Party believes that additional document custodians or sources should be added, then the requesting Party shall advise the producing Party in writing of the proposed additional document custodians or sources and the basis for the request. If the Parties have not agreed on whether to add the document custodian or source within 15 days of the requesting Party's request, then the matter may be brought to the Court.

   3.   The Parties' discussion of proposed search terms, document custodians, or sources does not preclude a Party from requesting additional search terms, document custodians, or sources pursuant to the terms of this ESI Protocol; nor does it preclude a Party from objecting to any such additional requests.

VI.   **PARAMETERS FOR SEARCHING AND CULLING OF PAPER AND ESI DOCUMENTS**

A.   **Meet and Confer**: The Parties agree to meet and confer to identify appropriate sources of information (email, cloud physical hard-drive, databases) and custodians to collect and search. A requesting or producing Party may, in good faith, seek to expand or contract the scope of a search. Where such a request is made, the Parties will meet and confer and attempt in good faith to reach agreement as to the timing and conditions of such expansion or contraction. If the Parties cannot reach agreement, any dispute may be presented to the Court. All meet and confer sessions under this paragraph will give appropriate consideration to ensure the prompt, efficient, and cost-effective exchange of information consistent with the Federal Rules of Civil Procedure, the Local Rules, and any Orders by this Court.

B. **Search Terms:** To the extent that search terms are used to identify responsive ESI, the parties agree to meet and confer regarding reasonable and proportional search terms to be applied to identify potentially responsive documents for review and production. As part of the meet and confer process, a producing Party will provide: (1) a proposal of search terms the producing Party intends to use, (2) information about whether the Party intends to use different search terms or other limiters with different Document Custodians or Sources, (3) per-term "hit count" information (at both the individual document and family level), (4) the total number of documents that would be in the search universe both (a) without application of the search terms and limiters and (b) with application of the search terms and limiters; and (5) any other information agreed to by the parties, where requested. If, after the completion of the initial search term negotiations, a requesting or producing Party determines that any search terms should be added to or removed from the initial search term list, then the requesting or producing Party shall advise the affected Parties in writing of the proposed change(s) to the search term(s) and of the reason(s) for the proposed change(s). The Parties agree to meet and confer in accordance with ¶ VI(A) above. Any disputes that cannot be resolved may be submitted by either Party to the Court for further consideration and resolution.

C. **Disclosure of Other Culling Parameters Required:** A producing Party is permitted to cull data using the agreed-upon custodial and non-custodial sources, agreed-upon date parameters, and agreed-upon search terms (if applicable), and a producing Party is permitted to remove known system or operating files, such as those that appear on the National Software Reference Library (NSRL) hash list. As such, the Parties may cull entire file directories from computer hard drives that contain Program Files, Program Data, SWTOOLs, Windows Operating System files, etc. For those excluded directories, the Parties will only conduct searches on user-created content that is reviewable and likely to yield responsive content. To the extent a producing Party wishes to use additional culling parameters, those parameters will be disclosed.

D. **Use of Technology Assisted Review or Other Advanced Technology-Based Analytics:**

   1. A Party may use Technology Assisted Review ("TAR"), Continuous Active Learning review ("CAL"), or similar alternative technology to sort documents for linear review without disclosure of that use.

   2. If a Party elects to use TAR, CAL, or similar alternative technology to cull or otherwise limit the volume of unstructured ESI subject to linear review, that Party will disclose that election and the proposed methodology to be applied to the opposing Parties of that election in advance. The Parties will meet and confer in good faith to discuss parameters for the use of that technology and methodology in those instances. If an agreement cannot be timely reached, then the Parties agree to raise this issue with the Court.

    a. The Party that elects to use TAR will disclose the TAR software used, the TAR methodology used, the criteria used to identify the universe of documents to which TAR was applied (including any pre-culling of documents, search terms, domain filtering, file-type exclusions, minimum text requirements, etc.), the methodology of the training process, the targeted level of recall (*e.g.*, 70%) (if any), the methodology and results of the validation testing used, and how documents containing little or no text (*e.g.*, media files, images, un-OCR'ed PDFs, encrypted files) were handled.

    b. A producing Party need not conduct any additional review of information subjected to, but not retrieved by, a TAR tool as part of the identification of the subset of information that will be subject to review and production, provided that the procedures in paragraph ¶ VI(D)(2)(a) above are followed.

