# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

THE ESTATE OF GENE B. LOKKEN, GLENNETTE KELL, DARLENE BUCKNER, CAROL CLEMENS, THE ESTATE OF FRANK CHESTER PERRY, THE ESTATE OF JACKIE MARTIN, JOHN J. WILLIAMS, AS TRUSTEE OF THE MILES AND CAROLYN WILLIAMS 1993 FAMILY TRUST, AND WILLIAM HULL, individually and on behalf of all others similarly situated,

          Plaintiffs,

vs.

UNITEDHEALTH GROUP INCORPORATED, UNITED HEALTHCARE, INC., NAVIHEALTH, INC. and Does 1-50, inclusive,

          Defendants.

Civil File No. 23-cv-03514-JRT-SGE

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY RESPONSES AND PRODUCTION OF DOCUMENTS**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................................ 3

      A.    Medicare Advantage and the Putative Class ................................................ 3

      B.    naviHealth ................................................................................................. 3

      C.    Care Coordinators' Use of nH Predict ........................................................ 7

III.  PROCEDURAL BACKGROUND ...................................................................... 9

      A.    Judge Tunheim's Order Granting Defendants' Motion to Dismiss, in
            Part ........................................................................................................... 9

      B.    The Parties Meet and Confer Regarding Discovery ................................... 10

IV.   LEGAL STANDARD ........................................................................................ 12

V.    ARGUMENT ..................................................................................................... 14

      A.    Plaintiffs Are Not Entitled to Wide-Ranging Discovery on Unpled
            Theories ................................................................................................... 14

      B.    Defendants Have Responded to Request for Production Nos. 4 and 5
            and the Additional Documents Plaintiffs Seek Are Neither Relevant
            Nor Proportional ...................................................................................... 16

            1.    Discovery From Prior to When Defendants Used nH Predict
                  for the Putative Class is Not Relevant ............................................. 17

            2.    Discovery Regarding IRFs and LTACs Is Not Relevant,
                  Proportional or Responsive ............................................................ 19

      C.    Discovery Regarding the Design and Creation of nH Predict Is
            Neither Relevant Nor Proportional to Plaintiffs' Contract Claims ............ 24

            1.    Request for Production No. 7 .......................................................... 24

            2.    Interrogatory No. 11 ...................................................................... 27

      D.    Documents Regarding the Acquisition of naviHealth Are Neither
            Relevant Nor Proportional ........................................................................ 28

ii

E.    Plaintiffs Seek Irrelevant Financial Data ...................................................... 30

F.    Plaintiffs' "Cloned" Requests for All Documents Concerning Any
      Governmental or Internal Investigation Should be Denied......................... 32

G.    Plaintiffs' Request for Highly Sensitive Discovery Regarding
      Employee Compensation and Disciplinary Records Is Irrelevant and
      Burdensome ................................................................................................... 36

H.    Plaintiffs Seek Irrelevant Discovery Related to Defendants' "AI
      Review Board" ............................................................................................... 39

I.    Defendants Responded to Interrogatory Nos. 3 and 4 and No Further
      Answer Should Be Compelled ...................................................................... 40

VI.   CONCLUSION ......................................................................................................... 43

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Claims Mgmt. v. Allied World Surplus Lines Ins. Co.*,
  No. 18-cv-925-JLS(MSB), 2018 U.S. Dist. LEXIS 245777 (S.D. Cal.
  Dec. 31, 2018) ................................................................................................ 19

*Apex Fin. Options, LLC v. Gilbertson*,
  No. 21-023-LPS-SRF, 2021 U.S. Dist. LEXIS 47850 (D. Del. Mar. 15,
  2021) ............................................................................................................... 31

*ARC Res. Mgmt. v. Civ., LLC*,
  No. 20-27-DLB-EBA 2024 U.S. Dist. LEXIS 183627 (E.D. Ky. Oct. 8,
  2024) ............................................................................................................... 31

*Bredemus v. Int'l Paper Co.*,
  252 F.R.D. 529 (D. Minn. 2008) ............................................................... 20, 21

*Cargill v. Ron Burge*,
  284 F.R.D. 421 (D. Minn. 2012) ..................................................................... 18

*Carlson v. BNSF Ry. Co.*,
  No. 19-cv-1232, 2021 U.S. Dist. LEXIS 213958 (D. Minn. May 20,
  2021) ............................................................................................................... 37

*In Re CenturyLink Sales Prac. & Sec. Litig.*,
  No. 18-296, 2020 U.S. Dist. LEXIS 248595 (D. Minn. Oct. 28, 2020) ............... 33, 34

*Churlik v. Gate City Bank*,
  No. 23-cv-0637, 2024 U.S. Dist. LEXIS 20090 (D. Minn. Feb. 6, 2024).................. 29

*Clear Spring Prop. & Cas. Co. v. Arch Nemesis, LLC*,
  2024 U.S. Dist. LEXIS 162527 (D. Kansas Sept. 10, 2024) ....................................... 20

*Dekker v. Cenlar FSB*,
  No. 21-cv-162, 2022 U.S. Dist. LEXIS 169309 (D. Minn. Sept. 20,
  2022) ............................................................................................................... 13

*Dyer v. Northwest Airlines Corps.*,
  334 F. Supp. 2d 1196 (D.N.D. 2004).............................................................. 40

iv

*Hancock v. Aetna Life Ins. Co.*,
   321 F.R.D. 383 (W.D. Wash. 2017) ........................................................... 13

*Hofer v. Mack Trucks, Inc.*,
   981 F.2d 377 (8th Cir. 1992) ................................................................... 13

*Insignia Sys. v. News Corp.*,
   No. 19-1820, 2020 U.S. Dist. LEXIS 259977 (D. Minn. Mar. 24, 2020) .................. 33

*Klossner v. Iadu Table Mound MHP, LLC*,
   2021 U.S. Dist. LEXIS 148483 (N.D. Iowa Apr. 16, 2021)..................................... 13

*Lynch v. Experian Info. Sols., Inc.*,
   569 F. Supp. 3d 959 (D. Minn. 2021) ......................................................... 16

*Marlow v. City of Clarendon*,
   78 F.4th 410 (8th Cir. 2023) ................................................................... 12

*Midwest Gas Servs., Inc. v. Indiana Gas Co.*,
   No. IP 99-690-C-D/F, 2000 U.S. Dist. LEXIS 8098 (S.D. Ind. Mar. 7,
   2000), *rev'd in part on other grounds,* 317 F.3d 703 (7th Cir. 2003) ...................... 33

*Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2*,
   197 F.3d 922 (8th Cir. 1999) ................................................................... 13

*Moore v. Specialized Loan Servicing, LLC*,
   No. 3:20-cv-01962-IM, 2021 U.S. Dist. LEXIS 167833 (D. Ore. Sept. 3,
   2021) ............................................................................................. 29

*Osborn v. United States*,
   918 F.2d 724 (8th Cir. 1990) ................................................................... 22

*Perius v. Abbott Labs.*,
   No. 07C1251, 2008 WL 3889942 (N. D. Ill. Aug. 20, 2008)................................... 34

*Peters v. Mut. Ben. Life Ins. Co.*,
   420 N.W.2d 908 (Minn. Ct. App. 1988) ....................................................... 31

*Raddatz v. Standard Register Co.*,
   177 F.R.D. 446 (D. Minn. 1997)................................................................ 37

*In re RFC & ResCap Liquidating Trust Action*,
   332 F. Supp. 3d 1101 (D. Minn. 2018) ......................................................... 31

*Skinner v. Aetna Life Ins. Co.*,
   No. 83-0679, 1984 U.S. Dist. LEXIS 19817 (D.D.C. Feb. 2, 1984)........................... 31

*Soto v. Castlerock Farming & Transp., Inc.*,
  282 F.R.D. 492 (E.D. Cal. 2012) ............................................................ 22

*In re St. Jude Med., Inc. Sec. Litig.*,
  629 F. Supp. 2d 915 (D. Minn. 2009) .................................................... 23

**Statutes**

42 U.S.C. § 1395f .................................................................................... 6, 8

**Other Authorities**

42 C.F.R. 413.343(b) ................................................................................... 8

42 C.F.R. Part 409 ...................................................................................... 6

42 C.F.R. Part 422 ...................................................................................... 4

88 Fed. Reg. 22120, 22186 ......................................................................... 4

Fed. R. Civ. P. 12(b)(1) ............................................................................ 22

Fed. R. Civ. P. 26(b)(1) ............................................................................ 12

H.R. REP. NO. 105-217 (1997) ................................................................. 4

Medicare Managed Care Manual, CMS Pub. 100-16, Chs. 4, 13 ............. 4

Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1356 (4th ed. 2024) ...... 22

## I.    INTRODUCTION

Plaintiffs allege Defendants used nH Predict in place of physician medical directors to make adverse medical necessity coverage determinations regarding Medicare benefits, in breach of the terms of Evidence of Coverage ("EOC") documents. In his ruling on Defendants' Motion to Dismiss, Judge Tunheim substantially narrowed this action to a dispute based solely on claims "rooted in contract law" that the Court held were not preempted by "the expansive preemption clause of the Medicare Act." Judge Tunheim held that the Court's ruling that "[t]hese [remaining] claims thus effectively arise out of UHC's evidence of coverage documents because the question would be whether UHC complied with its statement that claim decisions would be made by 'clinical services staff' and 'physicians' when it allegedly used artificial intelligence.'" ECF 91 at 19.