  3. The Parties agree to meet and confer about other methods and technology to help increase the efficiency and speed of production.

## VII.  <u>STRUCTURED DATA</u>

To the extent a response to discovery requires production of discoverable ESI contained in a structured database, the Parties shall meet and confer in an attempt to agree upon a set of queries to be made for discoverable information and generate a report in a reasonably usable and exportable electronic file (*e.g.*, Excel or CSV format) for review by the Requesting Party. Upon review of the report, the Requesting Party may make reasonable requests for additional information to explain the database schema, codes, abbreviations, and different report formats or to request specific data from identified fields.

## VIII.  <u>CLAIMS OF PRIVILEGE AND REDACTIONS</u>

 A. **Production of Privilege Logs:** Except as provided otherwise below, for any document withheld in its entirety or produced but redacted, the producing Party will produce privilege/redaction logs in MS Excel format or any other format that permits electronic sorting and searching.

 B. **Exclusions from Logging Potentially Privileged Documents:** The following categories of documents do not need to be contained on a producing Party's privilege log, unless good cause exists to require that a Party do so.

1. Any communications exclusively between a producing Party and its outside counsel, any non-testifying experts in connection with specific litigation, or, with respect to information protected by Federal Rule of Civil Procedure 26(b)(4), testifying experts in connection with specific litigation.

2. Any privileged materials or work product created by a Party's outside counsel, any non-testifying experts in connection with specific litigation, or, with respect to information protected by Federal Rule of Civil Procedure 26(b)(4), testifying experts in connection with specific litigation.

C. **Privilege Log Requirements:**

1. **Privilege Log:** To the extent applicable, each Party's privilege log only needs to provide objective metadata (to the extent it is reasonably available and does not reflect privileged or protected information), a description of the privilege or protection being asserted, and identification of the attorney(s) associated with the document, consistent with Fed. R. Civ. P. 26(b)(5).

    a. Objective metadata includes the following (as applicable to the document types as shown in Appendix 1):

        i. A unique privilege log identifier
        ii. A family relationship identifier
        iii. Custodian
        iv. Subject/File Name
        v. Email Subject
        vi. Author
        vii. From
        viii. To
        ix. CC
        x. BCC
        xi. Date Sent
        xii. Date Received
        xiii. Date Created

    b. In addition to the objective metadata fields, a Party must also indicate which privilege or protection is being asserted, include a field on its privilege log entitled "Attorney/Description of Privileged Material" that contains a brief description of the privileged or protected material, and identify which persons associated with the document (*i.e.*, senders, recipients, or authors) are attorneys. Further, for any document withheld for which there is no objective metadata, a Party

17

        must manually populate on its privilege log an author and date, unless such information is not reasonably discernable from the document or the information is not necessary to evaluate the claim of privilege in light of the metadata that is discernable and/or the information provided in the Attorney/Description of Privileged Material field.

    **c.**    With respect to the "Email Subject" or "File Name" field, the producing Party may substitute a description of the document where the contents of these fields may reveal privileged information. In the privilege log(s), the producing Party shall identify each instance in which it has modified the content of the "Email Subject" or "File Name" field.

    **d.**    If a document is withheld on the basis of work product, in addition to the objective metadata fields, a Party must also include the basis of the claim in the manner required by Fed. R. Civ. P. 26.