Defendants do not oppose discovery related to how naviHealth, Inc. ("naviHealth") used nH Predict for the putative class and whether Defendants relied on it to make adverse coverage determinations. Defendants appropriately object, however, where Plaintiffs are engaging in a fishing expedition seeking broad and burdensome categories of documents that are neither relevant to any claims or defenses nor proportional to the needs of this case.

Defendants have produced and will continue to produce extensive discovery relevant to the claims of the Named Plaintiffs as well as the central issue that Plaintiffs have alleged ties together and establishes the existence of a putative class: the alleged systematic use of nH Predict to make adverse coverage determinations in the place of physician medical directors. Defendants have also agreed to produce or offered to produce documents relating to other class certification issues, including template and/or exemplar

EOCs, data reflecting the claims of the putative class, information about premiums allegedly paid by the putative class and a sampling of administrative records relating to the putative class. Defendants' position on the appropriate scope of discovery is consistent with the Court's Motion to Dismiss Order that narrowed the claims in this dispute to breach of contract claims.

Plaintiffs' motion to compel seeks discovery far afield from the foundational question of whether nH Predict was used to make adverse coverage determinations in the place of medical professionals or the additional discovery they have demanded which ostensibly supports the claims of the putative class. For example, Plaintiffs seek discovery regarding (1) facilities and timeframes in which nH Predict was ***not*** used for putative class members; (2) naviHealth's post-acute care claims practices in general, unrelated to the use of nH Predict; (3) documents and communications regarding UnitedHealth Group Incorporated's acquisition of naviHealth; (4) documents regarding Defendants' valuation, revenue, and profits unrelated to any possible damages theory; (5) documents relating to any government investigation into any post-acute care policy, practice, or operation, or use of any algorithms or artificial intelligence ("AI"); (6) confidential and sensitive personnel information relating to all naviHealth employees; and (7) documents relating to Defendants use of algorithms or AI, generally, not just nH Predict. Plaintiffs have failed to show the relevance and proportionality of the additional discovery they seek, despite their burden to do so. Plaintiffs are instead engaged in a fishing expedition seeking broad categories of documents that are neither relevant nor proportional to any claims or defenses in this case.

Plaintiffs' motion to compel underscores that their discovery requests are not about this case but instead are an attempt to transform discovery of this narrow breach of contract challenge into a broad-ranging investigation into irrelevant matters. Plaintiffs' motion to compel should be denied in its entirety.

## II.    FACTUAL BACKGROUND

### A.    Medicare Advantage and the Putative Class

Medicare Advantage differs from traditional Medicare in that Medicare Advantage members receive Medicare benefits through a private insurance plan that contracts with the Centers for Medicare & Medicaid Services ("CMS"). The Named Plaintiffs and all putative class members enrolled in Medicare Advantage plans offered by UHC or its affiliated entities that are Medicare Advantage Organizations. Am. Compl. ¶ 170. Because Plaintiffs' non-contract claims were dismissed, the sole remaining alleged class includes only "persons who purchased Medicare Advantage Plan health insurance from Defendants and had benefits denied due to Defendants' use of nH Predict" from November 14, 2019 to the present. *Id.* ¶¶ 17, 183-202 (noting that Counts I and II are brought on behalf of the "Benefits Denial Subclass").

### B.    naviHealth

naviHealth performs post-acute care utilization and care management services for Medicare Advantage plans, including plans sponsored by United HealthCare Services, Inc. and certain of its affiliated regulated subsidiary insurance companies (collectively, "UHC"). Declaration of Allysia Druga ("Druga Decl.") ¶ 2. A subsidiary of UnitedHealth Group Incorporated ("UnitedHealth Group") acquired naviHealth in May 2020, but

naviHealth began providing certain post-acute care utilization management ("UM") and care management services for UHC Medicare Advantage plans in July 2019. *Id.* ¶¶ 7, 13.

At naviHealth and in the managed care industry generally, UM refers to the management of health care service delivery. *Id.* ¶ 5. naviHealth's goal in conducting UM is to promote delivery of appropriate care to Medicare Advantage insured members ("members") in the most appropriate setting at the appropriate time, subject to criteria established by CMS and the plan benefits covered under a given Medicare Advantage health plan. *Id.*[1] UM processes may take place before or during a member's clinical encounter with a health care provider. *Id.* ¶ 6. The type of UM that occurs before the clinical event is called prior authorization or "pre-service" review. *Id.* If UM occurs during clinical care for a patient admitted to a facility, then this type of UM is called a continued stay review. *Id.*

On or around July 1, 2019, naviHealth began providing certain post-acute care management and UM services for UHC. *Id.* ¶ 7. For purposes here, acute care refers to

---

[1] Congress designed the Medicare Advantage program with a goal of reducing overall Medicare spend by contracting with private plans who are better positioned than CMS to engage in cost-control activities, such as UM. H.R. REP. NO. 105-217, at 585 (1997) (noting that it will allow beneficiary choice and "will enable the Medicare program to utilize innovations that have helped the private market contain costs and expand health care delivery options"). CMS explicitly contemplates that Medicare Advantage plans will implement UM programs to reduce medically unnecessary utilization and, thus, control costs. CMS regulates Medicare Advantage UM programs and provides guidelines for how UM programs should operate. 42 C.F.R. Part 422; Medicare Managed Care Manual, CMS Pub. 100-16 at Chs. 4, 13, *available at* https://www.cms.gov/regulations-and-guidance/guidance/manuals/internet-only-manuals-ioms-items/cms019326; *see also* 88 Fed. Reg. 22120, 22186 (April 12, 2023) ("CMS understands that utilization management tools are an important means to coordinate care, reduce inappropriate utilization, and promote cost-efficient care").

patient admissions in a hospital. *Id.* The UM services naviHealth provides include managing care across several different types of post-acute care facilities including SNFs, Inpatient Rehabilitation Facilities ("IRFs"), and Long-term Acute Care Hospitals ("LTACs"), as well as some home health programs. *Id.* ¶ 8. A SNF is a facility in which a member's condition requires daily, skilled nursing or rehabilitative services. *Id.* ¶ 9. An IRF is a facility in which the member receives intensive rehabilitation services from a multidisciplinary team overseen by a rehabilitation physician. *Id.* An LTAC is a facility in which members with complex medical/nursing needs requiring prolonged acute care hospitalization, receive daily physician visits. *Id.*

With respect to SNFs, the UM services that naviHealth provides to UHC fall into two categories: (1) prior authorizations, and (2) concurrent reviews of ongoing inpatient post-acute stays (referred to as "Continued Stays"). *Id.* ¶ 11. These services include working with SNFs to address barriers to effective post-acute care by promoting timely initiation of services and patient-specific care planning as well as assistance with navigating an individual's post-acute care journey. *Id.* ¶ 10. naviHealth also provides these UM services to other Medicare Advantage plans sponsored by other health insurance companies. *Id.* ¶ 12.

Approximately 2,300 clinicians currently work for naviHealth. *Id.* ¶ 24. These clinicians include, among others, care coordinators and Medical Directors. *Id.* A care coordinator is a licensed health care professional, such as a physical therapist or registered nurse, who works directly with the member and facility. *Id.* ¶ 15. A care coordinator may approve—but may not deny—prior authorization or ongoing coverage of post-acute care

services. *Id.* Care coordinators are responsible for engaging with providers, members, family, and caregivers throughout the member's admission in the post-acute care facility and assist with planning for their discharge to the next level of care. *Id.* Approximately 2,000 care coordinators currently work for naviHealth: 460 on prior authorizations and 1,500 on Continued Stay. *Id.* ¶ 16.

A naviHealth Medical Director is a licensed physician who is responsible for reviewing any case which may result in an adverse medical necessity determination; that is, a denial of coverage. Declaration of Andrea Vogler ("Vogler Decl.") ¶ 4. If a care coordinator cannot determine whether a service is medically necessary and therefore covered by an individual's insurance, the care coordinator refers the case to a physician Medical Director for review. Druga Decl. ¶ 17. The Medical Director then conducts an individualized review of the member's clinical information to decide whether the services are covered. Vogler Decl. ¶ 4. Medicare covers a stay in a SNF only if certain coverage requirements are met. *Id.* ¶ 8. Those requirements are statutorily mandated under 42 U.S.C. § 1395f and set forth in 42 C.F.R. Part 409 and Ch. 8, § 30 of the Medicare Benefit Policy Manual. Medicare covers a stay in a SNF, if, among other things "the individual needs . . . on a daily basis skilled nursing care (provided directly by or requiring the supervision of skilled nursing personnel) or other skilled rehabilitation services, which as a practical matter can only be provided in a skilled nursing facility on an inpatient basis." 42 U.S.C. § 1395f(a)(2)(B). If, for example, an individual needs skilled rehabilitation services but does not need those services on a daily basis or can effectively receive those skilled

rehabilitation services in another setting (including at home), that individual does not qualify for such services in a SNF setting.

When Medical Directors join naviHealth, they undergo eight to twelve weeks of training. Vogler Decl. ¶ 9. Part of that training includes presentations by individual physician subject matter experts. *Id.* Each subject matter expert focuses on medical necessity reviews for a specific type of facility. *Id.* That subject matter expert is responsible for drafting and presenting the training for his or her type of facility. *Id.* As part of the training, new Medical Directors work with the application of criteria from CMS under the direction of a subject matter expert. *Id.* The subject matter expert is also involved in ongoing training of Medical Directors. *Id.* Currently, approximately 122 Medical Directors work for naviHealth. *Id.* ¶ 7.