  **2.**  **Email Chains:** If there is more than one branch of (*i.e.*, more than one unique group of recipients of) an email thread, each branch will be individually logged; however, each individual email within the thread need not be logged if the recipients of the email chain are all identical or if a Party has elected to use threading for review and/or production of emails. A Party asserting privilege over a chain of emails may produce only a single redacted copy of such email chain to the extent some portions are only partially privileged, except that any unique branches of the email chain must also either be produced in redacted form or included on the metadata privilege log.

**D.**  **Challenges to Privilege Claims:** Following the receipt of a privilege/redaction log, a requesting Party may identify, in writing (by Bates/unique identification number), the particular documents that it believes require further explanation. The producing Party shall endeavor to respond to such a request within 10 business days. If a Party challenges a request for further information, the Parties shall meet and confer to try to reach a mutually agreeable solution. If they cannot agree, the matter may be brought to the Court.

**E.**  **Attorney's Ethical Responsibilities:** Nothing in this order overrides any attorney's ethical responsibilities to refrain from examining or disclosing materials that the attorney knows or reasonably should know to be privileged and to inform the Disclosing Party that such materials have been produced.

**IX.**  **NON-PARTY DOCUMENTS**

    A Party that issues a non-Party subpoena ("Issuing Party") shall include a copy of this Order with the subpoena and advise that Third Parties should produce

documents in accordance with the specifications set forth herein. The Issuing Party shall produce any documents obtained pursuant to a non-Party subpoena to the opposing Party. Nothing in this Order is intended or may be interpreted to narrow, expand, or otherwise affect the rights of the Parties or third Parties to object to a subpoena.

## X.  MISCELLANEOUS PROVISIONS

A. **Objections Preserved:** Nothing in this ESI Protocol shall be interpreted to require disclosure of information protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity. Except as provided expressly herein, the Parties do not waive by virtue of this order any objections as to the production, discoverability, authenticity, admissibility, or confidentiality of documents and ESI.

B. **Inaccessible ESI:** If a producing Party asserts that certain categories of ESI that are reasonably likely to contain responsive information are inaccessible or otherwise unnecessary under the circumstances, or if the requesting Party asserts that, following production, certain ESI is not reasonably usable, the Parties shall meet and confer to discuss resolving such assertions. If the Parties cannot resolve any such disputes after such a meet and confer has taken place, the issue shall be presented to the Court for resolution. The following types of data stores are presumed to be inaccessible and are not subject to discovery, and need not be collected, absent a particularized need for the data as established by the facts and legal issues of the case (*e.g.*, information suggesting that relevant evidence has been lost or is no longer available in other more accessible forms):

   1. Deleted, slack, fragmented, or other data only accessible by forensics;

   2. Random access memory (RAM) or temporary files;

   3. Server, system, or network logs; and

   4. Data maintained or duplicated in any electronic backup system for the purpose of system recovery or information restoration, including but not limited to, system recovery backup tapes or other media, continuity of operations systems, and data or system mirrors or shadows, if such data are routinely purged, overwritten, or otherwise made not reasonably accessible in accordance with an established routine system maintenance policy ("Backup System").

C. **Variations or Modifications:** Variations from this ESI Protocol may be required. Any practice or procedure set forth herein may be varied by agreement of all affected Plaintiffs and all affected Defendants, which will be confirmed in writing.

19

In the event a producing Party determines that a variation or modification is appropriate or necessary to facilitate the timely and economical production of documents or ESI, the producing Party will notify the requesting Party of the variation or modification. Upon request by the requesting Party, those Parties will meet and confer to address any issues in a reasonable and timely manner prior to seeking Court intervention. To the extent the parties cannot resolve the dispute, the producing Party must seek relief from the Court if it wants to deviate from this ESI Protocol. Each Party retains the right to seek exceptions, amendments, or modifications to this Protocol from the Court.

**SO ORDERED.**

Dated: October 27, 2025

*s/Shannon G. Elkins*
SHANNON G. ELKINS
United States Magistrate Judge