### C.    Care Coordinators' Use of nH Predict

nH Predict is a data-driven care support tool that helps members and care teams anticipate and plan for future care needs. Druga Decl. ¶ 18. It provides additional information to SNFs, care coordinators, members, families, and caregivers about potential expected functional gains while in the SNF, caregiver support needs at discharge, potential for acute readmission from the SNF, estimated SNF length of stay, therapy intensity in the SNF, and an estimate of actual discharge settings of similarly situated members. *Id.*

nH Predict helps to anticipate, based on past experience, the timing of a member's discharge and the member's needs upon discharge. *Id.* ¶ 19. This allows the care coordinator to work with caregivers to timely address barriers to safe discharge by, for example, arranging for home care, ordering safety devices, or planning for alternative

7

living arrangements. *Id.* Care coordinators also use nH Predict to assist in setting dates for medical necessity review by which the care coordinator will collect documentation from the facility and conduct a review and either authorize a continued stay or refer the case to a Medical Director for review, although the care coordinator is ultimately responsible for setting the schedule of reviews based on the care coordinator's clinical judgment. *Id.* ¶ 20. These periodic assessments are consistent with those statutorily mandated under 42 U.S.C. § 1395f(a)(2) for SNFs to receive reimbursement from Medicare Part A.[2]

naviHealth does not use nH Predict nor the reports generated using nH Predict to deny care to members or to make adverse medical necessity coverage determinations. *Id.* ¶ 21. Only physician Medical Directors make adverse medical necessity coverage determinations based on Medicare criteria applied on an individualized basis and without relying on nH Predict. *Id.* naviHealth Medical Directors have never relied on nH Predict in prior authorization reviews to deny care, and nH Predict has not been used by care coordinators for any aspect of their prior authorization reviews since May 2023. *Id.* ¶ 22. naviHealth does not use nH Predict in connection with IRF or LTAC services. *Id.* ¶ 23.

---

[2] *See also* 42 C.F.R. 413.343(b) ("SNFs must submit assessments according to an assessment schedule. This schedule must include performance of an initial Medicare assessment with an assessment reference date that is set for no later than the 8th day of posthospital SNF care, and such other interim payment assessments as the SNF determines are necessary to account for changes in patient care needs.").

### III.    PROCEDURAL BACKGROUND

#### A.    Judge Tunheim's Order Granting Defendants' Motion to Dismiss, in Part

On February 13, 2025, Judge Tunheim granted Defendants' motion to dismiss in significant part, dismissing all claims because they were preempted by Medicare except Plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing. ECF 91 at 23 (the "Dismissal Order"). The Court dismissed most claims because the Court recognized that their resolution would require the Court to delve into matters that are preempted by the Medicare Act; namely, to determine whether Plaintiffs were entitled to additional benefits, the reasonableness of the clinical determinations underlying such entitlements, and whether the manner in which coverage decisions were made could violate any non-contractual duties. *Id.* at 19-22.

The Dismissal Order narrowed the case to two claims: Count 1 (Breach of Contract) and Count 2 (Breach of the Implied Covenant of Good Faith and Fair Dealing). *Id.* at 23. The Court explained that "in analyzing these [remaining] claims, the Court would only be required to investigate whether UHC complied with its own written documents," and that it "need only review insurance documents to resolve these claims." *Id.* at 19, 2. The Court clarified that the two remaining claims "effectively arise out of UHC's evidence of coverage documents because the question would be whether UHC complied with its statement that claim decisions would be made by 'clinical services staff' and 'physicians' when it allegedly used artificial intelligence." *Id.* at 19.

On March 7, 2025, Defendants requested leave to file a motion for reconsideration or clarification of the Court's Dismissal Order. *See* ECF 95. Defendants requested

reconsideration or clarification because it appeared that resolution of the remaining claims would require the Court to assess Defendants' compliance with the Medicare Act and CMS regulations, rendering the remaining claims preempted. *Id.*

On June 2, 2025, the Court denied Defendants' request but provided additional clarification regarding the Dismissal Order. The Court first observed that "most of the claims were preempted by the Medicare Act" and were dismissed. Clarification Order at 2. "However, Plaintiffs' claims that were rooted in contract law survived." *Id.* The Court then held that Counts 1 and 2 survived preemption "due to their independence from the Medicare Act, *which limited the Court's analysis to the Evidence of Coverage ('EOC') documents provided by UHC.* Accordingly, the contract claims are limited to breaches of EOC terms." *Id.* (emphasis added).

As a result of the Court's Rulings, the Court significantly reduced the scope of the dispute to whether Defendants breached the EOC terms by making adverse coverage determinations based on nH Predict instead of clinical services staff or physicians, as alleged in the Amended Complaint. *See* Am. Compl. ¶¶ 38, 190, 196-97.

## B.    The Parties Meet and Confer Regarding Discovery

In September 2025, Your Honor denied Defendants' Motion to Bifurcate, and ordered the parties to meet and confer regarding remaining discovery disputes. Plaintiffs misrepresent Defendants' Motion to Bifurcate. ECF 145 at 5. Defendants did not seek to limit stage one discovery to the claims of the Named Plaintiffs. Rather, Defendants sought to focus discovery on the surviving issue from Judge Tunheim's decision and order of whether Defendants used nH Predict in place of physicians to make adverse coverage

determinations in breach of Defendants' EOCs. ECF 121 at 6. Defendants offered discovery on issues broader than the Named Plaintiffs' claims, but Plaintiffs refused to engage on what discovery they needed to establish that Defendants used nH Predict to deny coverage, which remains the only issue that Plaintiffs have asserted as a common issue allegedly applicable to the putative class. *Id.* at 7.

In the last four months, Defendants have extensively met and conferred with Plaintiffs through multiple conferences and rounds of letters. *See* ECF 146, ¶¶ 9-21. In each instance, Defendants have asked Plaintiffs to explain how their requests are relevant to their breach of contract claims. Additionally, given the number of individuals potentially involved in this case and the anticipated high volume of electronic documents, the parties discussed the use of custodians and search terms to narrow the volume of potentially responsive documents for review. Declaration of Michelle S. Grant ("Grant Decl.") ¶ 9. Defendants approached these conversations in good faith in an effort to provide Plaintiffs with all relevant information while not unduly burdening Defendants.

Defendants have worked diligently to respond to Plaintiffs' discovery requests since last fall. Defendants served amended responses to Plaintiffs' written requests on November 20, 2025. Grant Decl. ¶ 3. Defendants then conducted an extensive review of documents using 22 different sets of search terms from non-custodial sources and 16 custodians. *Id.* ¶ 9. These custodians include the Medical Directors involved in reviewing and deciding SNF continued stays for named Plaintiffs, as well as individuals responsible for training naviHealth Medical Directors and care coordinators regarding continued stay reviews for SNFs from July 1, 2019 to present. Applying those search terms to the 16 custodians

yielded a set of over 50,000 documents for review. *Id.* ¶ 10. After email threading and de-duplicating documents, the review population resulted in 37,749 documents. *Id.* Defendants also agreed to conduct multiple targeted searches for specific data following negotiations with Plaintiffs. On many issues, Defendants compromised and agreed to produce documents and information, despite disagreeing with Plaintiffs on whether these materials were discoverable. Defendants agreed to produce documents and information regarding, among other things, criteria used to evaluate Medical Directors (ECF 146-12 at 13); grievances referencing naviHealth (including those that went beyond nH Predict) (ECF 146-15 at 11); template EOCs, Notices of Medicare Non-Coverage ("NOMNCs"), and nH Predict Outcome Reports (ECF 146-12 at 13); data showing the number of NOMNCs issued (ECF 146-12 at 10); training materials for care coordinators (ECF 146-15 at 9); and organizational charts (ECF 146-12 at 7). To date, Defendants have produced over 5,500 documents, constituting nearly 55,000 pages of data. Grant Decl. ¶ 12. Defendants are continuing to review and produce documents in accordance with the Amended Scheduling Order.

## IV.    LEGAL STANDARD

"Unless otherwise limited by court order," a party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Rule 26(b) does not 'allow fishing expeditions in discovery,'" and a party requesting discovery "must first make a 'threshold showing of relevance' of the evidence requested." *Marlow v. City of Clarendon*, 78 F.4th 410, 416 (8th Cir. 2023) (quoting *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir.

1992)); *see also Hancock v. Aetna Life Ins. Co.,* 321 F.R.D. 383, 390 (W.D. Wash. 2017) (recognizing it is the moving party's burden to show "why the information sought is relevant and why the responding party's objections are not meritorious").

Although discoverability is broader than admissibility, this standard "should not be misapplied so as to allow fishing expeditions in discovery. Some threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case." *Hofer*, 981 F.2d at 380. Discovery into issues that are not relevant to a claim or defense should be denied absent a showing of good cause. *Klossner v. Iadu Table Mound MHP, LLC*, 2021 U.S. Dist. LEXIS 148483, at *22 (N.D. Iowa Apr. 16, 2021) (recognizing discovery that "relates to the 'subject matter'" of the dispute but is "irrelevant to any claim or defense may only be obtained 'on court order based on a showing of good cause'" (citing 8 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2008 (3d ed. 2010))).

Even relevant discovery "is not permitted where no need is shown, or compliance would be unduly burdensome, or where harm to the person from whom discovery is sought outweighs the need of the person seeking discovery of the information." *Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2*, 197 F.3d 922, 925 (8th Cir. 1999) (quotation omitted). "'[A] court can—and must—limit proposed discovery that it determines is not proportional to the needs of the case.'" *Dekker v. Cenlar FSB*, No. 21-cv-162 (MJD/TNL), 2022 U.S. Dist. LEXIS 169309, at *5 (D. Minn. Sept. 20, 2022) (quotation omitted). When assessing proportionality, courts consider "the importance of

the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* (quoting Fed. R. Civ. P. 26(b)(1)).

## V.    ARGUMENT

Plaintiffs' motion seeks to compel Defendants to provide further discovery responses, but each request seeks irrelevant information and/or requires discovery efforts disproportional to any reasonable need for this case. We address each in turn below.

### A.    Plaintiffs Are Not Entitled to Wide-Ranging Discovery on Unpled Theories

Plaintiffs argue that they are entitled to discovery "beyond whether Defendants used nH Predict in place of medical professionals to make coverage determinations" because they "pleaded other bases for their contract claims" and are entitled to discovery on these claims. ECF 145 at 29, 33.[33] Plaintiffs also baselessly assert that "Plaintiffs' case is about Defendants' use of AI to resolve claims for Medicare Advantage customers," leading them to seek discovery regarding use of AI and "post-acute care claims practices" that have nothing to do with nH Predict. Their attempt to seek discovery of these unpled theories should be rejected.

---

[33] Without tying their requests to any "other bases for their contract claims" supposedly pled, Plaintiffs state that their additional discovery theory entitles them to information in response to Request for Production Nos. 4, 7, 11, 12, 14-17, and 19, and Interrogatories 11 and 12. *Id.* at 29.

Plaintiffs ask this Court to adopt a strained reading of Judge Tunheim's dismissal order where the Court stated that Plaintiffs' contract claims "effectively arise out of UHC's evidence of coverage documents because the question would be whether UHC complied with its statement that claim decisions would be made by 'clinical services staff' and 'physicians' when it allegedly used artificial intelligence." ECF 91 at 19. From this language Plaintiffs falsely assert that they may seek discovery regarding "other breaches." ECF 145 at 34. Plaintiffs also misconstrue this Court's order on Defendants' Motion to Bifurcate, which did not reject Defendants' relevancy objections as Plaintiffs argue. In fact, during the September hearing, this Court recognized—in accordance with Judge Tunheim's Order—that this case is about Plaintiffs' challenge of Defendants' allegedly "systemic use of nH Predict to adjudicate claims for medically necessary treatment, and [Plaintiffs] argue that this was done in contradiction to defendants' contractual obligations that each determination would be made by appropriate medical professionals." ECF 129 at 25. Accordingly, the Court has already recognized that Plaintiffs may not demand discovery into subject areas other than the use of nH Predict in place of medical professionals to make coverage determinations.

Plaintiffs identify no terms of their EOCs as the "bases for breach" other than those for which they already are receiving discovery. The contract terms Plaintiffs have cited are: (1) EOC provisions requiring that "Clinical Services Staff and Physicians make decisions on the health care services you receive based on the appropriateness of care and services and existence of coverage," Am. Compl. ¶ 187; and (2) EOC provisions requiring them to "provide written statements to Plaintiffs and the Class, accurately listing all bases for

Defendants' denial of claims and the factual and legal bases for each reason given for such denial," *id.* ¶ 189. ECF 145 at 25.[4] Plaintiffs' "[m]ere speculation" that the discovery they seek may have "relevance" to showing the breach of some other unspecified contract terms "is not sufficient" to compel discovery into a large swath of discovery unrelated to Plaintiffs' enumerated breach theories. *Lynch v. Experian Info. Sols., Inc.*, 569 F. Supp. 3d 959, 968 (D. Minn. 2021).

Plaintiffs' attempt to seek discovery wholly unrelated to their remaining contract claims should be denied.

## B. Defendants Have Responded to Request for Production Nos. 4 and 5 and the Additional Documents Plaintiffs Seek Are Neither Relevant Nor Proportional

Plaintiffs' Request for Production No. 4 seeks documents and communications sufficient to show policies, operating procedures, protocols, methods, practices, memoranda, and reports concerning the manner in which Defendants assess and adjudicate post-acute care claims from November 14, 2019, to the present. Request for Production No. 5 seeks "all Documents and Communications discussing (including meeting minutes

---

[4] Plaintiffs do not point to a specific provision in the EOC. There is a provision in the EOCs that state that "If our answer is no to part or all of what you requested, we will send you a written statement that explains why we said no." *See, e.g.*, Grant Decl. Ex. A at UHG_Lokken_00000262. In connection with denials of coverage for SNFs, CMS requires that SNFs provide a NOMNC to beneficiaries when their Medicare covered services are ending, and CMS regulates its content. A Detailed Explanation of Non-Coverage ("DENC"), which is also regulated by CMS, is given only if a member appeals. Defendants have produced the NOMNCs and DENCs for the Named Plaintiffs. Defendants also have agreed to produce template NOMNCs. Plaintiffs do not tie any of the discovery requests at issue in this motion as being relevant to this alleged breach.

whether in virtual or in person) or analyzing (including reports) nH Predict." ECF 146-1 at 11.

In response, Defendants have agreed to produce documents sufficient to show the applicable training materials and other policy documents addressing how Medical Directors apply Medicare criteria in coverage determinations for SNFs and how nH Predict is used at naviHealth for UHC Medicare Advantage plans from July 1, 2019, to present. Defendants' production includes not only overarching policies, procedures, and training materials, but responsive documents from 16 different custodians for the time period from July 1, 2019, to the present, including those responsible for training both care coordinators and Medical Directors regarding the use of nH Predict and coverage determinations for SNFs.

Plaintiffs take issue with Defendants' production, claiming it is incomplete because Defendants object to producing documents from before July 1, 2019, and documents regarding IRFs and LTACs. But Defendants did not use nH Predict for UHC Medicare Advantage plans prior to July 1, 2019, and do not use nH Predict in connection with IRFs or LTACs. Druga Decl. ¶ 23. Accordingly, Plaintiffs' request for additional documents should be denied as the requested discovery is not relevant, not proportional, and (in some cases) not responsive.

### 1. Discovery From Prior to When Defendants Used nH Predict for the Putative Class is Not Relevant

Plaintiffs' claims all relate to alleged denials of coverage in 2022 through March 2024. Am. Compl. ¶¶ 56-169. Plaintiffs, however, seek documents from November 14,

2017, to the present, two years prior to the beginning of the putative class period, and nearly twenty months before Defendants used nH Predict in any way in connection with UHC Medicare Advantage plans. Plaintiffs fail to offer a valid justification for seeking discovery from November 14, 2017 to June 30, 2019, and their motion to compel should be denied.

Plaintiffs allege that the use of nH Predict breached the terms of the EOCs for UHC Medicare Advantage plans. naviHealth only began providing certain post-acute care management and utilization review services to UHC on July 1, 2019, and Defendants did not use nH Predict for UHC Medicare Advantage plans prior to this date. Druga Decl. ¶ 7. Discovery related to the period *before* Defendants used nH Predict with respect to UHC Medicare Advantage Plans logically would not show anything relevant to the Plaintiffs' breach of contract claims which allegedly arose years later. *See, e.g.*, *Cargill v. Ron Burge*, 284 F.R.D. 421, 429 (D. Minn. 2012) (denying discovery of insurance claims prior to the claims at issue because the documents requested to ascertain the defendant's "pattern or practice of handling other claims" were irrelevant). Nor can such documents establish any relevant fact relating to the claims of the putative class Plaintiffs seek to represent. Plaintiffs argue that documents from before July 1, 2019 are relevant to "how and why Defendants' policies and practices changed over time," (ECF 145 at 7), but fail to explain how a change in policies and practices over time is relevant to their contract claims.

Moreover, Plaintiffs' request for such documents is not proportional to the needs of the case. Plaintiffs ask that naviHealth search for and produce all documents discussing or analyzing nH Predict for nearly two years before the date when naviHealth provided *any* services to UHC. Plaintiffs offer no explanation why the documents Defendants will be

producing will not provide full information regarding the purported use of nH Predict during the relevant time period. Furthermore, production of pre-July 1, 2019 information would disclose information related to naviHealth's customers other than UHC. Such document production would require either producing personal health information for a large population of individuals that are **not** putative class members and have no relation to this case, or devoting substantial time and expense to redacting such information. These documents are neither relevant nor proportional to the claims or defenses in this action. *See, e.g.*, *Am. Claims Mgmt. v. Allied World Surplus Lines Ins. Co.*, No. 18cv925-JLS(MSB), 2018 U.S. Dist. LEXIS 245777, *16-17 (S.D. Cal. Dec. 31, 2018) (collecting cases and denying motion to compel production of documents because high costs and burden of production outweighed relevance of demanded discovery).

Plaintiffs' motion to compel documents from prior to July 1, 2019, should be denied.

### 2. Discovery Regarding IRFs and LTACs Is Not Relevant, Proportional or Responsive

Plaintiffs' contract claims are premised on the alleged "use of nH Predict to deny claims for medically necessary treatment in a manner that violates" the EOCs. ECF 145 at 2. Defendants do not, however, use nH Predict in connection with claims adjudication or coverage determinations for IRFs or LTACs. The Court should deny Plaintiffs' request for discovery related to IRFs and LTACs as not relevant, proportional, or responsive.[5]

---

[5] Request for Production No. 5 seeks documents and communications regarding nH Predict. Because Defendants did not use nH Predict in connection with IRF or LTAC services, there are no documents relating to these facilities that are responsive to Request for Production No. 5.

Plaintiffs misleadingly try to assert that, because naviHealth provided certain UM services relating to IRFs and LTACs, nH Predict must have been used. naviHealth does not use nH Predict in connection with IRF or LTAC services. Druga Decl. ¶ 23. The data set used for nH Predict's model involves only data from SNF episodes of care. *Id.* nH Predict does not incorporate data from, and is not designed to be used in, other post-acute care contexts. *Id.* Documents produced by Defendants confirm this. Because Defendants did not use nH Predict in connection with IRFs and LTACs, Plaintiffs cannot meet their burden to "make any showing that the requested documents are relevant to this action." *Bredemus v. Int'l Paper Co.*, 252 F.R.D. 529, 534 (D. Minn. 2008); *Clear Spring Prop. & Cas. Co. v. Arch Nemesis, LLC*, 2024 U.S. Dist. LEXIS 162527, at *22-23 (D. Kansas Sept. 10, 2024) (same). *Bredemus* is instructive. There, plaintiffs asserted personal injury claims based on the alleged use of chemical mixtures at a wood treatment plant. 252 F.R.D. at 534. The plaintiffs sought to compel discovery regarding alleged chemicals in defendants' mixtures. *Id.* The defendants submitted testimony and documents demonstrating the chemicals at issue were never present in the mixtures used at the treatment plant. *Id.* at 534-35. The Court held plaintiffs' motion to compel "fail[ed] on its merits, because the [p]laintiffs have failed to make any showing that the requested documents are relevant to this action." *Id.* Plaintiffs' requests seeking discovery regarding IRFs and LTACs are analogous to the discovery sought, and denied, in *Bredemus*.

Plaintiffs next argue that they are entitled to discovery regarding IRFs and LTACs because multiple Plaintiffs, including William Hull and Frank Chester Perry, assert claims

premised upon Defendants' denial of prior authorization claims for inpatient rehabilitation care. ECF 145 at 36-37. The Court should reject this argument as well.

*First*, Hull does not allege a "denial of prior authorization claims for inpatient rehabilitation care." ECF No. 145 at 37. The only reference to an IRF in Hull's allegations is that he was "discharged from Saddleback and transferred to Providence Mission Hospital in Laguna Beach, California, where he received inpatient rehab care for three weeks." Am. Compl. ¶ 168. This passing reference to *approved* IRF care does not mean Hull's claims are "premised upon" a denial of IRF care. While Perry alleges that Defendants denied prior authorization for his acute rehab care at Lovelace UNM Neurological Rehab, *id.* ¶ 127, naviHealth's records show that the prior authorization request was granted, not denied. Grant Decl. Ex. B. And despite Plaintiffs' misleading assertion, no other Plaintiffs allege any denial of prior authorization for IRF.[6]

*Second*, and more importantly, Defendants did not use nH Predict in connection with review of prior authorizations for IRF services, or for IRF services in general. Druga Decl. ¶ 23. Defendants produced records for these prior authorization requests confirming this. Because nH Predict was not used in IRFs, any claim arising from these episodes of care is separate from the claims Perry and Hull seek to assert on behalf of any putative class. *See* Am. Compl. ¶ 172 (asserting claims on behalf of an alleged class who "had benefits denied due to Defendants' use of the nH Predict AI Model."). As such, class-wide discovery into IRF prior authorizations is irrelevant and beyond the needs of the case.

---

[6] naviHealth does not do continued stay reviews for IRFs for UHC Medicare Advantage members. Vogler Decl. ¶ 6.

In response, Plaintiffs cite *Kisting-Leung v. Cigna Corp.*, claiming that "if Defendants wanted to challenge the factual bases of Plaintiffs' claims, Defendants could have made a factual challenge to Plaintiffs' complaint on a motion to dismiss—but Defendants chose not to, and these claims remain part of this litigation." ECF No. 142 at 36 (*citing* 780 F. Supp. 3d 985, 997-1000 (E.D. Cal. 2025)). *Kisting-Leung* did not say that. There, the court discussed a "factual challenge" to subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)—not a discovery dispute. *Id.* at 998. On a 12(b)(1) motion, "the court considers matters outside the pleadings . . . and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). There is no such thing as a "factual challenge" to the merits of Plaintiffs factual claims. Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1356 (4th ed. 2024) (a 12(b)(6) motion "is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case"). Defendants did not need to bring a "factual attack" on the pleadings to raise relevance and proportionality arguments to Plaintiffs' discovery requests.

*Third*, no Plaintiff alleges denial of any LTAC care. "Plaintiff[s] [are] not entitled to discovery for the claims" they are "unable to pursue on behalf of a class." *Soto v. Castlerock Farming & Transp., Inc.*, 282 F.R.D. 492, 503 (E.D. Cal. 2012). Here, no Named Plaintiff alleges denial of coverage for LTAC care and discovery into LTACs is, therefore, irrelevant and goes beyond the needs of the case.

*Finally*, Plaintiffs appear to argue that they should get discovery into naviHealth's claims review practices regardless of whether Defendants used nH Predict. ECF 145 at 37.

Plaintiffs make no attempt to show how this is relevant to their claims. Nor can they. Plaintiffs' claims turn on whether determinations to deny coverage were made by physicians or nH Predict. Am. Compl. ¶ 41 ("Defendants wrongfully delegate their obligation to evaluate and investigate claims to the nH Predict AI Model in breach of the insurance agreement."). Indeed, Plaintiffs seek to certify a class comprised of UHC Medicare Advantage members who "had benefits denied *due to Defendants' use of the nH Predict AI Model.*" *Id.* ¶ 172 (emphasis added). Judge Tunheim similarly described Plaintiffs' claims. ECF 91 at 23 ("Plaintiffs bring a putative class action contesting UHC's use of nH Predict, rather than actual people, to make coverage decisions, contradicting UHC's insurance policy documents."). As Plaintiffs themselves note, they are "the master of their Complaint." Plaintiffs cannot now go on a fishing expedition regarding unpled claims relating to unidentified challenges to naviHealth's general "claims review practices" untethered to the alleged use of nH Predict to deny coverage instead of physicians in violation of the EOCs. *See, e.g.*, *In re St. Jude Med., Inc. Sec. Litig.*, 629 F. Supp. 2d 915, 917 (D. Minn. 2009) (granting summary judgment against party whose "entire theory changed" "midstream" in litigation after party survived a "motion to dismiss" on a "different theory").

Plaintiffs' motion to compel discovery regarding IRF and LTACs should be denied.[7]

---

[7] Beyond Request for Production Nos. 4 and 5, Plaintiffs also seek to compel information regarding IRFs and LTACs for Request for Production Nos. 14-17 and Interrogatory Nos. 3-4, as well as requests not part of the pending motion. ECF 145 at 14-18, 29.

### C.    Discovery Regarding the Design and Creation of nH Predict Is Neither Relevant Nor Proportional to Plaintiffs' Contract Claims

Request for Production No. 7 seeks "*all* documents and communications concerning the development, design, creation, approval, implementation, and use" of nH Predict, "including data, rules, source code, and medical guidelines nH Predict is based on." Interrogatory No. 11 broadly asks Defendants to identify "all persons involved in the development, design, creation, implementation, and approval of nH Predict."

Defendants have agreed to produce documents regarding the implementation and use of nH Predict for UHC Medicare Advantage plans and have identified individuals involved in the training of both Medical Directors and care coordinators. Plaintiffs have not shown how their burdensome requests for "all documents and communications" related to the development, design, creation, approval, and implementation of nH Predict, and identification of "all persons involved in" the same going back to November 14, 2017, are relevant or proportional. The Court should reject Plaintiffs' requests.

#### 1.    Request for Production No. 7

Plaintiffs misstate the record regarding this request. Plaintiffs wrongly assert that what Defendants have agreed to produce is not responsive to this request. ECF 145 at 12. Request for Production 7 seeks, among other things, "all Documents and Communications concerning . . . implementation, and *use of the nH Predict*" and, thus, overlaps with Requests for Production Nos. 4 and 5. Accordingly, Defendants properly referenced the same category of documents that they agreed to produce. For example, the policies explaining how Defendants used nH Predict (Request for Production No. 4) and what care

coordinators and Medical Directors learn about nH Predict (Request for Production No. 5) also are responsive to Request for Production No. 7, as are many of the nearly 40,000 custodial documents Defendants have agreed to review for production. The documents Defendants have agreed to produce show what nH Predict is, and how Defendants used and implemented it in relation to UHC Medicare Advantage plans after June 1, 2019. This discovery squarely responds to Request for Production No. 7, and shows that Defendants have agreed to produce significant information and documents in response to Request for Production No. 7. What Defendants object to is producing "all documents" regarding the "development, design, creation, approval, [and] implementation of nH Predict," as well as "the data, rules, and source code," as irrelevant, burdensome, and not proportional.

Plaintiffs argue that this response is insufficient, but they do not support their argument with any reasonable grounds. *First*, Plaintiffs claim they are entitled to "all documents" regarding the development of nH Predict going back to 2017 because it is relevant to show "(1) how nH Predict works; (2) the development goals of nH Predict; (3) the anticipated benefits of nH Predict; and (4) whether nH Predict was designed to supplant physician decision-making, among other things." ECF 145 at 38. But documents regarding the use of nH Predict that Defendants *have* agreed to produce will also show how nH Predict works, its goals and anticipated benefits, and whether Defendants used it to supplant physician decision-making as related to Plaintiffs' claims and the putative class claims. Nor have Plaintiffs even attempted to explain how "the data, rules, and source code" are relevant to their contract claims. Plaintiffs claim that "Defendants wrongfully delegate their obligation to evaluate and investigate claims to the nH Predict AI Model in

breach of the insurance agreement." ECF 145 at 3. Plaintiffs will get discovery to test that assertion and do not need the data, rules and source code. The documents Defendants already produced explain, among other things, what nH Predict is, its inputs, and how Defendants used it. Plaintiffs will have sufficient documents and information from the putative class period either to support or refute their alleged contract claims that Defendants used nH Predict in lieu of physicians to make adverse coverage determinations regarding Medicare benefits.

*Second,* Plaintiffs fail to explain the relevance of this vast swath of "all documents and communications" over an eight-year period relating to the design, development, and implementation of nH Predict. Documents from prior to June 1, 2019, will necessarily be unrelated to Defendants' use of nH Predict for UHC Medicare Advantage plans.[8] Rather because naviHealth provides services to other Medicare Advantage plans, such discovery will solely relate to use of nH Predict for plans *other than* providing services relating to the putative class. Plaintiffs have no conceivable explanation as to why they need these earlier documents when they will get documents sufficient to show how Defendants used nH Predict in connection with UHC Medicare Advantage plans and "whether it was designed to supplant physician decision-making." Further, Plaintiffs' request for "all documents and communications" regarding implementation and use of nH Predict conceivably would

---

[8] Given that naviHealth provides UM services to other Medicare Advantage plans sponsored by other health insurance companies, it will also include confidential and personal health information relating to non-parties.

cover any document including the term "nH Predict." Plaintiffs have failed to explain how this is relevant or proportional to their contract claims.

*Third*, Plaintiffs incorrectly assert that Defendants refuse to respond to this request because Defendants deny Plaintiffs' allegations. ECF 145 at 12. Plaintiffs mischaracterize Defendants' objection and omit recognition of the extensive information Defendants have agreed to produce. Defendants are not refusing to respond to this request because they deny Plaintiffs' allegations.

The additional documents Plaintiffs seek in response to Request for Production No. 7 are neither relevant nor proportional to the claims in this case. Plaintiffs' motion to compel should be denied.

### 2.    Interrogatory No. 11

Plaintiffs' arguments fail with respect to Defendants' objections to Interrogatory No. 11, which broadly asks Defendants to identify "all persons involved in the development, design, creation, implementation, and approval of nH Predict." For the same reasons discussed regarding Request for Production No. 7, Plaintiffs' request seeks irrelevant information and is not proportional to the needs of the case. Defendants have identified individuals responsible for training Medical Directors and care coordinators, including on the use of nH Predict. Plaintiffs argue that "the people responsible for creating nH Predict" are "material deponents in this case" because they have information on "(1) how nH Predict works; (2) the development goals of nH Predict; (3) the anticipated benefits of nH Predict; and (3) whether nH Predict was designed to supplant physician decision-making." ECF 145 at 19. The individuals Defendants have identified can testify as to how

nH Predict is used, what it is used for, and whether it "designed to supplant physician decision-making." Further, Interrogatory No. 11 asks for identification of "all persons" involved in the "implementation, and approval of nH Predict." Taken to its logical conclusion, this burdensome request would require identification of anyone involved in "implementation" of nH Predict, which conceivably could include everyone that has used nH Predict. Plaintiffs have no explanation for how such a broad request is relevant to their claims.

### D. Documents Regarding the Acquisition of naviHealth Are Neither Relevant Nor Proportional

In Request for Production No. 12, Plaintiffs broadly seek "all documents and communications concerning" UnitedHealth Group's acquisition of naviHealth, "including without limitation all evaluations, reports, analysis, memoranda, meeting minutes, or other documents related to the decision to acquire naviHealth (including documents concerning projected cost-savings and the number of impacted clients and insureds)." This request is not related to any of the claims or defenses in this litigation, and it is unduly burdensome. This request underscores that Plaintiffs' disputed discovery requests are not about this case but instead are an attempt to transform discovery of this narrow breach of contract challenge into a broad-ranging investigation into irrelevant matters.

Plaintiffs claim that this request seeks relevant documents because the requested documents may show: "(1) why UnitedHealth acquired naviHealth; (2) what UnitedHealth hoped to gain by acquiring naviHealth; (3) what changes UnitedHealth intended to make to naviHealth's practices and why; and (4) whether UnitedHealth intended to use

naviHealth to supplant physician decision-making," as well as other unidentified "critical information." ECF 145 at 8. Plaintiffs fail to show how UnitedHealth Group's "motivation" to acquire naviHealth, or "changes" it purportedly "intended to make to naviHealth's practices" in general, are relevant to Plaintiffs' contract claims. Normal business activity—such as profit maximization—is not actionable to show bad faith for a claim for breach of the implied duty of good faith and fair dealing. *Churlik v. Gate City Bank*, No. 23-cv-0637 (WMW/LIB), 2024 U.S. Dist. LEXIS 20090, at *4-5 (D. Minn. Feb. 6, 2024) (a party bringing a claim for breach of the implied covenant of good faith and fair dealing must "plausibly allege" in their "complaint" that defendant had "any improper motive beyond maximizing profit" (citing *BP Prods. N. Am., Inc. v. Twin Cities Stores*, 534 F. Supp. 2d 959, 967 (D. Minn. 2007))); *see also Moore v. Specialized Loan Servicing, LLC,* No. 3:20-cv-01962-IM, 2021 U.S. Dist. LEXIS 167833, at *14 (D. Ore. Sept. 3, 2021) ("reasonable expectations include the right of either party to further its own legitimate business interests") (cleaned up).

Moreover, the scope of naviHealth's business goes well beyond nH Predict, contrary to Plaintiffs' contentions, and Plaintiffs' contract claims have no relation to *any* naviHealth practice beyond the alleged use of nH Predict to supplant physician decision-making. And, to the extent this request seeks documents concerning whether nH Predict was in fact used to "supplant physician decision-making" (it was not), Defendants have already produced thousands of documents concerning nH Predict and its use in response to Plaintiffs' other document requests. In making this broad request for all documents regarding UnitedHealth

Group's acquisition of an entire company, Plaintiffs have failed to meet their threshold burden of showing how such documents are relevant to the remaining contract claims.

Even if Plaintiffs could meet a threshold showing of relevance with Request for Production No. 12 (which they cannot), their motion to compel should be denied as burdensome and not proportional. As written, this request seeks expansive discovery into large categories of transactional documents that are irrelevant to this dispute. At the time of the acquisition, naviHealth was a multi-billion-dollar company that provided a variety of services, including those unrelated to SNFs and nH Predict. The large volume of documents pertaining to due diligence conducted prior to the acquisition, negotiations relating to the transaction, and business planning around the future integration of naviHealth into UnitedHealth Group's business operations, are neither relevant nor proportional to the needs of this case. Because of substantial attorney involvement in the acquisition and due diligence and related processes, the request also would encompass a significant number of privileged documents that would require many hours of privilege reviews to identify and segregate.

Plaintiffs simply have no justification for how such a burdensome request is relevant, much less proportional, to the needs of this case. Plaintiffs' motion to compel documents responsive to Request for Production No. 12 should be denied.

### E.     Plaintiffs Seek Irrelevant Financial Data

Request for Production No. 13 seeks documents, communications, and data concerning the "valuation, value, revenue, profits, and profitability of each" of Defendants' businesses. ECF 146-1 at 13. Plaintiffs state that this request is relevant because

"information about Defendants' earnings and revenue" may show "Defendants' motive to increase denials, demonstrate[] how much Defendants gained by abusing nH Predict, and establish[] potential damages." ECF 145 at 8. Plaintiffs' justifications are not supported by the law.

The valuation of Defendants' businesses is not relevant to establish damages. "[I]n a breach of contract case, [a] plaintiff is limited to damages flowing only from such breach"; "damages which are speculative, remote, or conjectural are not recoverable." *In re RFC & ResCap Liquidating Trust Action*, 332 F. Supp. 3d 1101, 1191 (D. Minn. 2018) (cleaned up). "[T]he appropriate measure of damages for breach of contract is that amount which will place the plaintiff in the same situation as if the contract had been performed." *Peters v. Mut. Ben. Life Ins. Co.*, 420 N.W.2d 908, 915 (Minn. Ct. App. 1988). Courts routinely deny motions to compel such financial discovery in breach of contract cases. *See, e.g.*, *ARC Res. Mgmt. v. Civ., LLC*, No. 20-27-DLB-EBA 2024 U.S. Dist. LEXIS 183627, at *8-11 (E.D. Ky. Oct. 8, 2024) (denying motion to compel "information and documentation" related to a party's "financial state" because the "requested financial records would touch on [the party's] state of mind, which is irrelevant in a breach of contract claim"); *Apex Fin. Options, LLC v. Gilbertson*, No. 21-023-LPS-SRF, 2021 U.S. Dist. LEXIS 47850, at *9-12 (D. Del. Mar. 15, 2021) (denying motion to compel discovery of "financial information" as amounting to "fishing expedition"); *Skinner v. Aetna Life Ins. Co.*, No. 83-0679, 1984 U.S. Dist. LEXIS 19817, at *2-3 (D.D.C. Feb. 2, 1984) (denying motion to compel production of defendant's financial information in a breach of contract action because information was only relevant to a claim for punitive damages).

Nor can a purported financial "motive" be relevant to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing. Again, profit maximization is not actionable to show bad faith for a claim for breach of the implied duty of good faith and fair dealing. *Supra* § V.F. And, in any event, Plaintiffs' make no attempt to explain how "documents, communications, and data" concerning the "valuation, value, revenue, profits, and profitability of each" of each Defendants' entire businesses are relevant or proportional.

Plaintiffs' motion to compel documents responsive to Request for Production No. 13 should be denied.

### F.    Plaintiffs' "Cloned" Requests for All Documents Concerning Any Governmental or Internal Investigation Should be Denied

Request for Production No. 14 broadly requests "all documents and communications concerning internal . . . or governmental agency investigations into Defendants' policies, practices, or operations, and Defendants' use of nH Predict, any other algorithms, or AI to assess or adjudicate claims." Request for Production No. 15 broadly requests all documents or communications produced by Defendants to "any local, state, or federal governmental agency or regulatory body concerning your assessment and adjudication of" post-acute care claims (including SNF, IRF, and LTAC claims). Courts have rejected similar requests for "cloned discovery," and they should be rejected here.

Plaintiffs argue that they are entitled to every document Defendants have produced to *any* governmental agency relating to *any* post-acute care claim practices or *any* use of AI. ECF No. 145 at 34-35. Besides being burdensome and well beyond anything relating

32

to nH Predict (seeking any investigation into any post-acute care claim policy or practice or use of AI), courts routinely reject this kind of "cloned" discovery, reasoning "[t]here could be a number of reasons why documents appropriately requested and provided in another case—even if the subject matter of those cases seem to overlap—would be irrelevant or burdensome to provide in another case. If relevant and proportional documents exist in the custody or control of the responding party, the appropriate thing to do is to request those documents.'" *Insignia Sys. v. News Corp.*, No. 19-1820, 2020 U.S. Dist. LEXIS 259977 at *3 (D. Minn. Mar. 24, 2020) (Thorson, M.J.) (quoting *Goro v. Flowers Foods, Inc.*, No. 17-cv-02580-JLS-JLB, 2019 WL 6252499, at *18-19 (S.D. Cal. Nov. 22, 2019)). The court's decision in *Midwest Gas Servs., Inc. v. Indiana Gas Co.*, No. IP 99-690-C-D/F, 2000 U.S. Dist. LEXIS 8098 at *2 (S.D. Ind. Mar. 7, 2000), *rev'd in part on other grounds, Midwest Gas Servs. v. Ind. Gas Co.*, 317 F.3d 703 (7th Cir. 2003), is instructive. The court denied a motion to compel "any and all documents received from or provided to the United States Justice Department from 1995 to the present." *Id.* at *2. The court rejected this "cloned" request reasoning if "plaintiffs are interested in the content of documents and for that they must make proper requests describing the information in which they are interested. The plaintiffs' counsel must do their own work and request the information they seek directly." *Id.* Similarly, in *In Re CenturyLink Sales Prac. & Sec. Litig.*, No. 18-296 (MJD/KMM), 2020 U.S. Dist. LEXIS 248595 at *26 (D. Minn. Oct. 28, 2020), then Magistrate Judge Menendez quashed a subpoena seeking all documents produced to any governmental entity). *Id.* The court rejected this "cloned" discovery

33

request because it "would likely result in the production of large chunks of information that is irrelevant to this lawsuit while not necessarily producing information that is." *Id.*

The same is true here. Plaintiffs eschew any document-by-document analysis of relevance and proportionality, instead asserting that a document is automatically relevant if it was a part of any internal or governmental investigation into various business practices. Even narrowed to post-acute care, these requests cover *any* investigation by *any* unit of government of *any* of Defendants' activities that touch on post-acute care. Defendants operate in a heavily regulated industry and respond to requests from governments at all levels. A production of "all documents and communications" relating to these investigations, irrespective of subject matter, will "likely result in the production of large chunks of information that is irrelevant to this lawsuit." *CenturyLink*, 2020 U.S. Dist. LEXIS 248595 at *26; *see also Perius v. Abbott Labs.*, No. 07C1251, 2008 WL 3889942, at *4-5 (N. D. Ill. Aug. 20, 2008) (denying plaintiff's "requests for wholesale discovery" into DOJ and other investigations because Defendants produced other documents showing the reasons for plaintiff's termination, discovery regarding the investigations "would overwhelm discovery related to [plaintiff's] claims," and plaintiff's requests "could potentially interfere with the ongoing DOJ investigation").

The breadth of Plaintiffs' requests is reflected in the Senate Permanent Subcommittee on Investigation Report cited by Plaintiffs. Plaintiffs wrongly assert that this investigation concerned "*exactly the same practices* at issue in this litigation." ECF No. 145 at 39. The Report shows that the investigation was much broader. The Report discusses tools other than nH Predict, including an "auto authorization model," "a home health

management solution," and a proposed machine learning tool intended to "flag" likely appeals. *See* U.S. Senate Permanent Subcommittee on Investigations, Refusal of Recovery: How Medicare Advantage Insurers Have Denied Patients Access to Post-Acute Care, Majority Staff Report, 21-31 (Oct. 17, 2022). None of these tools are at issue this litigation, meaning production of all documents produced in connection with even this investigation would include documents that have nothing to do with the issues in this case. The broader scope of the investigation by the Senate Permanent Subcommittee demonstrates why a document is not relevant solely because Defendants produced it to the government. Plaintiffs can serve proper requests for documents regarding the use of nH Predict (and have), but Defendants should not be required to produce *en masse* documents produced to the government merely because Plaintiffs have attempted to piggy-back off of those investigations by serving these broad "cloned" discovery requests.

The burden of producing this material outweighs any minimal relevance. As detailed above, Plaintiffs' requests potentially implicate a range of governmental inquiries that would require burdensome identification, review and production. Plaintiffs downplay the burden imposed by these requests, suggesting "RFP No. 15 seeks documents that Defendants have already been searched, culled, identified, screened for privilege, and produced to third parties—no further work needs to be done, so there is little or no burden in making this production." ECF 145 at 40. Plaintiffs are incorrect.

*First*, Plaintiffs ask for more documents than Defendants produced in connection with a governmental investigation—they also ask for *all documents and communications* concerning these investigations. This, at the very least, would require burdensome

custodial review, including documents likely to contain significant numbers of documents protected by the attorney-client privilege or work product doctrine. *Second*, Defendants would bear the burden of identifying and sifting through and assessing the relevance of every regulatory request and response to see if it related to post-acute care claims or "use of AI." *Third*, Plaintiffs ignore internal investigations, which are almost always conducted at the direction of attorneys under privilege and with resulting work product documents. Such internal investigations also may proceed informally and typically do not result in a neat set of documents that "have already been searched, culled, identified, screened for privilege, and produced to third parties." ECF 145 at 40. Collecting, reviewing, and producing this irrelevant information, and logging privileged documents, will impose an extensive and undue burden on Defendants. Given that Defendants are otherwise producing relevant underlying documents, regardless of whether they may otherwise have been provided to government entities, there is no proper justification for these overly broad requests. Plaintiffs' motion to compel responses to Requests for Production Nos. 14 and 15 should be denied.

### G.    Plaintiffs' Request for Highly Sensitive Discovery Regarding Employee Compensation and Disciplinary Records Is Irrelevant and Burdensome

Request for Production Nos. 16 and 17 broadly seek highly sensitive documents regarding naviHealth employee performance and disciplinary records that are neither relevant nor proportional to the needs of the case.

Request for Production No. 17 requests documents relating to "*any* disciplinary actions" against any naviHealth employee for failure to meet performance expectations

related to assessment or adjudication of claims or KPI metrics. Plaintiffs' request for disciplinary records should be denied because it implicates privacy concerns that require a heightened relevance standard, which is not met here. "A party seeking discovery of personnel documents must make a compelling showing of relevance due to the privacy interests of the employees involved." *Carlson v. BNSF Ry. Co.*, No. 19-cv-1232 (WMW/DTS), 2021 U.S. Dist. LEXIS 213958, at *18 (D. Minn. May 20, 2021). In *Carlson*, similar to here, plaintiff argued that personnel records were relevant to show that negative performance reviews motivated employees to engage in improper conduct to improve their metrics. 2021 U.S. Dist. LEXIS 213958, at *18-20. The court explained that "rationale [wa]s too remote and speculative to compel production of the personnel records." *Id.* at *19-20. This Court should find the same. *See also Raddatz v. Standard Register Co.*, 177 F.R.D. 446, 447-48 (D. Minn. 1997) ("[T]he very act of disclosing an employee's sensitive and personal data is a highly, and frequently, an unnecessarily intrusive act—whether or not that disclosure is governed by the terms of a Confidentiality Order.").

Beyond the intrusive nature of their request, Plaintiffs' request is burdensome and not proportional. Plaintiffs seek documents going back to 2017, two years before naviHealth even began providing utilization and care management services for UHC Medicare Advantage plans. There is no central repository housing personnel records that would be susceptible to a key word search. Declaration of Jule Karger ("Karger Decl.") ¶ 4. Personnel records for naviHealth employees are saved in at least three separate database systems. *Id.* Determining whether disciplinary records exist, each individual personnel file,

for all former and current employees, would need to be individually examined. *Id.* That wholesale examination would be unduly burdensome. naviHealth currently has 2,300 clinicians. Druga Decl. ¶ 14; Karger Decl. ¶ 8. The number of former employees going back to 2017 is unknown. This manual search may not locate records even if disciplinary action occurred. Manager notes are not part of personnel records. Karger Decl. ¶ 5. Accordingly, discussion of the rationale for an employee's termination, and records of informal reprimands, may or may not be included in a given personnel record. *Id.* Requiring Defendants to identify and pull thousands of personnel files where the information may not even be contained would be burdensome and likely a futile effort. Plaintiffs' motion to compel documents responsive to Request for Production No. 17 should be denied.

As to Request for Production No. 16, Plaintiffs seek documents regarding how Defendants "evaluate the performance of naviHealth employees (including performance reviews), set performance expectations for naviHealth employees (including bonus compensation)," and "use of key performance indicators ('KPIs') or other metrics (including length of stay metrics) to evaluate employees." Defendants agreed to produce any performance criteria naviHealth used in evaluating the performance of Medical Directors involved in making continuing coverage decisions for treatment in SNFs from July 1, 2019 to the present. ECF 146-3 at 27 (Am. Resp. at 26). Defendants further agreed to produce documents sufficient to show that compensation for Medical Directors was not based on the number or percentage of requests approved or denied. ECF 146-15 at 15.

Plaintiffs claim that Defendants' response is deficient because it excludes (1) documents regarding performance metrics for care coordinators; and (2) documents

relating to Medical Directors involved in reviewing medical necessity determinations for IRFs and LTACs. Plaintiffs' claim lacks merit. Care coordinators do not make adverse medical necessity coverage determinations. Only Medical Directors do. There is no reasonable basis to conclude that identifying performance metrics for care coordinators would or could evince that Medical Directors relied on nH Predict to make adverse medical necessity coverage determinations. Similarly, documents relating to IRFs and LTACs are irrelevant because nH Predict is not used in connection with those facilities. *See supra* § V.C.

Plaintiffs' broad requests for highly sensitive documents regarding naviHealth employee performance and disciplinary records should be denied.

### H. Plaintiffs Seek Irrelevant Discovery Related to Defendants' "AI Review Board"

Request for Production No. 19 and Interrogatory No. 12 seek "all documents and communications" concerning any review by UnitedHealth Group's AI Review Board of nH Predict, "as well as any reports, presentations, analyses, findings, or recommendations about [Defendants] use of AI generally" and identification of all members of the AI Review Board.

Plaintiffs fail to show that the discovery sought is relevant. Plaintiffs do not contend the discovery sought relates to proving a breach of contract. Plaintiffs instead contend that "internal audits or reviews of naviHealth," and Defendants' "broader policies and practices about the use of AI throughout their organization may inform whether Defendants' use of nH Predict was lawful." ECF 145 at 16-17. Plaintiffs also claim that the "identities of the

individuals responsible for internal oversight of Defendants' use of AI" are relevant to "whether Defendants improperly used AI through nH Predict to make medical necessity determinations." *Id.* at 14.

Plaintiffs state no rationale showing how any alleged "use of AI throughout [Defendants'] organization" relates to Plaintiffs' contract claims, which turn on the use of nH Predict. In addition, discovery regarding whether Defendants allegedly violated their own internal policies and procedures regarding AI is not relevant to any claims or defenses in this case. Plaintiffs have no standing to bring a claim premised on a violation or "breach" of an internal policy. *See Dyer v. Northwest Airlines Corps.*, 334 F. Supp. 2d 1196, 1200 (D.N.D. 2004) (dismissing breach of contract claim where plaintiffs failed to demonstrate that they accessed, relied upon, or suffered damages from an alleged breach of defendant's internal policy). Furthermore, Plaintiffs offer no explanation why the documents Defendants have already agreed to produce regarding the use of nH Predict will not provide them full information regarding the purported use of nH Predict and whether such use breached the EOCs.

The Court should deny Plaintiffs' motion to compel responses to Request for Production No. 19 and Interrogatory 12.

## I.   Defendants Responded to Interrogatory Nos. 3 and 4 and No Further Answer Should Be Compelled

Interrogatory No. 3 asks Defendants to identify all employees "involved in decisions to issue NOMNCs" over an eight-year period. Interrogatory No. 4 asks Defendants to

identify all employees responsible for training Medical Directors and care coordinators over an eight-year period. Defendants identified relevant individuals in response to each.

Defendants objected to Interrogatory No. 4 because it sought information regarding all "Employees" who were responsible for training naviHealth Medical Directors and care coordinators over an eight-year period, and is not limited to training related to nH Predict, or even review and coverage determinations regarding SNFs (the only facility where nH Predict was used). Despite the overbreadth, Defendants identified nine individuals involved in and/or responsible for training naviHealth Medical Directors and care coordinators regarding continued stay reviews for SNFs from July 1, 2019 to the present. Plaintiffs complain this is not sufficient and seek to compel identification of individuals that were responsible for this training *before* naviHealth provided services to UHC Medicare Advantage members, and those responsible for training individuals involved in reviews of coverage determinations for IRFs and LTACs. As discussed above, this information is neither relevant nor proportional to Plaintiffs' claims because nH Predict was not used prior to July 1, 2019 for the putative class, nor was it used in connection with IRFs or LTACs.

Interrogatory No. 3 is similarly objectionable because it seeks information from before July 2019. Defendants also objected that the phrase "involved in decisions" was ambiguous. Defendants interpreted "involved in decisions" to mean the individuals making the decisions to issue a NOMNC and further answered that: naviHealth's Medical Directors make the decisions to issue a NOMNC.

41

Plaintiffs now seek identification of all Medical Directors and care coordinators over an eight-year period for all post-acute care claims. NOMNCs are not issued in connection with coverage determinations for IRFs and LTACs, so Plaintiffs' request for these facilities seeks non-responsive information.

Even as to SNF claims, Plaintiffs' request would require identification of thousands of both current and former employees. Plaintiffs' only argument is that they need the identities of these individuals to identify potential deponents. ECF 145 at 17. But, Plaintiffs have information to identify potential deponents: they know the names of the Medical Directors who reviewed their claims (as well as other members of the putative class), and, more importantly, Defendants have identified nine individuals involved in training naviHealth Medical Directors and care coordinators regarding continued stay reviews for SNFs from July 1, 2019 to present. Plaintiffs also can identify additional potential deponents from the thousands of documents Defendants are producing (including emails and other custodial documents). In addition, during the conferral process, to address Plaintiffs' concerns regarding Interrogatory No. 3 (and other requests not at issue in this motion), Defendants proposed producing records for a statistically significant valid random sample of putative class members, which would identify additional Medical Directors and care coordinators. Plaintiffs never responded to Defendants' proposal. Defendants' proposal would impose a proportional burden, while still providing Plaintiffs with sufficient discovery. There is no valid reason to require identification of thousands of both current and former employees. Plaintiffs allege systematic, not sporadic, use of nH Predict. Thus, there is no reason Plaintiffs need the identity of *all* Medical Directors and care

42

coordinators. Moreover, because care coordinators do not make the determination to issue NOMNCs, identifying all care coordinators is neither relevant nor proportional to determining whether nH Predict made coverage determinations instead of physicians.

Plaintiffs' motion to compel further answers to Interrogatory Nos. 3 and 4 should be denied.[9]

## VI.    CONCLUSION

For the above reasons, the Court should deny Plaintiffs' Motion to Compel in its entirety.


Dated: February 4, 2026                     DORSEY & WHITNEY LLP


                                            By  /s/Michelle S. Grant
                                                Nicole Engisch (#0215284)
                                                engisch.nicole@dorsey.com
                                                Michelle S. Grant (#0311170)
                                                grant.michelle@dorsey.com
                                                Shannon L. Bjorklund (#0389932)
                                                bjorklund.shannon@dorsey.com
                                            50 South Sixth Street, Suite 1500
                                            Minneapolis, MN 55402
                                            Telephone:  (612) 340-2600
                                            Facsimile:  (612) 340-2868

                                            Nicholas J. Pappas (*pro hac vice*)
                                            pappas.nicholas@dorsey.com
                                            DORSEY & WHITNEY LLP

---

[9] As to Plaintiffs' argument regarding Defendants' privilege objections, Defendants are not relying on "abstract" privilege objections to withhold documents. Defendants have been diligently working on reviewing custodial documents and recently began rolling productions of those documents. Defendants will comply with their obligations to produce privilege logs and redacted documents in the course of completing the review and production of custodial documents.

51 West 52nd Street
New York, NY 10019-6119
Telephone:  (212) 415-9387

*Attorneys for Defendants*